UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NXP B.V.,

    Plaintiff,

v.                                                        Case No.  6:12-cv-498-Orl-22TBS

RESEARCH IN MOTION, LTD. and
RESEARCH IN MOTION, CORP.,

    Defendants.
_____/

ORDER

Defendants, Research in Motion, Ltd. and Research in Motion Corporation (collectively "RIM") move to disqualify Plaintiff, NXP B.V.'s ("NXP") expert witness, Dr. Donald Alpert, Ph.D.  (Doc. 84).  NXP opposes the motion.  (Doc. 87).  The Court has read the parties motion papers and heard oral argument of counsel on March 5, 2013.  For the following reasons, the motion is due to be denied.

I. Background

NXP is a Dutch technology company that was spun out of electronics conglomerate, Royal Philips.  (Doc. 66 at 6).  RIM is comprised of the corporate entities behind the Blackberry brand of smartphones and tablets. (Doc. 63 at 3).  On April 2, 2012, NXP filed suit against RIM in this Court, alleging that RIM created and marketed various smartphones and tablet computers that infringe six patents owned by NXP.[1]  (Doc. 1).  RIM maintains that "[t]he vast majority, if not all, of the specific

---

[1] See U.S. Patent Nos. 7,330,455 ("the '455 patent"), 6,434,654 ("the '654 patent"), 6,501,420 ("the '420 patent"), 5,597,668 ("the '668 patent"), 5,639,697 ("the '697 patent"), and 5,763,955 ("the '955 patent").

components that NXP accuses of infringing are not designed or manufactured by RIM" and instead are purchased from third-party suppliers before their integration into RIM's devices. (Doc. 63 at 3-4).

RIM bases the motion on Dr. Alpert's service as an expert witness on its behalf in Saxon Innovations, LLC v. Nokia Corp., et al., Civ. No. 6:07-cv-490-LED (E.D. Tex.) ("Saxon"). The plaintiff in Saxon filed a Complaint for Patent Infringement against RIM and thirteen other defendants. (Doc. 84-4). RIM engaged attorney, Peter J. Chassman, then with the law firm of Howrey LLP as lead counsel in the Saxon case. (Doc. 85 ¶ 4). Howrey retained Dr. Alpert to serve as an expert witness. (Id. ¶ 6). Dr. Alpert's engagement letter with Howrey provided that he would consult the firm on behalf of RIM concerning certain patents. (Doc. 85-1). Although he was employed by Howrey, his invoices for services rendered were sent to RIM. (Id. at 2-3). It was Mr.Chassman's general practice to discuss his cases with the relevant experts in a manner in which the client's confidential information and litigation strategies were disclosed. (Doc. 85 ¶ 10). Although Mr. Chassman has no specific recollection of his discussions with Dr. Alpert, he has "no reason to believe that [he] deviated from that [standard] practice with respect to Dr. Alpert in the Saxon case." (Id.).

RIM and Howrey anticipated that Dr. Alpert would receive proprietary and confidential information from RIM, other parties, and third parties in the Saxon case. (Id. ¶¶ 11,13; Doc. 85-1 at 3). Dr. Alpert did receive "RIM Source Code" files and other exhibits relevant to his review of United States Patent No. 5,771,394 and he issued a report of his expert opinion regarding the invalidity of that patent. (Doc. 85

-2-

¶¶ 7, 13-14). Dr. Alpert promised to maintain in confidence, all of the information given to him and all of his discussions with the attorneys at Howrey. (Doc. 85-1 at 3-4). He also promised not to consult as an expert, any adverse parties during the Saxon litigation without Howrey or RIM's prior approval. (Id. at 3).

The Saxon court entered an Amended Protective Order which provided that retained experts who were given access to source code had to "agree in writing not to perform software development work directly or indirectly intended for commercial purposes relating to wireless encryption and microprocessor technology for a period of one year after the issuance of a final, non-appealable decision resolving all issues in the case." (Doc. 87-3 at 10). The Court dismissed the Saxon case with prejudice on October 20, 2009. (Doc. 84-5).

## II. Legal Standards

It is well established that "a court has the inherent authority to disqualify expert witnesses who have conflicts of interest." Goldman v. Bracewell & Patterson, LLP, No. 6:04-cv-725-Orl-18JGG, 2005 WL 5960357, at *1 (M.D. Fla. May 9, 2005); see Koch Refining Co. v. Boudreaux MV, 85 F.3d 1178, 1181 (5th Cir. 1996) ("Federal courts have the inherent power to disqualify experts, although cases that grant disqualification are rare[.]") (internal citations omitted); see also Hewlett-Packard Co. V. EMC Corp., 330 F. Supp. 2d 1087, 1092 (N.D. Cal. Aug. 10, 2004) ("Federal courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversary process, protect privileges that otherwise may be breached, and promote public confidence in the legal system."). "[D]isqualification is a drastic measure that

courts should impose only hesitantly, reluctantly, and rarely." Hewlett-Packard, 330 F. Supp. 2d at 1092.

In determining whether to disqualify a potential expert, the court should consider the following factors: "[1.] whether the other party had a confidential relationship with the expert, [2.] whether it was objectively reasonabl[e] for the other party to believe such a relationship existed, and [3.] whether the other party disclosed confidential information to the expert." Goldman, 2005 WL 5960357, at *1 (citing Wyatt v. Hanan, 871 F. Supp. 415, 419 (M.D. Ala. 1994)). "The party seeking disqualification of an expert bears the burden of proof on confidentiality." Id.; Koch, 85 F.3d at 1181.

Courts have found that a confidential relationship existed between an adverse party and an expert when "the record supports a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the retaining party's] modus operandi, patterns of operations, decision-making process, and the like." Koch, 85 F.3d at 1182; see also Hewlett-Packard, 330 F. Supp. 2d at 1093. Depending on the type of relationship that existed, disqualification "may not be warranted even if the expert witness has signed a confidentiality agreement with the adversary." Hewlett-Packard, 330 F. Supp. 2d at 1094.

Courts have determined that "[c]onfidential information essentially is information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege.'" Hewlett-Packard, 330 F. Supp. 2d at 1094; see Rhodes v. E.I. Du Pont De Nemours

and Co., 558 F. Supp 2d 660, 667 (S.D.W.Va. 2008).  The phrase "confidential information" includes "discussion of the [retaining party's] strategies in the litigation, the kinds of experts [the party] expected to retain, [the party's] views of the strengths and weaknesses of each side, the role of each of the [party's] witnesses to be hired, and anticipated defenses." Koch, 85 F.3d at 1182.  Technical information is not confidential. Koch, 85 F.3d at 1182; see Hewlett-Packard, 330 F. Supp. 2d at 1094.

Courts must also consider policy objectives when determining whether an expert should be disqualified, namely, whether disqualification would prevent conflicts of interest and maintain the integrity of the judicial process.  Koch, 85 F.3d at 1182

### III. Analysis

As an initial matter, this is not a case in which Dr. Alpert is accused of having switched sides in the litigation.

The Court finds that RIM has satisfied the first two Goldman factors. The record demonstrates that a confidential relationship existed between RIM and Dr. Alpert during the pendency of the Saxon case.  Although Dr. Alpert was employed by Howrey as an expert in the Saxon case, his invoices for services rendered were sent to RIM, and his engagement letter with Howrey provided that he would consult Howrey on behalf of RIM concerning certain patents.  Therefore, it was objectively reasonable for RIM to believe it had a confidential relationship with Dr. Alpert.

Regarding the third Goldman factor (the inquiry into the nature of information disclosed to Dr. Alpert), the Court finds that RIM disclosed confidential, but not privileged information (attorney-client or work product) to Dr. Alpert in the Saxon

litigation. The information RIM disclosed was technical and, depending upon the claims and defenses of the parties, discoverable. It did not involve litigation strategy, litigation theories or defenses, the strengths and weaknesses of RIM's position, the role of witnesses or the specialities and identities of experts to be retained. Assuming arguendo that Dr. Alpert was made privy to privileged information, (which was not proven), it would be Mr. Chassman's strategies in and assessments of the Saxon case, which do not have any bearing on this case.

RIM contemplated that Dr. Alpert might become adverse to it in the future and those parties dealt with that possibility in the engagement letter. RIM also accepted the terms of the protective order in the Saxon case all of which are inconsistent with its position in this Court.

Accordingly, upon due consideration, RIM's motion (Doc. 84) is DENIED.[2]

IT IS SO ORDERED.

DONE AND ORDERED in Orlando, Florida, on March 14, 2013.

_____
THOMAS B. SMITH
United States Magistrate Judge

Copies to all Counsel

---

[2] Denying Defendants' request for disqualification does not undermine any policy objectives.

-6-