1

```
UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
                        ORLANDO DIVISION

                     Docket No. 6:12-cv-498

. . . . . . . . . . . . . . .
NXP B.V.                          :
                                  :           Orlando, Florida
          Plaintiff              :           December 13, 2013
                                  :           9:00 a.m.
               v.                 :
                                  :
BLACKBERRY LIMITED and            :
BLACKBERRY CORPORATION            :
                                  :
          Defendants             :
. . . . . . . . . . . . . . .


          TRANSCRIPT OF CLAIMS CONSTRUCTION HEARING
            BEFORE THE HONORABLE ANNE C. CONWAY
               UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Plaintiff:  Denise DeMory
                    Cliff Win


For the Defendant:  Tom Reger
                    Noah Graubart


Court Reporter:     Sandra K. Tremel, RMR/CRR
                    407-245-3110
```

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

```
 1              P R O C E E D I N G S
 2         THE COURT:  Case number 12-CV-498, NXP v.
 3  BlackBerry Limited and BlackBerry Corporation.
 4         Could we have appearances, please.
 5         MR. ZEHNDER:  Good morning, Your Honor.  Tom
 6  Zehnder, King, Blackwell, Zehnder & Wermuth on behalf of
 7  the plaintiff NXP.  With me this morning is lead counsel
 8  Denise De Mory, colleague Cliff Win and Aaron Hand.
 9  Ms. De Mory is going to handle three of the patents, Judge,
10  and Mr. Win, two.
11         And also we have a client representative here,
12  Ethan Andelman, who's the director of IP litigation for
13  NXP.
14         THE COURT:  Good morning.
15         MR. MITCHELL:  Good morning, Your Honor.  Rick
16  Mitchell with Gray Robinson on behalf of the BlackBerry
17  defendants.  And with us here today is Mr. Thomas Reger.
18         MR. REGER:  Good morning, Your Honor.
19         MR. MITCHELL:  And Noah Graubart with Fish &
20  Richardson firm.
21         And also we have Sarah Columbia with the McDermott
22  firm.
23         THE COURT:  I know.
24         MR. MITCHELL:  And our client representative,
25  Mr. Frank Geng.
```

1              THE COURT:  Good morning.

2              MR. GENG:  Good morning, Your Honor.

3              THE COURT:  Okay, who wants to start?  We're going

4     to do only one patent at a time.  We can go to 11:30 and

5     then we can take a -- unless Sandy begs for mercy,

6     depending on how you all perform, we'll go to 11:30, then

7     we'll take a break till 1:00.  I have to go to an

8     investiture this afternoon, so I don't have any flexibility

9     in quitting time, okay?

10              So who wants to go first?  Which patent are you

11    doing?

12              MS. DE MORY:  We're going to start with '455.

13              THE COURT:  Okay.  Just give me a second.  Okay.

14              MS. DE MORY:  And if I may approach, Your Honor, I

15    do have a set of slides for both the Court -- I have two

16    sets of slides for the Court and then one for opposing

17    counsel.

18              THE COURT:  All right.

19              MS. DE MORY:  Good morning, Your Honor.

20              We are here today to talk about claim construction

21    of five different patents.  I'm going to start with the

22    brief introduction to NXP and some claim construction

23    principles and then begin our discussion of the '455

24    patent.

25              THE COURT:  Okay.

1          MS. DE MORY:  So I have a slide here for

2     introductions, but Mr. Zehnder has taken care of that for

3     us so we will move past this.

4          So a little bit about NXP.  NXP is not a household

5     name like some other companies that are -- BlackBerry, for

6     instance, and so a little about NXP.

7          NXP was the semiconductor used for Philips

8     Semiconductor, and so Philips Semiconductor was the

9     semiconductor company that supported Philips Electronics

10    consumer products.  In 2006 NXP became an independent

11    company and the patents were transferred to NXP as part of

12    that spinoff.  So these were patents that were developed at

13    Philips or companies that were acquired by Philips and then

14    became part of NXP as part of the spinoff.

15         THE COURT:  Okay.  Hold on one second.

16              (Pause in the proceedings.)

17         THE COURT:  All right, go ahead.

18         MS. DE MORY:  Sorry about that.  I'm going to get

19    at the same place as you are because I'm having a hard time

20    with my eyes seeing the projector over there.

21         So NXP today is -- it's located in Eindoven in the

22    Netherlands, has over 28,000 employees in 25 countries with

23    annual sales of $4.36 billion in 2012.  They sell a large

24    number of semiconductor devices, but they're focused in

25    certain particular areas.  And some of the big areas for

NXP are automotive, identification, and supporting consumer
electronics.  So your car probably has NXP chips in it,
phones have NXP chips in them, and that's where NXP is
today.

If we slide to the next slide, we can just see the
various product groupings for NXP.  We have automotive,
identification, standard products, and some of the
companies that NXP supports.

NXP has a strong history of innovation dating back
over 50 years as part of Philips Semiconductor.  3,300
employees in R&D today.  And over 11,000 issued in pending
patents of which these five are at issue today.

So let's move to the patents we're going to talk
about today.  We have the '455 patent which is up first.
And we'd like to call these by sort of shorthand names
instead of just the numbers.  And so we call this the WiFi
or 802.11g patent.

We'll also be talking about the '654 patent which
we call the bus or variable bus patent; the '420 patent
which we call basically the GPS power management patent;
and then the two dummy fill patents, '668, '697, which will
be addressed by my colleague Cliff Win, having to do with
the semiconductor processing.

But let's talk about a few of the claim
construction principles that are going to apply across

1    everything we talk about today.

2              As the Court knows, claim construction is a

3    question of law which is why we're here today talking about

4    this in advance of the trial.  And it's basically a way of

5    elaborating on the meaning of the claim terms such that we

6    come to a common understanding of what they mean, and to

7    help the jury, of course, understand what the claims mean.

8              And I think a critical issue is that they need to

9    be resolved only to the extent that there's a dispute.  But

10   if there is a dispute, those claim terms do need to be

11   resolved.  And I think there are several very clear

12   disputes that have crystalized as a result of this process.

13             The claims define the scope of the invention.  And

14   so the claims themselves that are the important part of --

15   the most important part of the claims construction, and we

16   look first to the words of the claims -- to the claims.

17             We give them their ordinary meaning, as one of

18   ordinary skill in the art would understand them at the

19   time.  And I think that's going to be particularly

20   important with regard to '455, and we'll talk about some of

21   the background there, because there is a sort of

22   presumption by its discussion of the standard and things as

23   to, you know, the level of skill in the art and what the

24   underlying information is there.

25             Claim construction stays true to claim language,

is the preferred claim construction and the best, and claim

construction should be ascertained from the intrinsic

evidence.  Claims should be given the broadest reasonable

interpretation and so then they generally should not be

construed so as to be limited to the embodiment.

And I think this an important point that's going

to come up several times today, and it comes from the

*Philips* case which is one of the seminal claim construction

cases.  The Federal Circuit has expressly rejected a

contention that the patent describes only a single

embodiment, the claims must be construed, must be construed

to be limited to that embodiment.

So with that, let's move to the '455 patent.  So

the '455 patent is what we call the '55 patent.  The claim

terms that are under construction here are a first and

second data transmission rule, a first communicant and

second communicant, and then permissible value range.

So let's take a look at the '455 patent.  So if we

start from the beginning of this patent, what is the '455

patent about?  And we start with the title of the patent,

and it says it's a method and communication device for

expanding the range of transmission rates in wireless area

networks.

And I have here included on the slide, and I think

it's important to say, we asked BlackBerry's expert what is

802.11?  And he says 802.11 is the standard that applies to wireless local area networks.  So we're looking at the title itself, and it tells us we are in the area of WiFi and 802.11.

We continue on the rest of the front cover of the patent, and we looked at the '455 patent and it says -- we start with the prior art.  The first piece of prior art that's listed on the 802 -- on the '455 patent is the original 802.11 standard, the 1999 802.11 standard.  So we're looking at this from the perspective of one of ordinary skill in the art.  The first piece of prior art referenced is the 802.11 standard.

The next piece of prior art referenced is a proposal to the working group that ultimately came up with 802.11g with NXP contends this patent covers.  So the way that the standard progresses we'll talk about in a minute.  They progress from basically just what we call the 1999 version of 802.11 up through 802.11g at the time of this patent and then there have been subsequent revisions to that standard.

The patent -- the named inventors are also an important issue here.  We have Gunnar Nitsche, Matthias Hoffman and Volker Aue.  And we can see from some of the evidence and -- of record in the claim construction proceeding, docket 221 in Exhibit 2, which is defendant's

claim construction brief, that Gunnar Nitsche was actually
participating in the standard setting, the 802.11g setting.

So all of this is occurring in the context of
they're working on the 802.11 standard, the prior standards
are admitted prior art, so we're talking about a situation
where we're starting from a standard that's out there.  And
this 802 and the '455 patent is an improvement to that
standard.  The patent itself acknowledges that.

And if we go through, we can go through multiple
places in the specification, and we look again and again
and again, and it's describing this 802.11 standard that
exists and the need to improve on it.  And so if we go to
column 2, lines 5 through 9, it describes that one problem
that prevented wider adoption of WiFi initially was the
lack of a standard.  And then it goes on and says at
column 2, lines 19 through 33, it talks about how wireless
networks have been limited.

And then if we move on to column 2, lines 37
through 48, it actually talks about 802.11g.  And it says,
"At the moment, a further increase in data rate in the
2.4 gigahertz band is being worked on in the 802.11g
working group."  So this is the group in which the
inventors are working.  And so the entire focus of the '455
patent is on an improvement to the 802.11 existing
standards.

1          Now, so just briefly on -- I don't -- I actually

2    don't think, for purposes of this patent, we have to get

3    too deeply into WiFi networks and the technology because

4    we're focused on a very specific improvement which we'll

5    talk about in a minute.

6          But just briefly, I have included a depiction of a

7    basic WiFi network.  It's a wireless network much like is

8    used in the court here, and to which we thankfully got a

9    password at the beginning of the hearing so we can connect,

10   if necessary.  But basically what you have is the wireless

11   network enables us to connect without wires to the Internet

12   today.

13         And it started with the -- the widespread adoption

14   started with this initial adoption of 802.11 and has

15   obviously become very widespread today, including here.

16         So the progression of 802.11 standards are we have

17   the standard that's described in the prior art which is the

18   802.11 1999 standard.  Thereafter 802.11a and -b were

19   worked on in parallel, and those are also described as

20   admitted prior art in the specification of the '455 patent.

21   And then they were working on 802.11g at the time.

22         So that brings us to the issue of what were they

23   working on and what was the focus of the '455 patent.  What

24   is this improvement to the standards?  And that improvement

25   relates to data rates.

1     So when we look at '455, what we see is,

2  throughout the specification starting with the title and

3  the background of the invention and the focus of the

4  invention, everywhere we're talking about this patent

5  relates to data rates.  It is sort of the pool in which the

6  patent is swimming.  It's the data that's about the

7  improvement that we're focusing on.

8     So we have -- start with the title again.  And we

9  say that the title is "A Method and Communication Device

10  for Expanding the Range of Data Transmission Rates."  So

11  the goal is expand the range of data transmission rates.

12  We again look at the prior art.  And the proposal that's

13  cited is -- and I took the proposal to the group to --

14  related to the extended support agreement element.

15     We go to the field of the invention, and I think

16  that this is important here to pause on this because I

17  think this is going to be a contrast to '654 which we will

18  probably address next, but...

19     So we have the field of the invention here, and it

20  says here, the field of the invention is -- the invention

21  in particular relates to the methods for increasing data

22  transmission rates.  So that's the field in which we're

23  looking, increasing data transmission rates, as opposed to

24  '654 which we'll talk about, which the field is buses or

25  variable-width buses.  And what we're arguing about that is

whether or not a particular implementation described in the
specification and the preferred embodiment should be
important.  Here in the patent that's the '455, what we
have is the field of the invention is expanding data rates.

So as I've already said, it relates to the
progression of 802.11 standards.  As I said, what's the
disadvantage we're trying to address in the '455?  The
disadvantage we're trying to address is that wireless
networks did not allow for high data transmission rates and
that there was this limitation --

If we would actually skip ahead to 531.

And there's this limation in the a/b, so the
admitted prior art and the 1999 and a/b standards, that you
could only have eight data rates.  So the important work of
802.11g one issue was how do we get beyond eight data
rates.

And so there was another important issue, though,
which is that whatever we do in 802.11g, it has to be
backward compatible, so that if I now have an 802.11g
device and I come here, it will still work with an "a" or a
"b" network.  So those were -- that's the problem that the
inventors were trying to solve:  I want to have more data
rates, but I need it to still work in the old context.

And there's some historical perspective on this,
if you go to the standard, is because there was already a

1    situation where something wasn't backwards compatible, so

2    the inventors were trying to solve that problem.

3         And it says right here in -- if we look at

4    column 2, line 50 through 61, it says the 802.11g provides

5    for more than eight data rates, but interoperably tests

6    have shown that when more than eight data rates are

7    notified in the conventional element, backward

8    compatibility with existing solutions is no longer

9    guaranteed, and consideration is now being given on how to

10   improve this.  So this is the issue.  We tried to deal with

11   more than eight rates, interoperability tests have

12   determined that it's not going to be backwards compatible

13   so how do we resolve it?

14        So let's go on to how does the '455 patent teach

15   achieving these goals.

16        So, first, one thing that's important to

17   understand is how was rate information communicated in the

18   original standard.  And so for that we look at all versions

19   of the standard including 802.11g have something called an

20   information element, and it's basically just the package in

21   which certain information is delivered to either a phone or

22   a laptop.  It's the means by which we agree on standardized

23   format so that we can communicate with each other.

24        And figure 1 of the patent depicts that format.

25   And it has multiple parts.  It has 14, which is the

identification part; 15, which is the length; and 16, which
is actually the information that you're trying to
communicate.  So in this case, 16 would include the rate.
That's what we're trying to communicate, how fast can you
talk.  And so that's depicted here and described at
column 6, lines 20 through 25.

        And so the patent says there's a first data
transmission rule.  That first data transmission rule is
the prior art rule.  It's the rule that had the eight
rates.  So it had an information ID, it had a length part,
and it had eight rates in it.

        And there's a little dispute about this.  It's as
described in the specification, the versions only allowed
for eight rates.  Each one only had one element that
included the rate information.  And for that number 14, the
information part, the number was identified as number 1 in
the specification, the 1999, the "a" and the "b."  So that
number 1 identified the rates.  So the information ID of 1
identified the rates.

        And that's in the file history of the patent.

        If we turn to slide number 38.

        It's joint exhibit -- the joint appendix
Exhibit 6, document 206-12 at page ID 7251.  And we see
that this is actually the element IDs from the 802.11 prior
art standards, and it has supported rates which are

identified as information element 1.

And so what happens is that the --

Please move to slide 40.

So in the claim it says, okay, so in addition to this first data transmission rule, what I'm going to do is I'm going to have a second data transmission rule, and it's going to give me this additional space that I need to put in more than eight rates.

And that second data transmission rule is -- and we'll look at 802.11g -- is ultimately decided to be extended supportive rates element 50. It's not -- you know, that's -- that's the way it turns out. It could have been, you know, a different number, but -- so basically the patent says I -- that we have one. That's not enough. We need a second one that has the same kind of parameter in it that has the rates in it. So this is how I expand the amount of space I'm going to get to include rates.

Now, how is it backward compatible? It's backward compatible because the standard has built into it a feature that it will just skip over an ID it doesn't recognize. So if it's an old device and it gets to this second data transmission rule that has an ID that it doesn't recognize, it just skips over it.

So that means we can be backward compatible because all devices are going to have, if it's a

"g" device, it's going to have the rate before it, it's
going to have the slower rates as well.  And so if it's a
slow device, it just skips over the information element
that has the fast rates or the other rates.

And if we look at that, you know, if we go back
actually to slide number 38, and we look at the IDs, we see
that there was a limited list of IDs that were permitted or
recognized.  There was element ID.  In the original
standards before "g," there was 0, 1, 2, 3, 4, 5, 6, and
then 7 through 15 were reserved, they had no meaning, 16
had a meaning.  31 through -- 17 through 31 were reserved
for challenge text extension.  And then 32 to 55 were --
were reserved for something else, which one of them ended
up being element ID 50, which had the extended rates
element.

So in the standard was this concept that if it
wasn't defined, if it wasn't permitted, if it wasn't one of
the rates that was prespecified, that you would just skip
over it.  So an old device knows to recognize the element
IDs in table 20, and it skips over anything else.  So they
added the second data transmission rule which enabled you
to have more rates and to be backward compatible because
devices it didn't recognize that ID would skip over it.

So that's the context of the claim.  And so with
that context, we go to the exemplary embodiment --

1          THE COURT:  Well, wait, let's go back a minute.
2    If it skips over it, how does it recognize the second
3    transmission rule?  Or how does --
4          MS. DE MORY:  It won't.
5          THE COURT:  -- it react?
6          MS. DE MORY:  It won't.
7          THE COURT:  It doesn't.
8          MS. DE MORY:  It ignores it.  So I'm an
9    "a" device, and this -- let's say the network in the
10   courtroom is a "g" network, and I bring my old phone into
11   here that only works at the slower speeds.  Your -- your --
12   your network is going to be telling my phone I can -- it's
13   going to be sending my phone 1 and 50 all the time.  My
14   phone's just going to ignore 50, it's going to pick one of
15   the rates in 1 and ignore 50.
16         THE COURT:  So it just goes on as if 50 didn't
17   exist.
18         MS. DE MORY:  Exactly.
19         THE COURT:  But if you had a newer phone, it would
20   recognize 50 and accept the information 50 was giving.
21         MS. DE MORY:  Absolutely.
22         THE COURT:  Okay.  Go ahead.
23         MS. DE MORY:  Okay.
24         So this -- the exemplary embodiment.  So that's --
25   so that's claim 13, you know, that's how it works.  It says

add a second one, give it a new permitted, define a new
rate element, and tell me that that's something I'm going
to recognize, and that's the gist of the claim.  It's
pretty simple and just an improvement over the existing
standard.

So then we go to the exemplary embodiment.  And I
think this is important here because BlackBerry makes an
effort to limit claim 13 to the exemplary embodiment.  And
so the exemplary embodiment is described in column 6 of the
patent.  And it says right here that the exemplary
embodiment is not limiting.  If we look at it, it says, "An
exemplary implementation of the invention is described
herein with reference to a critical case, according to the
prior art, of successful data transition between an ERP
access point 1 and a station which is designed to point to
the prior art."

So that's exactly the question that the Court
asked which is this patent is really, you know, it's really
concerned about backward compatibility.  So in the
embodiment described in the specs, it talks about that
critical case where I come into your 802.11g network and I
have an old phone that doesn't recognize "g," or I have an
old laptop, or whatever the case may be, but it doesn't
mean that that's the only scenario because I can also come
into this courthouse with a Gphone and it will recognize my

Gphone.

So I think it's really an important issue that
this is an exemplary embodiment, and it is a critical case
because it is the case that's the backward compatibility
case, and that's why it was included in the exemplary
embodiment.

And so the exemplary embodiment describes a bunch
of different types of communication, because there's
another important issue here which is that it's not just
the case that the Court's wireless network is sending the
information to my phone.  My phone can come in and ask me,
"What are you?  What kind of network are you?"  And it can
sent in advance of -- send out a test signal as described
in the spec saying, "I'm an 'a,'" you know, and it just
sends that information element 1 and then wait and get
something back.

So it's not just the case that the -- it's a
two-way communication where in both cases either the
network can send -- the access point can send its
information elements to the receiving device, or the
receiving device, what we call a station, can actually send
the information elements also to the base station or the
access point.

And it shows three possible communications
scenarios, and we'll talk about it in a minute, but one of

those communication scenarios is exactly what I just said

where the phone is actually is -- or a receiving device, I

call it a phone -- because of this case but it could be

your laptop or anything else, where the receiving device is

actually sending out the information element.

        And so again, this is just -- the second rule

equals the extended rate rule.  And we know this because

when we look in the preferred embodiment, it says an access

point which operates on the basis of the second rule is an

extended rate access point.  So we already talked about

that.

        So let's -- so now we're looking at the context of

claim 13.

        Slide number 48, please.

        So in claim 13 you see the terms that we're going

to be construing, the first communicant and the second

communicant, the first data transmission rule and the

second data transmission rule and the permissible value

range.

        So the first issue is the first data transmission

rule.  Now, NXP says that these are encoded parameters

related to the data transmission rates.  It is essentially

in the context of actual standards.  It is the rule that

corresponds to information element 1, and what ultimately

became "g," which wasn't in existence at the time of patent

information element ID 50.  But it's sort of -- there's

just two different rules relating to rates.  And so for us,

the data transmission rules are the encoded parameters

related to the data transmission rates, and BlackBerry's

proposed construction is plain and customary meaning.

So it's our position that NXP proposed

construction should be adopted.  The title of the patent

relates to data rates.  The field of the invention is data

rates.  The cited prior art deals with data rates.  The

entire background of the invention is focused on data

rates.  The summary of the invention is -- describes data

rates, and the detailed description is focused on data

rates.

And the problem that's trying to be solved is to

be able to have additional data rates and still be backward

compatible.  So from NXP's perspective, the claim

construction is straightforward, and this is what the

patent is about, and that's the proper construction.

BlackBerry's primary response to this is claim

differentiation, and they look at the relationship between

claims 1 and 5, and they say, "Wait, claim 5 says 'rates,'

and so therefore there must be this claim differentiation,

it must not be that claim 1 is limited to rates."

Now I know that's not claim 13, but if we were

construing claim 1, then NXP's position would be the same,

1   it's this patent is related to data rate.  Those rules

2   relate to rates.

3           And so in the context of claim 5, though, if we

4   look at claim 5, this claim differentiation theory, it

5   doesn't work.  Because if claim 5 presumes that the first

6   data transmission rule is rates, it just adds some

7   additional detail about the kind of rates that are in the

8   second data transmission rule.  So if we look at it, it

9   says, "The method of claim 1 wherein the values in the

10  information part of the second information elements

11  represent a stated data transmission rates which are

12  supported by the transmitting communicant in such a way

13  that each value corresponds to one supported data

14  transmission rate."

15          So it's saying for these rates that are in this

16  rule, make sure that they have a one-to-one correspondence.

17  So in other words, you could put in some code that would

18  suggest multiple rates.  I mean, you could encode these

19  things in different ways.  And so this is saying for this

20  particular way of encoding the rates, make sure that

21  there's a one-to-one correspondence between what's in the

22  information part and an actual rate.  And so it's not --

23  you know, the claim differentiation argument doesn't work

24  as it presumes that there are rates there.

25          So -- and so this is not a question of the present

invention or limiting it to a preferred embodiment or, you
know, any of those kinds of things which we're going to
hear about later.  This is really a question of what is the
context.  And I think the clearest thing is the field of
the invention and the problem that's trying to be solved.
The context that we're talking about, data rates, we're
talking about this improvement to prior art standards, and
that is the context.

So we can move from the first data transmission
rules to a first and second communicant.  So we say here
that, plain and ordinary meaning, that it's just the first
communicant and second communicant.  The first communicant
could be the access point, or it could be the station.  And
the second communicant could be the access point or the
station.  It's two things that are talking to each other
essentially.

THE COURT:  So it doesn't matter which is first,
the access -- or the access point or the station?

MS. DE MORY:  It doesn't matter which is first and
which is second.

THE COURT:  So an access point can be either first
communicant or the second communicant.

MS. DE MORY:  It can.  It can.

THE COURT:  Is that in dispute?

MS. DE MORY:  It is.

1    THE COURT:  BlackBerry disagrees with that

2  statement?

3    MS. DE MORY:  BlackBerry disagrees.  They say that

4  the first communicant must be the access point and the

5  second communicant must be the station.

6    So there's nothing in the claim itself that

7  requires the first communicant and the second communicant

8  to be the access point of the station for this

9  correspondence.  And, you know, there's this discussion

10  about whether or not the preamble is limiting.  And it's

11  NXP's position that whether or not the preamble is limiting

12  or not, it doesn't change this dynamic of whether the first

13  communicant has to be the access point and the second

14  communicant has to be the station.

15    It basically depends on BlackBerry -- the argument

16  depends on the station having to have the first rule and

17  the access point having to have the second rule.  Now, that

18  is that critical case that we talked about from the

19  preferred embodiment, but that's not the only thing that's

20  described in this specification.  It's described as it

21  being able to be either way.

22    And so if we look at the specification at

23  column 4, lines 41 through 58, we see expressly the second

24  communicant can likewise operate using the second data

25  transmission rule.  It says, "If the second communicant can

likewise operate using the second data transmission rule
and could be set to the appropriate operating mode."

So if you have a Gphone and you come -- it can
work in the second mode.  And that's what the
specifications says.  So it's not the case that the access
point has both and the station is only the prior art.  That
is the critical case in preferred embodiment, but the
claims are not limited to that.

The second thing is that even if -- there's this
notion in the preamble, which BlackBerry, I'm sure, will
talk about, that says the first communicant is transmitting
to the second communicant.  So basically the first
communicant sends the rules to the second communicant.

So this goes back to the point we just talked
about a minute ago.  And so they say because it's
transmitting the rules, then the first communicant must be
the access point and the second communicant must be the
station.

But even in the preferred embodiment, that is --
that is contradicted by the preferred embodiment.  If we
look at column 6, lines 34 through 36 on slide 57, it says
in the data transmission test procedure, the station uses a
test request which contains the element identification
part 14 to request the access point to identify itself.

So the fact that the claim says there's this

transmission of the rules from the first to the second, you
know, the first, the -- the -- I'm sorry -- the first
communicant to the second communicant doesn't mean that
it's the access point sending the rules.  Because even in
the preferred embodiment, the station can send the rules.

So if you have a station -- now in the preferred
embodiment, the station is -- can only send one rule, but
the spec clearly says the station can be -- send both.  So
if you have a situation where you have a station that's a
"g," regardless of whether or not the access point is a
"g," the station can send both rules, and the access point
will either recognize both or will only recognize one.  And
so there's nothing in the claim that it should be first and
second or second and first access point or station.

And then the final thing is the permissible value
range.  And so this is one where this came up late in the
process.  It's one that sort of surprised us, but it wasn't
something that the parties had on their list of claim terms
in the initial discussion.  But in the context of
BlackBerry's expert reports, and again when the Court gets
to summary judgment, you'll see it there as well, there is
this -- clearly this issue about the meaning of permissible
value range.

And so it's NXP's position in a nutshell that
permissible value range are the permitted values in the

standard.  They are the values that have meaning.  So if we looked at that table 20 that we go back to, those are the permitted values.  And "a" or "b" or prior art device can operate with those permitted values, that's what the standard says.

And it's saying we're going to expand the permissible value range so that now we can have more permitted values.  So the way that we could add the second rule was we could go ahead and say, now we have another permitted value, it happens to be 50, we have additional permitted value of 50 and so we've now expanded the permissible value range.

So that's -- so that's sort of -- that's -- that's our construction of the term and it's pretty clear in the context of the patent itself.

So there's the first issue of, you know, what does it mean, permitted value range, and we say "permitted" means specified.  It's a -- you know, it's not just some number that's out there.

And then the second thing is whether or not the range can be just one or two values.  And this one, I think the claim language itself is as clear.  It says in the claim itself that the claim -- it says "expands to include a second value."  The range expands to include a second value.  That means that the range was a first value.

1          So in order to expand to include a second value,

2    the range must have initially been one and it expanded to

3    two.  So the issue on permissible value range is what is

4    permissible.  We say it's specified in the standard.  It's

5    a value that's permitted.  And, two, that the range, the

6    permissible value range, can expand from one to two because

7    the claim itself says "expands to include a second value."

8          And that is '455.  With that, I'll pass to

9    BlackBerry.  Thank you.

10          MR. REGER:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. REGER:  I believe you already have a hard copy

13    of our presentation.

14          THE COURT:  Yes.

15          MR. REGER:  May it please the Court.

16          Your Honor, in the interest of time, I'm going to

17    go ahead and start with slide 10.  I believe the parties

18    are generally in agreement on the law with respect to claim

19    construction.  The law's purpose is to properly identify

20    the invention that the inventors came up with.  And because

21    patents identify a patent monopoly right, we must trust

22    that the inventors carefully chose their words.  And the

23    public is entitled to rely on the words chosen by the

24    inventor in the claims as well as in the patent

25    specifications.

1          Turning first to the patents in suit generally.

2     There are five patents that NXP currently accuses

3     BlackBerry of, and they generally involve five technology

4     areas.  You have wireless networking, you have GPS, you

5     have computer buses, you have semiconductor masks, and

6     semiconductor fabrication.

7          But it's important to understand, Your Honor, that

8     NXP invented none of those things.  Wireless networking has

9     been around for decades.  GPS has been around since the

10    1970s.  Computer buses likewise have been around for

11    decades.  Rather each of these patents represents a narrow

12    advancement of the relevant technology.

13         With respect to the wireless patent, which we're

14    going to get to in just a moment, that patent acknowledges

15    that wireless network has been around for many decades.  In

16    fact, when we turn to that, you'll notice that the

17    standards have been around for years before the patent was

18    filed.

19         So turning first to the '455 patent.  As NXP noted

20    and as Your Honor I'm sure understands, the '455 patent

21    generally involves wireless networks.  It's important to

22    listen to NXP's argument because they indicated that the

23    legal standard is that you are not supposed to limit the

24    claims to embodiment.  That's the legal standard they

25    propose.  But out of the gate, the very first thing they

asked the Court to do was eliminate the claims of preferred
embodiment.

And they're arguing both sides of an issue.
They're arguing that BlackBerry supposedly is wrong for
trying to use preferred embodiment, but then they ask the
Court to adopt the preferred embodiment for their
particular claim limations.  So we'll address that in turn,
Your Honor.

Now, NXP is going to argue that the patent is all
about backwards compatibility that, not surprisingly, is
represented in the critical case.  It's represented in the
idea that an access point can be 802.11b or 802.11g, for
example, and communicate with older 802.11b devices,
according to the detailed description.

I'd like to turn first to the asserted claim.  The
independent asserted claim 13 is the only independent claim
asserted here.  Now the two terms offered from BlackBerry
for construction are found in the preamble.  They're the
only two terms that are in dispute that have been defined
by the inventors.  The other terms found in the body of the
claim are authored by NXP.

BlackBerry is offering these constructions because
we -- again, you're entitled to trust the inventors that
they chose their words carefully, that they knew what they
were doing when they added these words.

1    As to background, once again, Your Honor, wireless

2  networking has been around for decades.  In 1997, the

3  standard-setting organization called the IEEE, which has

4  over 420,000 members from many different companies,

5  released the first standard in 1997.  They formed a

6  committee that went out, reviewed this current state of

7  wireless networking, and they released a published

8  standard.  That committee was named 802.11.

9    In 1997 they released the standard.  They very

10  cleverly named the standard 802.11 1997.  Two years later,

11  they released a more mature version of the standard 802.11

12  1999.  In the same year they released two supplements to

13  that standard, 802.11a and b, also '99.

14    And we see this history recounted in the

15  background of the '455 patent.  The '455 patent

16  acknowledges that these standards existed before the

17  patent.

18    According to the '455 patent, the key addition of

19  802.11g was faster data rates.  This would allow the two

20  devices on the wireless network to talk faster to one

21  another, they would communicate data more and more quickly.

22  And we also see that it references backwards compatibility

23  of the 802.11b standard.  It recognizes that 802.11g is

24  already in development.

25    What I would like to mention, Your Honor, is what

the '455 patent is not about.  It's very important to understand that the '455 patent has nothing to do with the engines, the technology that characterizes faster data rates.  That was not invented in the '455 patent.  I asked NXP's technical expert, Mr. Joel Williams, what is the technology in 802.11g that allows for faster data rates? He said it's OFDM.  OFDM is a orthogonal frequency-division multiplexing.

And quite frankly, Your Honor, it's the last time I'm going to say that because it's not important to this case, it's not important to this patent.

I asked Mr. Joel Williams if OFDM is technology that drives faster data rates isn't referenced in the '455 patent.  He said, "You know, I don't think it is."  But regardless, it's not part of the claims.

We agree with it.  And just for the bow in it, Your Honor, I double-checked.  I looked at the '455 patent. It does not reference OFDM.  The technology -- again, so what allows the faster data rate if 802.11g, what allows devices to talk faster and faster has nothing to do with this patent.

So let's talk about what the patent is about. This context, it brings us to the disputed claims.  Again, BlackBerry offers first and second communicant, and NXP data transmission rule both first and second, and NXP

1    offers permissible value range.

2          I'd like to talk about the two terms BlackBerry

3    offered, "first communicant" and "second communicant."

4    These are the only terms in the claim that are defined by

5    the inventors.  So let's take a look at that.  They're

6    found in the preamble.  It says a communication device for

7    data transmission in wireless networks.  The communication

8    device is figured to connect in the first communicant to a

9    second communicant via electromagnetic path signals.

10         Let's first address whether or not the preamble's

11   limiting.  That's not something we can bypass.  NXP didn't

12   really dispute it, but they didn't adopt -- they didn't

13   accept the preamble.  So in the interest of ensuring that

14   this issue is joined and before the Court, the Federal

15   Circuit has laid out a number of guidelines, a number of

16   tests to determine whether or not the preamble, an opening

17   paragraph of a claim, is limiting.

18         You ask yourself, is the preamble -- does it

19   define the subject matter of the claims?  Does the preamble

20   provide antecedent basis for a claim limitation?  Does the

21   preamble recite additional structure?  Each of those

22   questions is "yes."  The answer to each of those questions

23   is "yes."  Does the preamble, claim 13, define subject

24   matter.

25         NXP does not dispute that in their marketing

response briefing. They say the preamble provides context
for the claim. The patent addresses wireless networks.
Does the preamble provide antecedent basis?

Now, antecedent basis will come up in just a
moment with respect to the data rates question. The
antecedent basis, Your Honor, I'm sure you're aware, is
where you first introduce a feature to a claimed invention.
You introduce it using "a" or "an." So I'm in a car, I add
"a" steering wheel. And that allows me to every time I
refer to the steering wheel later in the claim, to say
"the" steering wheel. That's antecedent basis. So if I
later on in the claim say "a" steering wheel, then that
means you're allowed to infer that there are two steering
wheels, otherwise I would have said "the" steering wheel.

Here we have in the body of the claim the
transmitting communicant, the only place that the
communicant's found is in the preamble.

Next, does the preamble require additional
structure? That's another test provided by the Federal
Circuit. The answer is yes.

Now, the preamble starts rather generically. What
the preamble starts with is a communication device, a data
transmission in wireless networks. A patent-drafter, the
inventors of the '455 patent, could have stopped there.
There's no requirement to go any further in their

1   claim-drafting than this.  They could have said a

2   communication device with the transmission and wireless

3   networks comprising, and then you go to the body of the

4   claim.

5          However, these inventors added this language for a

6   reason.  They added this structure.  They're telling us

7   that this particular communication device, the one we're

8   claiming in claim 13, it is going to be configured as a

9   first communicant.  It's not going to be a second

10  communicant.  It is not going to be any old wireless

11  device, any old wireless communication device.  And you're

12  defining this as a communication device that's configured

13  to be a first communicant.  It tells us who it's going to

14  communicate to, second communicant.  It tells us how it's

15  going to make that connection in the wireless network, by

16  electromagnetic path signals.

17         With that, Your Honor, we turn to those two terms.

18  "First communicant" and "second communicant."

19         Now, NXP argues claim and customary meaning of

20  first and second communicant.  But -- so there is no doubt.

21  There is no common understanding of the terms "first" and

22  "second communicant."  The word "communicant" is found

23  nowhere in these wireless standards that NXP continuously

24  points to.  Communicant is not found.  The word "access

25  points" are found, the word "station" is found.

And NXP's own corporate representative, Mr. Aaron Waxler, confirmed that the differences between "access point" and "station" is very important to understand because the information that flows back and forth between those devices are different.

The inventors again chose this language in the preamble carefully. The language in the preamble mirrors the definition of first communicant and second communicant. Here we have a communication device configured to connect to first communicant. They define "first communicant" parenthetically. They say "Access point (first communicant) forms a radio cell with at least one individual station (second communicant)."

That "forms a radio cell" is important. It's creating a wireless network. NXP's counsel said I come in here with an old device or a new device, I pick up the wireless network. You're picking up the wireless network because the access point from the wireless router is broadcasting the network. It's trying to create a wireless network for someone to join.

And I asked NXP's expert, "Did you consider the background of the invention?

"Yes, I did.

"Do you agree that the background helps define the terms?

"Yes, I do."

And in the background, again, we trust that the inventors knew what they were doing. They defined "access point" and "first communicant." They defined "station" and "second communicant."

NXP talks about figure 2. They raised this in their brief. And they went back and forth a little bit. It was, quite honestly, a little hard to follow because they say it's the critical case. They say it talks about backwards compatibility. They also say the patent is all about backwards compatibility. And then there were a few references that didn't quite follow because they indicated that there's also some descriptions of the station having the invention. That's not true.

If you look at the detailed description, if you look at the figure and the description of figure 2, it solely describes the invention as the idea of the access points. Not one reference to the station ever says this is where the invention is. This has the inventive rules that we're talking about here.

And I asked NXP technical expert, Mr. Joel Williams, again, does the detailed description ever, ever talk about the station as the inventive station as this -- what is called an ERP station?

He said, "No. No, it doesn't."

All three times that the patent talks about the access points or the station in these excerpts, it says the access point is an ERP access point, it is the inventive station.  Here it says the station which has the known data transmission rules according to the prior art.

Next, it says, the ERP access point 1 has the data transmission rules according to the invention.

"Since the ERP access point 1 has the data transmission rules according to the invention," the access point has the invention.  They say that over and over again.  So we have the inventors defining access points for the communicant.  We have the inventor saying the access point has the invention.

Now, NXP did tell this Court that the station sends communication to the access point, and there was an implication this communication from the station to the access point could include the new invented rules, supposedly invented rules.  Let's look at precisely what the patent tells us about that communication.

In their briefing, as well as in the presentation, NXP said there are line 4 test requests that the station sends the access point.  And they indicate that this allows for the station to transmit the second rule to the access point.

However, the definition -- excuse me -- the

excerpt that I have on the screen, Your Honor, slide 27,
says that the station is sending the background rules.  It
says these are the access points that respond with the
inventive rules, not the station.  Not once in the detailed
description does it ever say the station can be the
invention.

More importantly, it never says the access points
can ever be a prior art in the access points.  In fact, in
one of the excerpts that NXP shows you, they say that the
second communicant can be unknown.  In the context of
wireless networking, you're going to have an access point
that's constantly broadcasting what's called beacon frames
that say, "Hey, I'm the Middle District of Florida WiFi."
It doesn't make sense for the access point to be unknown.
The excerpt that he pointed to said that, said the second
communicant is unknown.  It can be.  It doesn't make sense
in the context of access points.

What NXP would like, Your Honor, is for claim 13
to be written differently.  What they would like is for the
preamble claim 13 to say "a communication device data
transmission wireless network" -- that's how they wish the
claim had been -- had been written.  The Federal Circuit
has a mandate that we must pay attention to all the
language in the claim.  We cannot write language out of the
claim.  We cannot write the claim the way the inventer

wished he or she had written it.  That's improper.  You
have various cases that say to construe a claim in a manner
that would read language out of the claim would be
improper.

          The inventors did not write the claim the way NXP
wished they had of any old communication device.  Instead
they wrote it like this.  Knowing how their background is
drafted, knowing that this additional structure mirrors the
sentence in the background, now, because the claim
language -- because all claim language matters, Your Honor,
and because the invention tells us the first communicant
and the second communicant means access point to the
station, we ask the Court to adopt BlackBerry's
construction of first and second communicant.

          I'd like to turn next to the data transmission
rule.

          Now, again on this term, NXP does exactly what it
incorrectly accuses BlackBerry of doing, limiting the
claims to preferred embodiment or any embodiment.  So first
blush it may seem like the parties are on different sides
of the same issue for two different terms.

          But that is not the case because for the first
communicant, again BlackBerry points to a definition in the
background.  For data transmission rule, NXP points to a
definition in the patent.  For data transmission rule,

1  BlackBerry can point to other claims that used the language

2  proposed by NXP.  For first communicant and second

3  communicant, NXP can point to no claim language that

4  overcomes the definitions in the descriptions of the

5  present invention.  In short, NXP has argued both sides of

6  an issue with little support.

7          So what are the data transmission rules and why

8  would the ordinary meaning suffice as BlackBerry proposes?

9  Most importantly, Your Honor, with respect to this term,

10  the plain meaning and ordinary meaning suffice because the

11  claim tells us what they are.  The claim defines the rules.

12          And as NXP acknowledged in the legal standards,

13  you start with the claims.  You look first to the claim

14  language and ask does it define -- does someone of ordinary

15  skill in the art that had the invention, would they look

16  and say, "Ah, I know what this means."

17          And the claim precisely defines the rule.  It

18  tells us the first data transmission rule includes -- it

19  defines an information element.  That information element

20  has different substructures called the element ID, the

21  length, and the information.

22          And you have deposition testimony of NXP's expert.

23  I confirmed with him that the patent's definition, the

24  claim's definition of data transmission rules conforms with

25  the data transmission rule is an information element.  He

says, "Yes, it's an information element." So according to

the claim -- according to NXP's expert, any data

transmission rule is any information element.

What is this information element? I know NXP went

into it briefly. With Your Honor's permission, I'd like to

address it myself as well.

The language of information element and its parts,

the element ID, the length, the information are all found

in the older wireless standards. That's where the language

for this particular element came from.

Now, what is an information element and what are

the element IDs? An information element is anything that

can be broadcast between the access point and the station

so that the two can ultimately communicate. It's not

limited to data rates, Your Honor.

And NXP showed you a very similar table to this.

In the element IDs, the information elements are not

limited to data rates. For example, the very first element

ID is zero. It's called SSID. SSID is the name of your

wireless network. So if I, in broadcasting as an access

point to the information element, it is that zero, my

information part includes Middle District of Florida WiFi,

it's not limited to data rates. We see all the element IDs

from the old 1999 standard. 0, 1, 2, 3, 4, 5 and so forth.

Now, the claim spends almost the entire time

talking about these rules.  There's very little structure,
actual hardware, that engineers love so much, in claim 13.
Claim 13 says I have the device, that's the first
communicant, it includes a transmission unit.  That's it.
Everything else is about these rules.  So the inventors
knew when to spend time on an issue.  They drafted the
entire 13 in the rules.  Not once in claim 13 do they use
the word "rates."  Not once.

        And they knew when to do it.  They knew when to
use the rates, and they knew when not to.  They were trying
to claim the broad idea of information elements.  So we see
in claim 5, which isn't quite a claim differentiation
argument.  There's a slight difference from the argument
we're actually making.  The argument we're making is
inventors knew when to use the language.

        Here we see claim 5, and we have to talk about
that antecedent basis again.  They say in claim 5 it's a
set of data transmission rates.  This is the first time
they're saying okay, claim 1, broader claim, is talking
about information elements.

        Claim 5 says, ah, here we're going to talk about
an information element that relates to data rates.  Here
we're going to talk about that information element 1 or 50
that NXP talked about.

        But here in claim 5, which is not asserted against

1  BlackBerry, which is not at issue in this case, the

2  inventors knew when to say "data rates."

3          Moreover, Your Honor, I'd like -- moreover, Your

4  Honor, the NXP proposal is circular.  Because what you have

5  is you have an incorrect -- you have a rule, data

6  transmission rule that defines the information elements

7  that include parts that include parameters.  If you look at

8  the claim, claim 13 defines every element in every subpart

9  and every information and every amount of data that goes

10  into those elements.

11          What NXP has left out is these information

12  elements include parameters.  So according to NXP's

13  proposed construction, you'd have parameters, encoded

14  parameters defining information elements that include

15  parameters.  It's a circular argument.  It's a circular

16  construction, and it is improper.

17          Because the claims define data transmission rules,

18  because the patent did not define data transmission rules,

19  apart from the claims themselves, and they did not define

20  it in a manner that was suggested by NXP, we ask the Court

21  to reject NXP's improper proposal.

22          Lastly, Your Honor, the '455 patent is permissible

23  value range.  Now, NXP springs this one on us before the

24  briefs were due.  And it was interesting to hear that they

25  were the ones surprised when they offered the proposed

construction.

Friday night at 8:30 p.m., before the *Markman* briefs were due, we get an e-mail from NXP's counsel.  They said, "We're proposing a construction for permissible value range," without telling us what their proposal construction was.

So during discovery, during all the technical depositions, during the expert reports, during the depositions of experts, the parties understood what permissible value range means.  It was only until the Friday night before *Markman* briefs were due that NXP decided they needed a construction.

And their stated reason for needing a construction is interesting.  What they say is that BlackBerry believes it is not infringing because of permissible value range, therefore a construction must be necessary.  That's flipping everything on its head, Your Honor.

You offer a construction when the intrinsic evidence mandates -- when the extrinsic mandates it.  When from looking at the claim itself, we do not understand what the claim term means.  One of ordinary skill in the art would not know what that particular language means or that it's been limited in some fashion through the specification or through other evidence.

There is no such evidence that NXP offers.  Their

1    only offer for reason for construction is BlackBerry

2    believes it doesn't infringe.  And so there's no doubt,

3    Your Honor, BlackBerry can say it does not infringe for any

4    reason, if one term is missing from a claim, if one term

5    from a claim is not found in BlackBerry's product, we do

6    not infringe.  Whether or not that term was construed or

7    not, that is not a proper reason to offer construction.

8            Now, why is ordinary value -- excuse me -- why is

9    ordinary meaning for permissible value range acceptable.

10   First, everyone knows what these words mean, not just one

11   of ordinary skill in the art at the time of the invention.

12   When I say permissible value range, I'm not being cute when

13   I say it's a range of permissible values.  People

14   understand, and that's how NXP understood it throughout

15   discovery, throughout expert reports.

16           Second, unlike first communicant, as BlackBerry

17   proposes, the '455 patent never defines permissible value

18   range.  It never says that permissible value range is a set

19   of standardized value.

20           Third, and most important, Your Honor, you start

21   with the claim language, as always.  Here the inventors

22   knew when to say "set" and when to say "range."  For the

23   termination they say permissible value range, 1 to 10; 10

24   to 20, whatever your range may be, it's a permissible value

25   range.

1          But for claim 5 they say it's a set of data

2     transmission rates.  It's a 1, a 4, an 8, a 16, skipping

3     ones in between.  You have your data transmission rates go

4     every four, every five, odd numbers, even numbers, those

5     are sets.  They knew when to say "set" and they knew when

6     to say "range."

7          Turning to NXP briefing, Your Honor, they offer

8     only one piece of evidence.  They cite to the patent

9     specification and they say, "This supports our proposed

10    construction."  That's -- with Your Honor's permission,

11    let's look at the patent specification that they cite.

12         What we see here is that this excerpt does not use

13    the word "set."  This excerpt does not use the word

14    "version."  This excerpt does not use the word

15    "standardized" or "standard."  What this excerpt does use

16    is the claim language.  And it confirms the ordinary

17    meaning of that claim language.  It says if you are outside

18    the permissible value range, then you skipped.  1 to 10, 5

19    to 11.  I'm going to skip you.

20         In short, Your Honor, we ask the Court to reject

21    NXP's proposed construction and adopt the plain and

22    customary meaning which would be apparent to one of

23    ordinary skill in the art.  And with that, Your Honor, we

24    conclude our presentation on the '455 patent, unless the

25    Court has any questions.

```
 1            THE COURT:  All right.  I don't.

 2            MR. REGER:  Thank you.

 3            THE COURT:  Ms. De Mory, why should I construe the

 4    permissible value range?

 5            MS. DE MORY:  So permissible value range, I just

 6    heard what Mr. Reger said, and so we said in our expert

 7    report the reason you should construe it is you go to the

 8    Micro case, because there is absolutely a dispute.  And in

 9    that regard, I'd like the Court to look at BlackBerry's

10    summary judgment motion.

11            In our expert report on infringement, we said the

12    permissible value range expanded from 1 to 2, it expanded

13    from having just rate element 1 to rate element 1 to 50.

14    So we defined permissible value range in our expert report.

15    And so that was our definition.

16            And the expert report and the summary judgment

17    motion says that's not what permissible value range means,

18    it means something different.  It has to be a set, it has

19    to be this, it has to be that.  So even in their -- in

20    their summary judgment motion, they're proposing an

21    alternative definition.

22            We are going to have to confront this issue.  We

23    have to confront it.  It has to be confronted to resolve

24    the dispute between the experts, it has to be confronted to

25    resolve the dispute with regard to summary judgment.  It's
```

1    not a factual issue, it's a legal issue, what does this

2    mean.

3            And so we proposed doing it now because this is

4    claim construction and it's the time that it makes sense to

5    do it.

6            THE COURT:  All right.  Well, you all gave me so

7    much to do, I haven't had time to look at the summary

8    judgment.

9            MS. DE MORY:  Right, right.  But it's not a

10   question that BlackBerry can certainly say claim element is

11   missing, that's not what they say.  They don't say the

12   permissible value range is missing.  What they say is the

13   permissible value range doesn't mean what your expert says

14   it means so therefore we don't infringe.

15           THE COURT:  Right.  And what is it exactly that

16   your expert says permissible value range means?

17           MS. DE MORY:  It -- he says that permissible value

18   range is the standardized value.

19           THE COURT:  Adding the new...

20           MS. DE MORY:  Yes.  So it's expanding the range --

21   he says we expand the range from 1 to 2.  He says there was

22   1, and it added a second standardized value.  That second

23   standardized value happens to be 50.

24           And so it says -- and it says what I see today,

25   maybe not in -- it's more, you know, from a -- from the

technical perspective of the standards, but the concept is

that the permissible value range expanded from 1 to 2, and

that you had permitted values, something that was defined

predefined --

THE COURT:  Permitted values within 1 and now

within 50.

MS. DE MORY:  Yes.  Well, no, the permitted values

are -- so this was actually something that created some

confusion.  Permitted values are not the rates.  The

permitted values --

If we go back to claim 13.

The permitted values are the values of the IDs.

So it's that first part of the string of information, it's

the 14.  So it's expand the range of permitted information

IDs.

So it's saying we had one information ID

initially.  We had a first data transmission rule 1.  And

we added a second data transmission rule 2.  So it went

from 1 to 2.  The rate goes from 8 to 12.  So it's not

about that --

THE COURT:  So it's not related to the rate, just

the fact that there's a new rule out there.

MS. DE MORY:  Exactly, a new rule that allows you

to add additional rates.  And so very -- if I may, just

very briefly on two other points, respond to them, we'll

1   will move to '654.

2          And I don't want there to be any confusion on the

3   OFDM.  We're not claiming that the patent covers OFDM.

4   OFDM enables you to have more than eight rates, and once

5   you had more than eight rates, things broke.  You couldn't

6   put it in that original information element.  And so

7   that's -- that's the issue.  It's not about faster or

8   underlying technology.  It's eight rates, more than eight

9   rates.  That's the issue.

10          And on the first -- I think the first and second

11  communicant is the only other issue that I'd respond to.  I

12  mean, first and second communicant are first and second.

13  And I heard Mr. Reger say over and over again that the

14  specification never teaches that the second communicant can

15  have the invention in it, that the second communicant can

16  operate according to the invention.  And that is just not

17  true.

18          What he was pointing to when he said, and if the

19  Court carefully looks at the slide, it's column 6, the

20  critical case, the one embodiment.  But if you go to

21  column 4 of the patent and we look at lines 48 through 52,

22  we say if the second communicant can likewise operate using

23  the second data transmission rule.  So the second

24  communicant can have the invention in it.

25          And in addition, even then if we go to the

52

exemplary embodiment in column 6, the critical case, the
second communicant, regardless of whether it has a first or
second rule, can send that information to the base station
or to the phone, whichever one it is.  So it can be the
communication goes both ways, the information elements get
communicated both ways, and the second communicant,
whatever it is, can be something that has the invention in
it.  So it's not the case of this is just a one-way
communication.  It's not about wishing that the claim was
written differently.  It's just a first and second
communicant.  And --

          THE COURT:  So are you saying with any particular
device that that can change?  You could be the first
communicant at one point and then another point you could
be second communicant?

          MS. DE MORY:  Exactly.  So I can come in here, and
the first thing I can send out is the test sequence as
described in column 6.  So I can come in and send out -- I
can be the phone so I could be the first communicant, and I
can send -- you know, it's in the sequence of described as
the test thing.  And in fact I think it's described first
in the thing -- in the trust -- in the data trust
transition procedure 3, the station uses a test request so
it can send out, you know, the station, and in this case it
was clearly talking about the station, and it doesn't do it

with regard to first or second communicant.

        But in the actual critical case, the station,
under some scenarios, can be the first communicant.  So the
station can be the first communicant and the station can
have the invention in it.  It can have the first and
data -- second data transmission rules, so there's no
reason to limit it.

        THE COURT:  Why do we care?

        MS. DE MORY:  We care for damages.

        THE COURT:  Ah.

        MS. DE MORY:  Because they only come with
BlackBerry phones, can operate as an access point.  And so
this is an attempt to limit damages to this one-way
communication.

        THE COURT:  Okay.  Where are we going next?

        MS. DE MORY:  We're going to '654 next.

        So this is a good segue from '455 to '654 because
I heard Mr. Reger say that we were trying to limit it to
the embodiment and so on and so forth with the rates issue,
but as is, I think very clear, rates is the intention of
the '455.  And so it's not an attempt to -- you didn't see
us pointing to any particular portion in the spec and say,
"Here it is defined."

        All we're saying is that the whole '455 invention
is directed to, and one of ordinary skill in the art would

1    understand, that it was an improvement in rates.  And when

2    we go to the '655 (sic), it's an important transition

3    because the background of the field of invention for the

4    '655 is not serialized commands, addresses, and --

5            THE COURT:  Are you talking about the '654?

6            MS. DE MORY:  I'm sorry, the '654.

7            So it's moved from '455 to the '654, and we look

8    at field of invention of the '654, so '455 we had -- it's

9    about adding more rates.

10           When we go the '654, it says the present invention

11   pertains generally to the field of computer systems, more

12   particularly the present invention relates to the field of

13   computer system bus architecture.

14           So that's the contrast between rates and '455 and

15   not limiting '654 to particular embodiments in the

16   specification.  That's the difference.

17           And with that context, let's go to the terms that

18   are at issue in the '654.  So we have three terms that are

19   at issue.  The serialized data blocks in claim 1,

20   determines effective bus width, also in claim 1, and, the

21   bus width inquiry which is in claims 2 and 3.

22           So let's start again with the title.  The title

23   is -- this is about a system bus with a variable width

24   selectively configurable initialization.  So when I power

25   on my device, it decides how wide my bus needs to be.  And

so let's pause and take a minute, because we're not talking
about bussing in the conventional sense and talking about
what a bus is.

So a bus in the context of computer architecture
is basically just an information pathway. It's the way in
which two devices communicate with each other. The
processer communicates with the memory, the WiFi chip
communicates with a processer. It's the connection between
two devices in a computer system.

And in particular, the claim that we're going to
look at is -- relates to a bus bridge. And a bus bridge is
the translator between two different buses. In this case
the translation that's at issue is -- there's multiple
translations -- but the primary one that we're going to
talk about is from a wider processer bus or wider host bus
to a narrower memory or a companion chip. And so we have
both this concept of a bus and then a bus bridge. So we
have a pathway and then a translator between these two
pathways, so that we make sure that all the information
that needs to get from the host chip to the companion chip
gets there as it was intended.

And it has to be packaged differently because you
don't have -- it's not like a freeway where it's always
four lanes straight ahead. It's more like a freeway where
there's an off ramp over here and the traffic merging in

over here and so on.  So this bus and the bus bridge have
to work together to make sure that the data that's coming
out of one device gets to the other device in a way that
the other device can understand it, and that it stays true
to what was transmitted.  So that's the job of the bus and
the bus bridge.

And so that is the field of the invention that
we're talking about with regard to the '654 patent.  That's
the context.

So I just have an exemplary picture here.  We have
a number of buses, sort of these long bars which is the
interconnection to the motherboard, and then I didn't
circle it or particularly depict, but there's also going to
have to be bus bridges that allow all of these things to
communicate with each other.

So the bus bridge of the '654 patent, as we look
at it structurally in figure 1, we have element -- or we
have the two chips on the left-hand side.  We have 110
which is the host chip.  And on the right-hand side we have
120 which is the companion chip.

We have the two buses which on the right side is
102 which is the host -- the primary bus.  And on the left
side -- I have them backwards because I always do that.

On the left side is the primary bus and on the
right side is the secondary bus.  So that's sort of the

structure. And what we're concerned with is, you know, how do you translate -- on the left side you have this wider host bus, on the right side you have this narrower companion bus, and how do we have these things communicate with each other?

And in particular the claim that we're looking at is how do you -- it focuses on this variable width, how can you do this in a way so you don't have to have a lot of wiring, a lot of pins, and you can configure the width of this bus when you turn on the system.

So we have the field of the invention, we look at that. And then we say does this patent describe just one feature or just one embodiment? Because in order for BlackBerry's argument to prevail, it has to do that. It has to just be singularly directed to one thing. But it doesn't. It did not.

So if we look at starting with the abstract of the invention, we have multiple features called out in the abstract. We have one feature of the present invention is the Pin Count requirement for the present invention is low. Another significant feature of the present invention is that the host and companion interfaces of the serial bus can have nonmatching widths, and to allow for the nonmatching widths, an initialization protocol that established -- is used to establish the effective width of

the bus at power on reset.  So it's that last feature of
the invention that we're focused on.

And the summary of the invention goes through and
describes a number of features as well.  So if you look at
the summary of the invention, we have --

Actually if you could move to slide 70 first.

So at the top of the summary invention, the very
first thing that we have is the present invention provides
a low pin-count moderate high-speed serial bus with a
variable width for the transfer of data between the devices
in a computer system.  According to one embodiment of the
present invention, the serial bus may be selectively
configured G148, and data including bus commands and
addresses carried by the wider parallel bus are serialized
into the bus width by blocks.

Now this is going to become an important passage
which I think you're going to hear a lot about, and so I
want to pause on this because, first of all, this is one of
the things described in the summary of the invention.  And
second, it's important to point out that it says,
"according to one embodiment of the present invention."  It
doesn't say this is it.  This is all that's described.

So then if we move back to slide 69, we have
another significant feature.  It says another significant
feature of the present invention is that the hosting

companion interfaces can have nonmatching widths, and
that's the portion that we contend claim 1 focuses on which
is nonmatching widths.

And then if we move on, there's another -- other
significant features.  It says another one feature of
present invention is that the pin count requirement is low.
In one embodiment, a bidirectional data transfer protocol
and so and so forth, I won't go through and read all that
stuff, at column 2, lines 12 through 29.

So in the summary of the invention, we have these
sort of multiple features and we have the patents, and
we're here to address these problems and we do it with
these multiple features.  And in one embodiment we do this,
in another embodiment we do that.

If we move to the figures, the discussion of the
figures which is immediately under the summary of
invention, it says brief description of the drawings at the
beginning.  And I just excerpted a couple of them here, but
it says Figure 1 illustrates an exemplary embodiment -- an
exemplary rotation of the serialized system, and according
with one embodiment, figure 2 is a logical diagram, and
according to one embodiment, so on and so forth.  So we
have exemplary embodiments in the figures.

We have the detailed description with the same
conceptual structure which is that the detailed description

1  of the preferred embodiments, and it describes that there

2  are numerous embodiments described throughout the

3  specification.

4          So we move to claim 1, and claim 1 is the claim

5  that we're construing.  And we have two terms in claim 1

6  that we're going to talk about which are serialized data

7  blocks and determine an effective width.

8          And so we have a bus bridge for transferring data

9  between different devices, we have the host, the companion,

10  and a control bus and the variable-width data bus coupled

11  to the host interface and with a companion interface.

12          So if we go back to that figure 1, we have the

13  data bus in between the host chip and the companion chip.

14  And this claim element says, "Wherein the host bridge and

15  second companion chip determines an effective width of

16  variable-width data bus upon power-on reset with the

17  computer system."  So this claim --

18          If we go back to slide 7 -- 69.

19          -- is directed to this significant feature of the

20  '654 patent, which is column 2, lines 30 through 42, also

21  described in the abstract, also described in other places

22  in the specifications.  But it is significant features that

23  the host and companion and interface can have nonmatching

24  widths, and that there is this initialization process at

25  power-on reset to determine and set the widths.

 1          And so that is the context in which the dispute

 2     between the parties arises and the context of the field

 3     invention of data buses.  And so we have the serialized

 4     data blocks --

 5          Slide 78, please.

 6          So we have the serialized data blocks of claim 1,

 7     the '654 patent, and we have this dispute between parties.

 8     We did in -- our position was data blocks is pretty

 9     generic.  So it's serialized data blocks that needed no

10     construction.

11          But if the Court was going to construe it, it

12     should be "effective bus-width data blocks that represent

13     wider data."  So it's this concept of what happens is the

14     data -- whatever's coming in on this end from the processer

15     gets serialized into blocks that match the width of the

16     narrower memory.  And so the claim construction is that the

17     effective bus-width size data blocks that represent lighter

18     data.

19          So it takes this -- takes the 32 bits that are

20     coming in over here in a stream of 32 numbers, and it says,

21     "Oh, I can't fit 32 numbers over here because this is only

22     four bits wide."  So it takes the data in an orderly

23     fashion in four-bit chunks and it transmits it over to the

24     other side.

25          And so because the bus is variable width, it has

```
 1   to decide in advance "Well, what's the biggest thing I can
 2   send over?"  Because it wants to be efficient.  "What's the
 3   biggest thing I can send over?"  And it says, you know.
 4            "What are you?
 5            "Oh, I'm four.
 6            "Okay, so I'll send over four this time."
 7            And that's what's happening in claim 1.  And our
 8   proposed construction is of the effective -- that the term
 9   "serialized data blocks" should be "effective bus-width
10   size data blocks that represent lighter data."
11            THE COURT:  Well, from reading this, I understand
12   that the dispute really has to do with whether claim 1 is
13   just data or whether it's data and addresses and --
14            MS. DE MORY:  Exactly.
15            THE COURT:  -- commands.
16            MS. DE MORY:  Right.
17            THE COURT:  So what difference does it make if
18   it's -- why can't -- where does it say that claim 1 is
19   limited to just data?
20            MS. DE MORY:  Well, the language -- let's start
21   with that.  First of all, that's what claim 1 says, it says
22   data blocks.  It doesn't say commands and addresses.
23            So I think it's sort of just the opposite which is
24   if we look at the language of claim 1 itself, claim 1 says
25   data.  So it says that "a variable-width data bus coupled
```

to said host interface and to site companion and interface

for transmitting serialized data blocks between the host

interface and said companion interface."

So "command" and "addresses" doesn't appear in

claim 1. And that's really the heart of NXP's construction

is you have a patent that has --

THE COURT: So -- so your contention is that

claim 1 should be defined differently than the other

claims, as far as the specialized data blocks?

MS. DE MORY: Well, I think the answer is that

it's not -- so let's look at what BlackBerry's saying. So

BlackBerry's saying that the specialized data blocks have

to include command and addresses, right, and that's the

dispute between the parties. But if we look at claim 11,

they're saying, "Well, you're trying to construe it

differently between claim 1 and claim 11."

But actually if you look at claim 1 and claim 11

actually calls out the commands and addresses. So there's

no reason to put commands and addresses into the data

blocks. So it's -- I mean, so it's not -- it's not

different. It's just that data blocks doesn't necessarily

imply commands and addresses because claim 11 itself says,

if we read it, "parallel interface for a coupling to a

parallel bus and for receiving bus commands, addresses, and

data from the parallel bus."

1          So it says what it's receiving, and then it says

2    "The state machine coupled to said parallel interface for

3    serializing said data commands, said addresses, and said

4    data into data blocks."

5          And so it's -- I mean, it's a -- that language is

6    there.  So it's not construing the terms differently

7    between two claims.  It's saying claim 1 is generic and

8    it's directed to this feature of the patent which is the

9    variable data bus.

10         And claim 11 is quite specific as to both what is

11   received, it's saying "You must receive," so in the context

12   of claim 1, you don't receive commands and addresses at

13   some point.  That's fine.  Claim 1 could also receive

14   commands and addresses, but it's not required.

15         So in the context of claim 11, it's saying the

16   parallel --

17         THE COURT:  Why can't the definition be broad

18   enough to contain it all, but if it's not needed for

19   claim 1, then it's not needed?

20         MS. DE MORY:  Right.  So that when --

21         THE COURT:  Wouldn't that be more consistent

22   throughout the patent?

23         MS. DE MORY:  So, right, but if you -- if you

24   require -- if you say it has to have commands and addresses

25   and in the context of a situation where commands and

addresses are not being communicated, then you're not going

to infringe claim 1, right?  So that in con -- so in

claim 1, it doesn't require either that command and

addresses are received or that they're put into the

serialized data blocks.

It could be because the data -- the data blocks

are sort of agnostic to what's in them.  You've got --

at -- at the processer you've got a bunch of information,

it's 32 bits wide, and you have to transmit it to this

narrow thing over here.  So you transmit it into four-bit

blocks.  You break it up and you put into four-bit blocks,

and you transmit it over here.

Now in claim 11 it's saying what got received here

was commands, addresses, and data.  And so when I create my

serialized data blocks, I have to put in -- I have to put

in commands, addresses, and data.  That's what I've got, so

that's what I need -- in order to make this system work, I

have to put this over here, that's claim 11, it's very

specific.  And that's the way the inventor drafted

claim 11.

With regard to claim 1, they're focused on this

other feature which it doesn't -- you know, you could

get -- you can get commands and addresses, but you need not

get commands and addresses in this data block that comes

here.

```
 1          So it's sort of like this dual use of the word
 2   "data" because in what we intend by our construction of the
 3   claim 1 is that data can include commands and addresses,
 4   but it must not always include commands and addresses.  So
 5   if that wasn't clear -- I mean, so when we say "data" in
 6   that context, it's sort of agnostic to the actual content.
 7   So it's like you use commands, data, and addresses to equal
 8   data, which is weird.
 9          So in the context of claim 1, we're saying data
10   blocks.  It's information, data is information.  That
11   information can be just some information or it can be a
12   particular kind of information.  It can be commands,
13   addresses, and what the patent -- the dual use of the word
14   "data" which we'll -- to simplify this, we'll call it
15   information.  So it can be, you know -- so that's -- that's
16   the context is that it can include it, but it's not that it
17   must include it.  And that's really what the dispute is.
18          It's -- it's not so much, sure, the spec describes
19   commands, addresses, and data and claim 11 talks about
20   receiving all of these at the -- to the left end of that
21   bus, and then -- so then it must process those and send
22   them across.  But claim 1 doesn't talk about what's
23   received at that end of the bus.  So it can just receive
24   information of any kind that may be -- may also include
25   commands and addresses.
```

1          And I think that's the heart of the dispute

2    between the parties.  And because claim 1 didn't call out

3    that it must receive commands and addresses, it's NXP's

4    position that it -- it should not be limited to that,

5    whereas claim 11 calls out commands and addresses and so

6    therefore it is limited to it.

7          Now the interesting thing is if you interpret data

8    blocks as BlackBerry says, then you have commands and

9    addresses twice in that same element because it says

10   serializing, you know, commands, address, and data into

11   data blocks which are commands, addresses, and data.  So

12   it's -- it makes the construction of claim 11 sort of odd.

13   If -- I mean claim 11 is a longer issue, but that's the

14   implication of it.

15         So it's our position that data can include

16   commands, addresses, and data but it need not include

17   commands and addresses as required by claim 11.

18         So that skips us ahead a fair amount.  So NXP's

19   position --

20         Slide 81.

21         So let's talk about how BlackBerry talks about --

22   they say we have this whole present invention concept.  So

23   this is BlackBerry's page 9, document 202.  While NXP's

24   multiple broad construction for serialized data blocks

25   ignore -- I'm sorry.

1          "While NXP's multiple broad proposals for
2     serialized blocks ignore this required feature," and it's
3     the "required" part of this that's in dispute.
4          The '654 patent specification states three times
5     that the present invention uses serialized data blocks that
6     carry all three types of information.  Therefore as a
7     matter of law, it must be interpreted.
8          But when we look at those three times, the first
9     time is the time that we talked about in the summary of the
10    invention, and that's at column 2, lines 3 through 11, and
11    it says "according to one embodiment," it's not
12    restrictive.
13         On the next slide is the next thing that
14    BlackBerry cites in footnote 19 is lines 38 through 43 of
15    column 3, and that excerpt doesn't even include the phrase
16    "the present invention."
17         And then if we go to page 84, column 4, lines 20
18    through 23, it talks about in a typical implementation you
19    have, you know, then "according to the present invention."
20    So this notion that it's restrictive in this way is what
21    NXP rejects.  It certainly can include that information,
22    but it's not -- it is not -- it must not always include
23    commands and addresses.
24         So it's our position that the present invention
25    argument is not supported.  The one embodiment -- and the

1   one embodiment argument is not supported.

2           And so we move to the case law, and I think

3   there's just a couple of cases that are important here.

4   *Praxair v. ATMI*, it says, "An invention may possess a

5   number of advantages or purposes and there is no

6   requirement that every claim directed to that invention be

7   limited to or encompass all of them."  And that's our

8   dispute, whether or not it must be limited to just that.

9           And the reason for that is when we look at

10  claim 11, for example, we can see how different claims are

11  directed to different aspects.  So claim 11 says "a state

12  machine coupled to said parallel interface," and then we

13  look at figure 2 of the patent as opposed to figure 1, and

14  we have the state machine depicted.

15          The next case that we move to is *Rambus v.*

16  *Infineon*, and here this was a very similar case and it

17  addressed whether or not a bus was limited to transmitting

18  addresses, data, and control signals.  And I would say the

19  specification was about of the nature that it is here in

20  that it said at one point the present invention includes a

21  plurality of bus lines for communicating all these things,

22  but at other points it describes other features of the

23  invention.  And the Federal Circuit said sure, it must be

24  able to do that but it's not limited to that.

25          And then I think the final one is -- this is

another example of, yes, it must be able do that but it's
not limited to that, and that's the *Voda v. Cordis* case,
again another patent using the present invention.  This one
I've actually put in excerpts from the patent, and I
apologize I didn't put in the column and line cites, but it
says here, "The guide catheter of the present invention in
a related state prior to the insertion within a
cardiovascular has a configuration that causes the
advantageous orientation of the guide catheter in an aortic
complex.  The guide catheter in its relaxed state includes
a first straight portion and a distal end."

And so here they're describing the present
invention and the inventor -- and the inventors say it has
a first straight portion.  And the Federal Circuit goes on
to say the use of present invention here did not limit the
claims because there were other portions of the
specifications directed to other features or described it
in ways that were just simply silent as to the straight
portion.  And so the Federal Circuit said, yes, it must be.
Yes, that's one way you can do it.

And the claims certainly shouldn't be interpreted
to preclude the first straight portion, but the claim is
not limited to the first straight portion.  There was no
clear disavowal of claim scope, which is our position on
what we have here.

1        So unless the Court has any questions on that,

2 I'll move to determines an effective width.

3        THE COURT:  That's fine.

4        MS. DE MORY:  So determines an effective bus

5 width, we have -- again, we have proposed initially no --

6 no meaning -- no construction of ordinary meaning, but it's

7 clear that there is a dispute between the parties.

8        So we have -- we propose adopting NXP's

9 construction which is setting -- sending a width into

10 effect or effectuating the width of the data bus.  And

11 defendant's claims construction is negotiates the data bus

12 width using the width of a host and companion interface.

13        I'm not sure we have as much a dispute as may be

14 clear or unclear from the papers, but -- so here's my stab

15 at it.

16        So BlackBerry disputes that "determines" means

17 "sets."  So I -- I read their briefs again over the last

18 couple days, and they dispute that it means sets.

19        And my impression from the briefing was that they

20 think that is NXP's -- saying "determines" means "sets" is

21 NXP's effort to say that there is -- to read out there in

22 the negotiation process, which they say must be included in

23 the -- in the claim.  It's the same situation here.  We're

24 not trying to read out the possibility of the negotiation

25 process.

1              Our position is that the determining step ends

2    with sets.  And so regardless of what happens before

3    setting it, so whether or not the negotiation process that

4    BlackBerry proposes or the one-step process that's

5    described in the specification, it ends with setting the

6    bus width.  And so that's -- that's really the issue.

7              The -- our argument against the negotiation

8    process or the requirement -- it's not against even,

9    because again, this is the same thing, it's a question of

10   whether or not the claims must be limited to the

11   negotiation process.  The negotiation process is a --

12   absolutely described in the specification, it should be

13   included within the scope of claim 1.  But the question is,

14   is that negotiation process required in the way that

15   BlackBerry claims.  And --

16             THE COURT:  So you're saying the negotiation may

17   happen, it may not happen, it could happen.

18             MS. DE MORY:  Yes.  What we know is the end point

19   is there's a -- there's a, you know, the set.  It's four

20   bits wide, that's the thing.  So that -- and so it's just

21   like whether or not the command and addresses are

22   transmitted.  It ends here.  So the question is what

23   happens before that.

24             BlackBerry says it requires this negotiation

25   process.  It can include a negotiation process, but the

specification also says that it may happen in a one-step

process. And that is described on slide 97, and it says it

should be noted that if the host processer 114 has a

one-bit-wide data interface, it is not required to perform

all the steps of the width initialization procedure, 1400.

Rather the host interface can set the effective width of

the data bus 151 to one-bit-wide and then end the

initialization procedure.

So if I know that the biggest -- if I'm the -- if

I'm this side of it, if I'm at left side, and I know only

one bit wide, I -- the process of setting the width can be

a one-step process essentially. So -- so it can include

negotiation, it can include all the steps in figure 13,

which is the 1400 steps, it could include some of them and

it couldn't be just a one-step process. That's -- that is

NXP's position which is that it ends with setting.

And then finally, we have the bus width inquiry.

And the bus width inquiry is this one, I think it occurs

only in claims 2 and 3, so it's dependent claims. And for

bus width inquiry -- we have the wrong constructions here,

but -- so the real dispute in bus width inquiry, just to

get to the -- to the heart of the dispute, is whether or

not the bus -- whether or not it must be a bus width that

is communicated in the inquiry or whether or not it can be

information representing the bus width.

So BlackBerry says essentially that you must
set -- you must -- you must send -- in response to this bus
width inquiry, you must send a bus width.  And NXP's
position is you can send information representing a bus
width.

And our construction is very simple.  It's based
on the claim language itself.  Claim 3 says the bus bridge,
as recited in claim 2, wherein said companion interface
transmits information indicating a width.  It doesn't say
"transmits a width."  It says "transmits information
indicating a width."

And as the specification discloses, it doesn't
actually transmit 1, 4, 8, or 16.  It transmits these codes
that indicate to the processer, "Oh, I got 81 each, I know
that's a 4 or an 8 or a 16," so it's never actually
transmitting the bus width.

So limiting the claim to transmitting the bus
width would be an improper limitation like the other two
limitations we've talked about, and instead it should just
be information indicating the width.

And that is the end of '654, unless the Court has
any questions.

THE COURT:  No.

MR. REGER:  I'm sorry, Your Honor, you get me
again.

1          I'd like to go with the '654 patent and

2     BlackBerry's response.

3          Before I get into our actual presentation, I'd

4     like to address something that occurred during NXP's

5     presentation.  They continuously focus on the word "data."

6     We're not asking for a construction of the word "data."

7     That's not a proposed claim term.  The claim term at issue

8     is "serialized data blocks."  So the question for the Court

9     is how does the patent define data blocks, how does the

10    patent define serialized data blocks?

11         Now, as indicated by NXP, the patent generally

12    involves buses.  Buses, like wireless networks, have been

13    around for decades.  NXP did not invent the idea of buses

14    or the idea of communicating data, commands, or address

15    across buses.

16         I'll quickly go through this, Your Honor, but bus

17    is nothing more than what allows two components to

18    communicate to one another, just as NXP proposed.  You

19    would have these edged lines on a printed circuit board

20    that would allow these processer memories to talk to one

21    another.  Without these bus lines, they can't talk.

22         Now, how does the component actually connect to

23    these bus lines?  They do so through something call pins.

24    Here we have a picture of an Intel processer that when you

25    flip it over, on the underside of that Intel processer are

these gold pins that actually allow the component, whether
it's a processer or a memory or some other computing device
component, to actually send signals, to send information
over the bus, over these signal lines to another component.

Now, as Your Honor can see, on the underside of
this Intel processer, the Pins take up almost the entire
underside.  So the question becomes if I want to send the
same number of -- same amount of information, but I want my
component to get smaller, how can I do that?  The '654
patent tells us.

What the '654 patent tells us is that we're going
to reduce the number of pins.  You reduce the number of
pins.  Your component can get smaller and fit into smaller
devices.

The patent begins by telling us in older devices
called a PCI bus, the PCI bus would have 50 to 60 pins.
What that means is you would have 50 of those gold
components that are sending signals.

Now, how can I reduce that pin count?  How could I
get to a smaller number of pins so I can have a smaller
component, which is NXP's characterization of the
invention.  It's how do I reduce my pin count?  How do I
reduce my interconnect cost?

So, for example, if we look at slide 47, this is
NXP's market briefing, they say "The inventor provides a

novel system to reduce the interconnect cost." You do that by reducing the pins. The invention provides a low pin count moderate speed to the data bus. Again, we're after reducing these pins, those gold components.

So the question ultimately becomes how do you reduce the pin count? That is the question. Earlier this week I took the deposition of an NXP corporate representative in response to a compel order from this Court. The testimony of these witnesses primarily involve the '654 patent. They're being presented on NXP's practice of the '654 patent.

So I asked this NXP engineer, "How can you reduce a pin count?"

And this NXP engineer testified there's two ways. You can reduce the number of signals or you can send the same number of signals over a lower pin count.

So, for example, if my component has 50 pins that's currently sending 50 signals. I can either send less signals, if I wanted to go down to 40 pins, I can send just 40 signals. If I wanted to still send 50 signals, I could go down to 40 pins and send multiple signals over one pin. He confirmed that those are the only two ways to do it.

So if my component, if my device, if my processer, my memory still needs the same amount of information, the

1   only way to do it is to reduce your pin count and send

2   multiple types of information over one pin.

3           What is that called?  That process is called

4   serialization.  It is a word that was, over and over again,

5   ignored and omitted by the NXP presentation to the Court

6   just now.  You kept hearing about data, even heard data

7   blocks a few times.  But serialization, serialized, that

8   concept was repeatedly thrown to the side.  That is what

9   the patent's about and is what the claims are about.  The

10  claims use the word "serialized."  The claims use the word

11  "serialization."  Serializing.  And serializing is taking

12  multiple types of information and sending them over one

13  bus.

14          For example, the lead inventor of the '654 patent

15  is Mr. Franklin Story.  When I talked to Mr. Story in his

16  deposition, I brought up one of his other patents.

17  Mr. Franklin Story has an '854 as opposed to '654.  You

18  have an '854 patent where he talks about a problem with

19  devices at the time was that they would have -- they would

20  have two types of information, two types of signals called

21  IRQs and DRQs, interrupt requests and DNA requests.  These

22  two types of information were being sent in parallel, they

23  were being sent over two bus lines.  But he wanted to

24  reduce the pin counts.  And as we see here in the

25  underlying portion, Your Honor, we see that he is going to

take these two types of information, serialize them,

allowing the system to control or to send both and reduce

the pin counts.

We also see in Mr. Story's patent, he continues to

the word -- use the word "serialized" in this in the same

fashion. You're going to conserve pins by taking certain

function that used to occur in parallel in implementing

these functions in a serial format. They used to both go

over multiple lines. Now they're going to go over one.

He says here a parallel data trans used to take

eight data bits. And a control bit can now be done using

only two, and we do that again by serializing.

So the question, Your Honor, is not what does

"data" mean as proposed by NXP. The question is what is

serializing? What is serialization?

The patent tells us. The patent tells us that

serializing is taking commands, addresses, and data and

turning them into data blocks. And, Your Honor, I

challenge NXP to find a recitation of data blocks in the

'654 patent that does not include commands and addresses.

The phrase "data blocks" seven times is referenced in the

'654 patent, all seven times taking command and addresses

and putting them into these data blocks. That's what

"serialization" means.

Your Honor, she indicated on slide 8 of NXP's

1  presentation that serializing said bus commands, said

2  addresses, and said data into data blocks seems to make our

3  proposal odd because our proposal for serialized data

4  blocks is that includes commands and addresses.

5          It's an odd argument because claim 11 is directed

6  at actually creating the data blocks.  You can serialize

7  commands and addresses into data blocks.  So what is the

8  result?  Serialized data blocks, which is our proposal.

9          So the ultimate result of serializing commands and

10 addresses and data into data blocks is serialized data

11 blocks, which is what claim 11 is directed -- excuse me --

12 is what claim 1 is directed to.  Claim 1 transmits

13 serialized data blocks.  Doesn't just transmit data, it

14 transmits serialized data blocks.

15          For that reason, Your Honor, we're proposing that

16 the patent -- that the claim language be held to what the

17 patent describes.  Serialized data blocks or variable sized

18 blocks that transmits commands and addresses in data.

19 Again, every description of data blocks includes commands

20 and addresses.  That's what serialization means.  We know

21 that through deposition testimony of the inventor.  We know

22 that there was patents.

23          NXP first proposes an ordinary meaning, but their

24 ordinary meaning has changed as the course changed -- as

25 this case changes.  Their first proposal was "ordinary

meaning with an alternative construction of data to be
transmitted or received bit by bit over a single pathway."
That was their first alternative construction.  Now we have
"effective bus-width size data blocks that represent wider
data."  So we know that the ordinary meaning can't be a
proper construction because NXP can't even make up its mind
as what "serialized data blocks" means.

So serialized data blocks, how do we know what
that means?  One, data bus is defined in the patent as
transmitting commands, addresses, and data.  It's defined
and -- we know that the present invention requires
serializing commands, addresses, and data into serialized
data blocks.  We know that the '654 patent repeatedly
consistently and exclusively uses data blocks that include
commands and addresses.

We also know that the invention cannot work unless
commands and addresses are sent over the data bus.  It will
not work.  Serialized data blocks must include commands and
addresses.

First, the patentee must be found under the
expressed definition.  And the Court has recognized that
Honeywell, that when the inventor repeatedly says "the
present invention," that you are allowed to take them at
their word, that when they define it -- when they use the
present invention, you take the inventor at his or her word

1    that they knew what they were talking about.

2           With respect to definitions, we have data bus,

3    here in the patent, table 1 of the '654 patent defines the

4    signals that are going over the data bus.  It's a single

5    definition.  If Your Honor notices, it says "commands,

6    addresses, and data."  Those are what's transmitted over

7    the data bus.

8           In the present invention, the *Honeywell* court

9    indicated that the written description is a fuel filter as

10   this invention or the present invention.  And, Your Honor,

11   I'm ready and happy to discuss the case law proposed by

12   NXP.  They've offered three cases.

13          The three cases, primarily *Rambus*, let's talk

14   about the *Rambus* case.  The *Rambus* case, the majority of

15   the description talks about a bus.  In two circumstances in

16   the patent they said a multiplex processer.  And in one of

17   those two descriptions they said the present invention

18   includes the multiplex processer.

19          And so the defendant in that case tried to limit

20   the claims plus, just plus to a multiplex processer.

21   Twelfth Circuit said that's not fair.  In multiple places

22   throughout this description they should say generic bus.

23          We've heard of the cases that this had this

24   generic or -- data.  They're trying to get this patent

25   swept under the *Rambus* case.  It's a false approach using

1    '654.  '654 exclusively defines data blocks, serialized

2    data blocks, including commands and addresses.  There's not

3    one time that data blocks includes anything else.

4           Here we have three excerpts that talk about the

5    present invention requiring serializing commands and

6    addresses and data.  In the *Abbott* case, the Federal

7    Circuit has also indicated that if you repeatedly,

8    exclusively, consistently use the term, the patent is

9    entitled to rely on that.  What do we have?  Multiple,

10   multiple accounts of data blocks including commands,

11   addresses, and data.

12          Each and every time the patent includes -- excuse

13   me.  Each and every time the patent uses the term

14   "serializing" or "serializing," it talks about data blocks,

15   it's referencing commands, addresses, and data.

16          One thing I'd like to address here, Your Honor, is

17   on slide 85 of NXP's presentation, they indicate that in

18   fact the present invention example says bus 115, not 151.

19   What they're pointing to, Your Honor, is here in figure 1

20   we see multiple lines between the companion and host,

21   between the processer and memory.  Those multiple lines are

22   collectively called bus 115.  You see that at the bottom of

23   the screen.

24          However, what NXP neglected to tell Your Honor is

25   that bus 115 includes two buses.  The larger bus that

1    includes two types of buses in it, in -- includes the

2    control bus which is claimed in claim 1 and includes the

3    data bus which is claimed in claimed 1.

4            Claim 1 claims the larger data bus.  It includes

5    the control bus and it includes the data bus.  NXP's

6    attorney's argument that commands and addresses could be

7    sent over anything else than the serial data bus, the 151,

8    has no support in the evidence.  They don't cite any in

9    their briefing, they don't cite any now.  It's pure

10   attorney argument.

11           Because the inventor testified that commands and

12   addresses can only go over the data bus.  That's why it's

13   called a serial data bus.  You have a larger serial bus,

14   115, that includes two buses, a control bus, a data bus.

15   You cannot send commands and address over the control bus.

16   You only send commands and addresses over the data bus.

17           And I asked the inventor.  He said, yes, if

18   they're transferred, that is where they're going to be

19   transferred.  I asked him about figure 2 of the patent,

20   "Where are your commands and addresses going to be

21   transferred?"  Again, only over the data bus.  Only over

22   the data bus.

23           We then continue on in this patent, Your Honor.

24   We have multiple figures that show where commands and

25   addresses are being transferred.  If Your Honor notices,

1    the top four lines that is the so-called control bus, the

2    control signals that are going back and forth like a clock

3    and their requests and their grant in the packet, all those

4    different types of control modes.  Commands and addresses

5    never go over those lines.  Ever.  The commands and

6    addresses go over the data bus.  You see this at the

7    bottom.  Every figure, every figure in the '654 patent

8    shows commands and addresses going over the data bus.

9            Your Honor, I'm aware we've hit it, 11:30.  Would

10   you like me to --

11           THE COURT:  Go ahead and finish this.

12           MR. REGER:  Thank you, Your Honor.

13           Your Honor, they also bring up Claim 11.  I

14   addressed that very briefly to indicate that there is no

15   distinction between claim 1 and claim 11 when it comes to

16   serialized data blocks.  Claim 11 tells us what is created

17   in a serialized data block.  It says serialized command

18   addresses, the data go to data blocks.  Claim 1 assumes

19   they're already created.  We're going to transmit those

20   serialized data blocks.  It doesn't say it's not

21   transmitting data.

22           And I've addressed the *Rambus* case, Your Honor.

23   One point I'd like to note is an acknowledgment of NXP in

24   its brief, there were also patents directed at the

25   multiplex data bus.  So the defendant's attempt in that

1   case to limit the generic bus to multiplex data bus was

2   improper.

3           Here there is no other patents.  The claim talks

4   about serialized data blocks.  So we asked the Court to

5   hold the patentee, hold the '654 to serialized data blocks,

6   which includes commands, addresses, and data blocks.

7           Your Honor, there's one more term that -- I can

8   wait until after lunch.

9           THE COURT:  No, go ahead.

10          MR. REGER:  Okay.

11          THE COURT:  Let's finish up with this patent.

12          MR. REGER:  Sure.

13          I'd like to quickly move here, Your Honor, to the

14  terms --

15          Your Honor, I'd like to move to the next term of

16  "determines an effective width."

17          With respect to this term, BlackBerry has proposed

18  a construction of negotiates the data bus width using the

19  width of the host companion interfaces.  NXP's prior

20  construction throughout the case has been ordinary meaning.

21  They now have -- are suggesting that "determines" can mean

22  "set" or "effectuates."  So, they haven't -- they say that

23  no construction is necessary.  Then they offer an

24  alternative construction of "sets."  Then they offer

25  alternative to that of "effectuates."  They have an

1  alternative to alternative --

2        THE COURT:  Well, why is "negotiating" -- why is

3  that word important?  What's wrong with just "determining"?

4  I mean "determining" has an ordinary meaning.

5        MR. REGER:  That is correct, Your Honor.  Here

6  what happens is that you have to have the host and the

7  companion do it together.  The question is how do they do

8  that?  It's not just one component that can determine or

9  one component that can set, according to the claim itself.

10  The claim tells us you have to have two different devices.

11  You have processer and memory that talk to one another, and

12  then they jointly determine what that bus width should be.

13        There has to be some sort of negotiation, and

14  that's how the patent describes it.  The patent describes

15  the negotiation mechanisms of the present invention that

16  are used by the host and by the controller -- or companion,

17  excuse me.

18        THE COURT:  Well, that doesn't answer the question

19  of why the word "determines" doesn't work in this context,

20  why that word needs to be construed.

21        MR. REGER:  Our proposal, Your Honor, was because

22  how the two things jointly determine something.  The

23  question would become to the jury how do you have two

24  separate components, determines, I think.  Because

25  typically --

1          THE COURT:  Why is it important to know how they

2     determine it?  I mean what's important about negotiating

3     over just using the word "determine"?  What is the jury

4     going to be sitting back there thinking, "Okay,

5     negotiation, it's not just a determination, it's a

6     negotiation, this is really important."  Why?

7          MR. REGER:  Again, Your Honor, what we're

8     trying --

9          THE COURT:  Are we back to damages again?

10          MR. REGER:  No, Your Honor.

11          THE COURT:  Okay.

12          MR. REGER:  And, Your Honor, of course what we

13     were trying to do during this claim construction process is

14     offer the proper constructions for the different claims.

15     Obviously NXP is consistently trying to read from

16     infringement cases to increase their damages.  And

17     BlackBerry, as the defendant, is trying to find

18     noninfringement and reduce the damages.  So there are no

19     alternative motives on trying to --

20          THE COURT:  I didn't mean to make ulterior

21     motives.

22          MR. REGER:  Yes, Your Honor.

23          But that was our attempt, Your Honor, was trying

24     to explain to the jury what "determines" means.  How.

25     Because you're absolutely right.  The word "determines" has

meaning. And if we wanted to use the word "determines" by
itself, it's fine. The question becomes, from a technical
standpoint, how do two components determine something
jointly. Because that's a claim of ours. It's our attempt
in proposing the construction of negotiations is that's how
the patent describes it. That's where --

    THE COURT: The patent uses the word
"negotiation"?

    MR. REGER: Repeatedly, Your Honor, yes.

    And so we tried to use the language from the
patent to again just explain this particular term.

    Now NXP tries to argue that we are limiting it to
a particular type of negotiation, which is false. That's
not in our construction. Our construction is merely two
devices are negotiating.

    NXP points to figure 13 which has multiple steps
and they say we're trying to limit them to those steps.
Again, that's incorrect. Because those steps lay out a
precise way that the components can negotiate. The host
can send a request. The companion can send information
back. The host then sets the bus width.

    Another way of doing it is not described in the
patent and not precluded by our proposed construction is
the companion can send the request. The host sends its bus
width. And the companion sets. There are multiple ways of

negotiating, and we are not limiting the claim to.  Again,
we're trying to describe how the determination can take
place, and it happens to be negotiation process.

          Here, Your Honor, NXP's expert is indicating that
"determines" means "sets."  He doesn't mention an
alternative construction of "effectuates."  He sets it into
effect.  "Determine" cannot mean "set."

          '654 patent uses those words differently.  You
determine what the width should be and then you set the
data bus to that particular width that you've determined.

          Again, the claim language says they both must do
it whereas NXP had offered the host by itself can do it.

          Here, Your Honor, is the question about
negotiation.  This is where the patent discusses
negotiation.  It's the bus width negotiation mechanisms of
the present invention.

          And finally, Your Honor, on this note on the '654
patent, I took the deposition of NXP technical expert on
'654, and I confronted him that his reading of the claim,
his reading of claim 1 required negotiation.  Because
they're accusing mobile devices of SD cards, for example,
it's a type of memory card that is sitting on the mobile
devices, that's what they're accusing, mobile devices and
SDs.  And I asked him, "You will agree with me that a
mobile device with SD card that does not perform any

1 negotiation does not infringe."

2          He said, "That's right."

3          I said, "What about the other type of accused

4 memory, MM -- eMMC, and what if you have a mobile device

5 with eMMC, that's an accused device, what if there's no

6 negotiation?"

7          He said it would not infringe.

8          I then continued on in the excerpts that's not

9 here.  I said, "What about the third type of accused

10 memory, SDIO, what if that doesn't negotiate?"

11          He said, "You know what, if it has just a host

12 setting, it's one bit and not doing any sort of

13 negotiation, that doesn't infringe either."

14          That's the NXP expert, Your Honor.

15          So because of that, we ask the Court to adopt

16 BlackBerry's proposed construction, "determines effective

17 width of said variable-width data bus."

18          Your Honor, we rest on our briefing.

19          THE COURT:  Okay.  So we'll be in recess till

20 1:00.

21                    (Recess at 11:42 a.m.)

22          THE COURT:  All right, what's next?

23          MS. DE MORY:  Next up is '420.  But if I may

24 briefly just address a couple points that were made on '654

25 and then move to the '420.

1          So in particular, I just want to term the

2     serialized data blocks.  I just wanted to address something

3     that I heard for the first time, not in any of the briefing

4     in the argument, which is this concept that serialization

5     itself requires different kinds of information, requires

6     combining different kinds of information.  And I don't --

7     you know, I was -- from a computer science perspective,

8     it's sort of shocking.  And you could look at Wikipedia to

9     start with.

10          And serialization is exactly what I -- the process

11     that I described to you.  I didn't avoid that at all.  And

12     I think there's a slide actually that Mr. Reger skipped in

13     his presentation that's probably helpful to look at, and

14     that is --

15          If I could ask you to please put up slide 51.

16          So this is the process of serialization.  The

17     process of serialization is going from something wider to

18     something narrower.  So something is being presented at the

19     host interface, whether we call it data, we call it data or

20     commands or addresses, whatever is being presented at the

21     host interface on the left needs to be communicated to the

22     companion in the narrower data string.  Now this picture

23     depicts the companion as just as wide, but in the context

24     of the patent, the companion is actually narrower.

25          So what has to happen is that we have to take

these parallel bits that are on the left side, and we have
to communicate them over to the companion in a serial
fashion.  We can't communicate all 32 at the same time
because the companion is either 1 or 4 or 8 or 16 bits
wide.

So the process of serialization is just going from
wider to narrower, and then on the other end being able to
recreate whatever that wider thing that you sent is.  And
so there's no requirement in the patent or anywhere in the
concept of serialization of having to combine different
kinds of data.

And so then I also -- Mr. Reger was talking about
that, you know, the patent consistently defines data blocks
as -- as including these three things.

So if we would go to slide 62, please.

I think it has to build.

So 62, he went past it very quickly, but he said
it's always data blocks.  But it's not.  And this is
important.  It says "data including bus commands and
addresses."  So there's this concept of there can't --
there's multiple things in the concept of data.

And when we look at claim 11 it says what is
coming in on that left-hand side of that picture is three
things, data, in a generic sense, data, commands, and
addresses.  And when we look at claim 1, data doesn't

1   require that there be commands and addresses there.

2   There's just data coming in on the left side, it's

3   serialized into something narrower and transmitted across.

4           Now that data that comes there could actually be

5   all three things, but it's not required.  And if we -- and

6   that's the -- that's the point, is that it's just not

7   required to always -- to be all three.  So -- and I think I

8   made that point during my primary argument, but, you know,

9   that's the important issue here.

10          So when we look at the --

11          You can switch back to the plaintiff's, thank you.

12          So when we look at the patent, you know, we see

13  situations where some of the blocks that are serialized --

14  in fact, the very figure that Mr. Reger put up have blocks

15  that are serialized that are comprised solely of data.  If

16  you look at figure 4, for example, we see serialized

17  blocks, D0, D1, D2.  Those are just data.

18          So it is the case that what NXP is saying is that

19  data is -- can be commands, addresses, or sort of a generic

20  form of information, whatever that may be.  Claim 11

21  requires all three of them to be there, and then those

22  blocks get serialized.  They're not combined with each

23  other.  They're just taken in small chunks and sent across.

24  That's the serialization sent across this -- this -- this

25  bus.  And so that the information is not limited to data,

commands, and addresses, but it can be any of those three,

all of those three, one of those three.

         And so that's NXP's proposed construction.

         So moving to the four --

         MR. REGER:  Excuse me, Your Honor, may I have an

opportunity just to briefly address the comments?

         THE COURT:  Well, let's just move on.  I

understand.

         MR. REGER:  Okay.  Thank you, Your Honor.

         MS. DE MORY:  So if we move on now to the '420

patent, '420 hopefully is our simplest of our patents

today, something that we can all sort of relate to which is

it is a GPS-enabled mobile telephone.

         Now, in the context of the '420 patent, we have to

bring ourselves back because this patent was filed in 2001,

so it's before we were all carrying around, you know -- it

existed, but you weren't carrying around the GPS-enabled,

Internet-enabled mobile phone.  Most of us weren't.

         And so when we look at it in that context, we go

back and we sort of look at what is GPS.  The '420 patent

is filed in 2001, and then we're looking at what is the

context of GPS.  So GPS is sort of figuring out where am I

on earth.  And it's this process where this guy standing on

a road and there's all these satellites around him and

other information that he can gather about.  And it gets

more refined every minute that we exist on this planet.
But where am I on the earth based on what WiFi is close by,
what base station is close by, and what satellite is above
me, how do I figure out where I am?

So if we go -- there are sort of two issues, two
inherent issues with regard to GPS.  One is how long does
it take us to find out where on earth we are, and the other
issue is how much battery is it going to consume to figure
that information out.  So the time to first fix is one
issue.  And the second issue is the -- keeping the GPS
receiver hot.

So obviously the user of the phone wants to get a
fix as fast as possible using as little battery as
possible.  Phone manufacturers want that to happen.  The
user of the phone wants that to happen.  And so you sort of
have these two issues.

"Time to first fix" means there's going to
inherently be a delay.  And the way to avoid that delay is
to leave the GPS receiver hot all the time.  So if you
leave it on all the time, though, we're going to burn
battery.  So we have this sort of tradeoff of performance
versus battery life.

So the solution in the '420 patent is to
anticipate the need for GPS and sort of turn it on early,
shuts down -- closes down the time to first fix, certainly

may use a little bit of battery, but not the same as

keeping the battery -- keeping it on all the time.  Because

even today, I don't know if you've been lost with Apple

Maps on, but GPS is so very intensive and, you know, can

cause you to -- to go with your -- lose your battery life.

        So here it says in the example -- one of the

examples in the specification of the '420 patent is in the

context of the 911 call.  So if you look at -- we have this

little phone here, we dial 9, then we dial 1.  When we dial

1, the GPS comes on in anticipation of the next number is

going to be a 1.

        Now it may turn out not to be a 1, and that

anticipation was unnecessary, but if it is a 1, then the

phone's already started figuring out where it is.  If it's

not a 1, according to claim 2 of the patent, then it turns

itself off.  So it saves battery if it figures out that it

anticipated but it didn't actually need the phone number.

So pretty simple improvement over the state of the art,

pretty simple patent.

        So we look at claim 3 of the patent, and it says

"an Internet-enabled mobile cellular telephone comprising a

communication transmitter/receiver arranged for two-way

communication with a base station and a GPS receiver," and

here comes the part that we are arguing about, "wherein the

GPS receiver is arranged to power up in response to a user

selecting a website."

So take that 911 example and now apply it to a website.  So anticipating the need that the GPS made -- that the website may need a GPS signal.

There are several terms that are in dispute.  The first one is "power up."  So we're going to talk about that.

So NXP's proposed construction is changed to a higher power state, and defendant's proposed construction is changed from off to on.

Now, the conceptual -- the words that NXP used to express its construction or change to a higher powered state, the conceptual issue is what the patent describes is go -- with the GPS going from not doing anything to getting a fix.  It's described as, you know, going from inoperative to getting a fix.  That's the gist of what the patent is about.

And so we say that's going to a higher power state, because as we look at the prior art for the patent that's described in the patent and incorporated in the patent, it's clear that the GPS -- GPS has existed in a number of different power states.  It can be in a factory start.  They can be in a cold start.  They can be in a dormant mode.  They can be in a sleep mode.  There are all these different modes.  And what the -- and those are all

1  low power modes.  Those are the modes where the GPS is not

2  burning any power.

3       And so what this patent is concerned with is going

4  from that state of not doing anything to a state of

5  obtaining a fix so that we get there faster.  And so our

6  proposed construction is to change from -- change to a

7  higher power state.  The concept is inoperative to

8  operative.

9       Now, BlackBerry --

10      THE COURT:  Why don't we just define it as

11 switching from inoperative to operative.

12      MS. DE MORY:  That's -- I mean, that's a

13 possibility.  Because it's not strictly off.  I mean off in

14 the BlackBerry sense, or at least what we've seen from how

15 that plays out as Your Honor has asked, what that's playing

16 out as is off means off.  No power supply.  But even --

17 unless you completely take your battery out of your phone,

18 all the components have some power supply to them as long

19 as the battery is in there.

20      So what this is really concerned about is just

21 going from not -- not obtaining a fix, not doing it, just

22 sitting there whether it's in dormant or sleep or any mode

23 to obtaining a fix.  So if that's inoperative to operative,

24 lower power state to higher power state, not obtaining a

25 fix to obtaining a fix, that's the concept.

1        And so that I think, you know, the Court -- with

2   that I'm not sure that I need to go through all of this,

3   but it is not strictly off to on.  It's not zero power to

4   on.  And that's really the gist of the dispute between the

5   parties.

6        So when we look at this on slide 114, it says in

7   column 4, line 51 through 56, it goes from -- remains to

8   cellular phone -- when the power on the phone is switched

9   on, so this contemplates the phone has a battery and it's

10  switched on, the GPS receiver and the microprocessor remain

11  inoperative and do so until they're powered up in response

12  to this stimulus.  So that's going from being inoperative

13  to being powered up.

14        The same thing occurs -- there are some other

15  examples on slide 115.

16        And then we looked at the prior art as well, slide

17  116.  So this is the priority application, and it talks

18  about the change from the dormant mode to the active mode

19  may occur in response to recognition of an emergency call

20  being made.  Same concept.

21        Even as we look at -- you know, one of

22  BlackBerry's points was that if you look at the dictionary

23  definition of "inoperative," you know, it means off.  But

24  actually inoperative includes dormant, not functioning,

25  that sort of thing, so it's not necessarily supplied with

1    no power.  So that's the issue with regard to power up.

2         The next -- the next issue is the GPS received --

3    so this is sort of the whole phrase.  And here I'm sure

4    you're going to hear about NXP's change of position or

5    changes of, you know, massaging the claim construction, and

6    what you'll see is -- I'm not going to go through them --

7    what you'll see, if you look carefully at them, is that

8    they've been -- they've come closer and closer to sort of

9    BlackBerry's claim construction.  We're sort of basically

10   eliminating issues for the Court where there are issues as

11   the Court has asked why are we arguing about this, we don't

12   need to argue about.

13        And so really we reduced it down now to a very

14   limited set of issues with regard to this claim term.  We

15   have agreed to construe the whole term which was first in

16   dispute, and we've reduced this down to a very limited

17   number of issues about the -- the phrase.

18        So the first is we agree that the -- that there

19   must be this anticipation.  So if we -- but BlackBerry --

20   so we agree that there must be -- this is sort of

21   dispute -- if go to slide 119, there are two issues really.

22        We agree that anticipation is required, but the

23   question is anticipating of what.  We say "of a need," they

24   say "of a request from the website."  So they want it to be

25   that the website has to request the information, that

1   that's the anticipation of the need.  And so that's the

2   anticipation that's required.  So that's dispute number

3   one.

4          And now dispute number two is whether or not

5   they're rewriting the claim as another claim, so that's --

6   those are the two disputes that we have left as to this.

7          So let's look at the actual difference in the

8   proposed constructions.  They're not -- the claim -- this

9   is -- this is sort of an important thing.  The claim

10  actually says "power up in response to a user selecting a

11  website."  But we both adapted this claim construction that

12  sort of deviates from that claim language because of the

13  prosecution history.

14         And so in the prosecution history, they say that

15  it powers up in anticipation of a need, which is where our

16  claim construction comes from.  So we look at the actual

17  proposed constructions, and we see this dispute between a

18  request and a need and the sort of disconnect from the

19  claim language itself.

20         So where does BlackBerry get its proposed

21  construction from?  BlackBerry gets its proposed

22  construction from column 2, lines -- I don't have the cite

23  in here unfortunately.  It looks around line 40.  And

24  there's an example.  There's a description of claim 3 in

25  here.  And it says, "For an Internet-enabled mobile phone

with a GPS receiver, the GPS receiver may be arranged to power up in response to the user selecting a particular website."

So let's pause right there. That is the exact language of the claim. So it's in response to a user selecting a particular website.

And then it goes on and it says "for example," so that's another important point, but this is an example, "a website associated with location-based services whereby the call is determined in anticipation of a request from that website." So we have the claim language and then "for example," and then the request limation that BlackBerry wants to import into the claim.

Now, and so that's -- you know, that's an important issue that we're -- have this "for example" language and then BlackBerry's trying to limit the claims to that "for example" language, and that we cited here in the Kinik case, should not be restricted for a particular example.

But even more importantly --

THE COURT: Where in the patent is it suggested that the GPS receiver would request anything other than location information?

MS. DE MORY: Oh, it's not that it would request anything other than location information. It's when --

1   it's when did the anticipation occur.  So does the

2   anticipation occur when the website -- so this is the

3   communication between the phone and the website, this

4   interaction.  So does the thing -- does the phone power up

5   in anticipation of the website asking for location

6   information, or the fact that the phone, whether it's the

7   website or the phone, there's going to be a need for

8   location information?

9         Regardless of whether or not that phone, via a

10   request, whether the phone has -- there's something that

11   happens within the phone itself that needs the location

12   information.  So there's this interaction between the phone

13   and the website.  And the question is, is it -- does it

14   strictly happen, does it strictly power up because of a

15   request coming from the website?  Or does it do it in

16   anticipation of a need for the information?  The need could

17   arise on the phone itself.  And that's -- you know,

18   that's -- that's the issue that exists between the parties.

19         And so the question is, we're diverted -- we've

20   gone away from the claim language, we've gone away from the

21   claim language that says in response to a user selecting

22   website, because if we went with just "in response to a

23   user selecting a website," we would say "it powers up when

24   they select a website."  There would be no issue of request

25   or not request or need or not need.

1        But we don't -- we agree that that's not the case.

2   We agree that the prosecution history requires this

3   anticipation element.  Well, then the anticipation element

4   is the anticipation element of the prosecution history, not

5   that "for example" that matches the claim language.

6        And when we go to the file history where this

7   actual limitation comes from, it says the present invention

8   provides the idea of anticipating a need for the GPS

9   receiver -- the present invention provides for future of

10  anticipating the need for the GPS receiver.

11       So -- so we got the limitation of anticipation

12  from the prosecution history, because if we went with just

13  "in response" we wouldn't even be talking about this.  If

14  we went "in response," we would say click on Facebook and

15  then GPS receiver would come up.  So we wouldn't even get

16  to this issue of whether it's in response to a request or

17  whether it's a need.

18       But because we're saying, "No, it's not in

19  response, it's this anticipation."  So we -- then we get --

20  we get the benefits and the burden of that.  I get the

21  burden of it which is that I now have to say it's an

22  anticipation, and with that comes what is it an

23  anticipation of?  It's an anticipation of the need.

24       So the construction comes from the prosecution

25  history as opposed to strictly the language of the claim

because if it was just a claim, it wouldn't be just
response to selecting the website. And so that is the
issue on anticipating need versus in response to a request.

And we propose that NXP's proposed construction
should be adopted.

And then the question is -- the second question on
this claim element is whether or not BlackBerry is trying
to limit -- make this a method claim. And they say they're
not, but it's our slide 126. What we have here is the
claim says "is arranged to power up" which means you just
require -- it's an apparatus claim, you just require a
physical arrangement, "it is arranged to power up." That's
what it says. That's all that's required.

But BlackBerry takes the next step which says it
is powered up. It actually kind of -- it -- it -- you
know, it's the method. It is powered up in response to
this. So that's -- the step actually has to happen.

So instead of just selling a phone that's capable
of doing this, they would say, "Well, no, you have to
actually show that it is doing it." But this is not a
method claim. This is an apparatus claim. So if it is
configured and capable of performing the steps of the
claim, then it infringes.

The final dispute is on website, and here we have
a situation where --

1    THE COURT:  So you're saying that the issue for

2    infringement purposes is the anticipation?

3    MS. DE MORY:  So the anticipation --

4    anticipation -- so we agree that anticipation is a

5    limitation.  It's what is it an anticipation of, yes.

6    Yeah.  What is it an anticipation of.  Either the request

7    which comes from the spec which goes with the original

8    claim language or the need which comes from the prosecution

9    history which matches up with the way that we've all

10   construed the term.

11   So then we have a -- I should just say one other

12   thing.

13   Even if it was the original claim language, I mean

14   the original claim language is in response, and so that

15   would just be it happens in response.  And I would argue

16   there, too, that the "for example" shouldn't be a

17   limitation.  So under all circumstances in NXP's view, the

18   "for example" should not be a limitation.

19   So then we move to website just briefly in

20   interest of time.  We say it's a resource accessible

21   through a worldwide web.  They say none has to be -- no

22   claim construction is necessary, but it's a common term.

23   And there is a dispute here, and interestingly

24   they say it's a common term, and they say this again and

25   again in their briefs, but when I ask their expert at

deposition I said, "Is www.facebook.com a website?" And he
said, "Just specifying to that level of detail, you can't
tell," and he went on to explain why.

And so, you know, what we say, you know, this
other issue here, but I expect that we're going to hear
from his expert -- their expert about whether or not
something is or is not a website, depending on what you
navigate to, what does it look like. And so it's NXP's
position that there is a dispute about this.

Now their primary argument on website is this
claim construction from the Frenetics case. And
interestingly the claim construction from the Frenetics
case is not that different from our claim construction. It
says "one or more related web pages at a location on the
worldwide web," and ours is "a resource accessible through
the worldwide web," and BlackBerry has proposed nothing.

And so my final point is there are other cases out
there. I mean, there are plenty of cases that construe
"worldwide web." It is not -- I mean, construe "website."
And I put in another example just for illustration, not
that we believe this is a claim construction that should be
adopted, but there's a discovery patent holding case out of
the District of Delaware where even more complicated
construction of "website" was adopted. And so it is not
the case given BlackBerry's expert's inability to even

identify www.facebook.com as a website, but it need not be construed.

THE COURT: Okay.

MS. DE MORY: Does the Court have any questions?

THE COURT: No.

MR. GRAUBART: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. GRAUBART: Noah Graubart from -- Mr. Mitchell introduced me this morning. The Court's indulgence for one second while I get set up here.

All right. So addressing this '420 patent that Ms. De Mory just described. So let's look at the claim that's at issue here, Your Honor. The only claim that's asserted is this claim 3. You've heard NXP's characterization of what the invention is, but I want to real briefly look through the various elements. We have an Internet-enabled mobile phone, some communications transmitters, a GPS receiver, and then as Ms. De Mory said, this crucial clause wherein the GPS receiver arranged to power up in response to the user selecting the website.

But what is important to keep in mind as we search for the appropriate claim construction here is which of these are the novel aspect, what's the scope of the claim? What's actually novel that NXP was awarded the patent on. Because very quickly you'll see that virtually all of the

1   elements within this claim were known, were prior art, and

2   so whatever happened here, whatever's being claimed is

3   something exceedingly, exceedingly narrow.

4        So first of all, NXP, of course, didn't invent the

5   mobile phone.  They didn't invent GPS.  They didn't invent

6   GPS receivers.  They didn't invent mobile phones with GPS

7   receivers.  This patent didn't even invent Internet-enabled

8   mobile phones.  Those existed at the time.

9        And the concept of just powering up the GPS

10  receiver within the phone only when it's required, that was

11  in the prior art, too.  The patent in the background of the

12  invention right up front says this is the way it already is

13  done.  And as a result, NXP's own expert says there's new

14  power-saving methodologies that are described in this

15  patent.

16       So it's with that backdrop that we reach these

17  disputed claims here.  The Court knows there's three terms

18  at issue.  BlackBerry proposes a construction for the first

19  two and NXP contends that that third one, website, also

20  requires construction.

21       Now the first one is "power up."  Their word

22  resides in the claim.  Now what does "power up" mean?

23       We submit that the plain and ordinary meaning of

24  "power up" as used in common usage as well as in this

25  patent as confirmed by the intrinsic and extrinsic

1   evidence, is to power from off to on.

2         At the beginning of Ms. De Mory's presentation,

3   when describing this patent in broad strokes, I

4   unintentionally perhaps used the same language, because

5   that is the colloquial understanding of "power up."  It

6   goes from -- she says GPS receiver comes on and then later

7   it goes off.  That's what "power up" means in an ordinary

8   fashion.

9         At some point, Your Honor, and Ms. De Mory was

10   discussing whether NXP would instead prefer a construction

11   that says "inoperable to operable."  So it's important --

12   that's not what the claim says.  They claimed "power up."

13   This is as NXP, as Mr. De Mory described, they think that

14   the claimed invention here is some novel way of managing

15   batteries.  Power is crucial to NXP's damages case on this

16   patent.  They didn't say "operable."  And if you were to

17   adopt some construction, which I contend is what happens

18   here even under the construction NXP's proposing, where

19   it's this twisting of "inoperable" or "operable," it

20   completely reads out "power up."  "Power up" is the term

21   that the inventors claimed and chose.  And that's what the

22   patent covers.

23         And notably we didn't hear about any support

24   anywhere in the patent for the dichotomy being "inoperable"

25   or "operable."  It's "power up."

1          So what is the specification -- what else does the

2     specification tell us about what "power up" means?  Well,

3     first in this passage there's a description of the passage

4     if the phone is off and then the phone is switched on.  But

5     the TV -- not everything is switched on.  The GPS receiver

6     remains inoperative.  It was inoperative when it was --

7     when the whole phone was off, the phone turns on, the GPS

8     receiver remains inoperative.  It remains off.  It's only

9     later that that component is powered up under certain

10    circumstances.

11         So the '420 patent only describes two power

12    states.  There's inoperative, off, and then there's power

13    up, on.

14         And so to turn the tail a little bit, NXP says

15    "No, actually they're describing powering up in multiple

16    ways for multiple states."  And Ms. De Mory referenced

17    factory cold starts, cold starts.  But I think it's

18    important to take a look at exactly what those references

19    are in the patent.  Because that's simply not so.

20         What you'll see in terms of factory cold start and

21    cold start, neither of them have anything to do with power

22    state.  They're both a matter, as Ms. De Mory said, of

23    time, time to first fix, how long has it been since the GPS

24    receiver powered up and got some information.  If it's a

25    cold start, it means it had been awhile.  If it's a factory

cold start, it means it never powered up, there's no
information.  But either way you're off and you're powering
up to on.  There's no -- this is not various ways to power
up.

            THE COURT:  Now are you saying that the whole
phone has to be off or just the GPS function?

            MR. GRAUBART:  No, Your Honor.  The GPS receiver.

            THE COURT:  You're not saying that the --

            MR. GRAUBART:  No.

            THE COURT:  -- the whole phone has to be turned
back on?

            MR. GRAUBART:  That's correct.

            And now beyond the specification, there's
additional intrinsic evidence that confirms that in this
patent, just like the ordinary meaning, "power up" means
from off to on.

            So the '420 patent claims priority to a British
patent application, the '371 application.  What that means
is the inventors came to the patent office here and said
"Patent office, we have another patent that we filed for in
the UK.  Same invention, so we want to claim priority of
that.  We want to be entitled to that date.  You should
judge prior art as early as that application."

            And so what's the effect of that?  The effect is
that that patent application is now part of the intrinsic

record for this patent just as much as the specification.
And so we look to that priority application and say, "Okay.
Well, how did the inventors use the word 'power up' there?"
And just like BlackBerry's construction, "power up" in the
priority application goes from off to on.

The "on" there is a dormant mode of operation.
And you heard both in the briefs and in Ms. De Mory's
presentation there that "dormant" means it's inoperative,
it doesn't power up, it's still inoperative. But that's
absolutely not correct.

The -- I skipped a slide. The priority
application says over and over and over, at least 10 times,
that dormant is a mode of operation. It's a state in which
the GPS receiver is activated, it's collecting GPS signals,
it's sampling them, it's storing them, it's preprocessing
them. It's an operation mode. That's what it's called
many, many times.

And so what NXP is asking the Court to do, they
realize this priority application is fatal to their
position because "powering up" is being used precisely as
BlackBerry proposes. So they tell the Court that "No, no,
no. That must have meant something else." And that's what
this argument is about dormant being inoperative. But as
you see, that's just absolutely incorrect. That is
precisely as BlackBerry proposes it.

1          In contrast, the priority application, if you go

2   back a slide, to slide 1 of 3, it turns to -- from -- from

3   dormant mode to active.  And there it takes the signals and

4   does other things with them to finally reach a location.

5          And they describe that differently from power up.

6   If you go from dormant to active, that is called "change"

7   many times, and at one point they call it "effect a

8   transmission."  They don't call that "power up," increasing

9   the power -- increasing the state.  "Power up" means off to

10  on in the prior application and in the patent.

11         Now the extrinsic evidence confirms this as well.

12  As Mr. Redder said just this week, he took depositions of

13  two 30(b)(6) deponents, four from NXP in response to

14  Magistrate Judge Smith's compel order, and NXP's engineer

15  used the phrase "power up" just like BlackBerry's

16  construction said "I understand it to mean to go from off

17  to on."  That's far from the only extrinsic evidence.

18         One of the inventors told us that, well, power up

19  means boot up.

20         Okay, so what does "boot up" mean?  We asked NXP's

21  expert on this patent.

22         And Dr. Albert said, "Well, 'boot up' means get

23  started.  From not moving to get started."

24         And then the other inventor, Mr. Mergler, when I

25  asked him about the prior art to the O'Neil reference, I

said, "How is this different from your invention in the

'420?"

He said the prior art is unable to power the whole

thing off whereas in the '420 invention, it can be powered

off completely.

That was the distinctive fact in his mind about

the '420 invention. It's not just going from some

inoperative state to operative state, various power levels,

it's a clear dichotomy.

So in sum we ask that the Court adopt BlackBerry's

proposed construction on power up.

Now moving on to the next term, the "wherein the

GPS receiver is arranged to power up in response to a user

selecting a website."

As Ms. De Mory said, the dispute centers around

this -- the language that I have here in slide 111 in green

and in red, the parties' proposals of what does

"anticipation" mean. Is it anticipating a request from the

selected website as BlackBerry proposes? Or is it

anticipating a need for location information as NXP

proposes?

So briefly before I even get into the intrinsic

and extrinsic support, NXP offers two criticisms of

BlackBerry's proposed construction, and I submit to Your

Honor that's a complete distraction. They are raised

solely -- they have no impact on the substantive aspects of
the construction.  So I want to dispense with them briefly.

      Mr. Reger, could you go to slide 121 for me,
please.

      So first of all, Ms. De Mory contends that the --
BlackBerry's construction converts the claim from apparatus
into a method.  That's not correct.  If you look at the
whole context of the claim, it is a -- as we said, it's a
phone, an apparatus, with certain components where one of
those components, the GPS receiver, powers up under certain
circumstances.

      That's true at the claim unconstrued, that's true
under NXP's construction, that's true in BlackBerry's
construction.  There's no method requirement here.  But
let's be clear.  To the extent that this is a problem and
to the extent the Court is concerned about it, we're happy
to adjust that aspect of it.  So instead of powered up, is
powered up, we'll go with "arranged to power up" just like
NXP says, so that's fine.

      The second criticism, they say that we've
rewritten in response to, to "upon."  "Upon user selected."
 They don't explain what the difference is because there
isn't any.  It's simply we believe that "upon the user
selecting" is just easier for the jury to understand.

      You know, this is effectively, Your Honor, the

first jury charge conference in this case.  We need to
interpret the terms correctly as a person of ordinary skill
at the time of the patent would have understood them, but
when you do it the way that the jury's going to understand.

         But once again, if this is a problem, if the
Court's concerned about it, we can change that from "upon
user selecting" to "in response to."  These are
insignificant issues.

         So if we go back, Mr. Reger, to slide 112, please.

         So both parties agree that there must be some
anticipation going on in this patent.  And the question is
what.  The patent office first rejected the '420 patent.
They said the prior art, just like you said in your patent,
already discloses powering up a GPS receiver in response to
taking some action.  And they said no, no, no -- the
inventor said no, no, no, patent office, you got that
wrong.  Our invention -- look at our patent carefully.  Our
invention has an anticipated feature.  There's this
anticipating feature they said is the critical distinction.

         So the patent office gave them claim 3 and they're
left with this anticipating feature.

         Well, we looked at the claim and the claim doesn't
specify.  The -- the patent office, there's no
anticipatory -- excuse me -- anticipatory feature in this
patent, but it's not the claim.  So we better look

somewhere else in the patent.  In the *Philips* case, the
federal circuit's primer on claim construction there in
banc decision in 2005, makes abundantly obvious is what we
need to do is look at the specification.

So that's what we do here.  We go to slide 114,
this column 2, line 40 to 46.  This is a critical passage.
The reason it's critical, Your Honor, is this is the only
sentence in the entire patent that describes anything
regarding Internet-enabled phones or websites.  This is it
right here.

And as Ms. De Mory admitted, the first two-thirds
of it or so, maybe half, it's just the claim.  So the only
thing the patent tells us beyond the claim language about
this whole notion of Internet-enabled phones and websites,
is this -- is this website associated with a location-based
service where it's in anticipation of a request from that
website.

And that, by the way, Your Honor, this a side
note, that's the basis for BlackBerry's motion for summary
judgment in the validity and written description, so this
alone doesn't draw any proof that the inventors possessed
this claimed invention.

So it's clear now, though, from this that this
anticipatory feature that the patentee swore to the patent
office was in their patent must be the concept of

1  anticipating a request from the website that the user

2  selected.

3          So because there's nowhere else to look in the

4  patent about websites, NXP says, well, this just must be an

5  example.  They point to this "for example" clause.  But

6  from the context, it's the -- a particular website "for

7  example" a website that -- with the location-based service.

8  The example is not the anticipation.  It's the example of a

9  website.  Why would you be needing location when you're

10 interacting with a website?  The inventor provides an

11 example.

12         The *Kinik* case on which NXP relies, which

13 Ms. De Mory mentioned, is presumably cited for the

14 proposition that some "for example" clause like this is --

15 it should be given some weight, less weight, more weight,

16 whatever it is.  In fact, *Kinik* doesn't have any discussion

17 of "for example" clauses.  *Kinik* stands for the

18 unremarkable proposition that where a patentee gives just

19 one embodiment, one example -- one embodiment, one example

20 in the patent should not automatically be imported into the

21 claim unless there's other reasons to do so like a

22 disclaimer in the file history that we had here where they

23 told the patent office it's this anticipating feature.

24 That didn't happen in *Kinik*.

25         So even if you move out beyond the context of

websites and Internet-enabled phones, the patent again
repeatedly describes anticipating requests.  That's the
only kind of anticipation in the patent.  The other
embodiments of this patent are the notion of calling
emergency services line, as Ms. De Mory said, so you dial
9.  In Britain it's 999, two "9"s.  Before the third "9,"
the phone is smart enough to anticipate a future request
from the network operator.

        Ms. De Mory introduced a concept that I think was
always implicit in their claim construction but we hadn't
heard explicitly.  It said, "We think the claim covers not
anticipation of a request from the website for location, it
could be that the phone has for some other need, some other
need in the phone."  But where is this other need in the
phone described in the patent?  It's simply not.  The only
kind of anticipating of any need in the phone is a need for
location to respond to a request.

        And so going back to the prosecution history where
they told the patent office you look at the context of what
it is they say is being anticipated.  They say it's
anticipating the need for the GPS receiver during a
potential emergency call, which the patent has explained
repeatedly being when you're on emergency call, the
emergency network asks you to send a request for location.

        So even here in the prosecution history, there

again, confirming the exact same thing, we're anticipating
the need for location to respond to a request in the
context of claim 3, that's the website requesting it.

          And then additionally what NXP's position is with
respect to this prosecution history is that, well, the
claim doesn't say anticipation, the patent has an
anticipating feature, and they told the patent office that
the anticipating feature is crucial, it's the key
limitation of the claim.  But we shouldn't actually look to
the anticipating feature in the patent that's described.
We should look at the words that the patentee used to the
patent office and say instead of anticipating a request, it
should just be anticipating a need.

          But as you see, Your Honor, that just broadens the
claim scope from specifically one where the claim is read
in the specification tell us that you need to anticipate a
request to just any old need.  And the law doesn't allow
that.

          You file your patent application.  The subject
matter that could possibly be within it is fixed on that
day, and although you can later tell the patent office, "I
want less.  I'm giving up some of this claim scope.  I'm
disclaiming it.  I'm disavowing it," in order to secure
your patent, you can't make a statement later and make it
broad.  You can't go out and grab additional material.  And

that's what the -- the *Honeywell* case says.  Specification compelled to construction some statement that might make it broader in prosecution is not going to help you.

So Ms. De Mory prefaced that we would explain to the Court that they changed position repeatedly, and she's absolutely right, because I think it's very important to understand here.  NXP tells the Court that they're faithfully implying the intrinsic evidence.  But evidence hasn't changed throughout the course of the case.  And yet NXP's construction has changed again and again and again as they try to find an infringement theory that they think will stick at trial.  They put up a construction they don't like that it has what the evidence says about it from an infringing standpoint, let's try another one.

These are not compromises closer to BlackBerry's position, as NXP said, I think you'll see.  So the first time in the response to an interrogatory NXP said no anticipation, just in response to the user selecting the website, just like the patent says is prior art.

So then with no warning, in their expert report without amending our response, their expert said no, no, of course there's anticipation.  But what is anticipated?  The need for location by the intended Internet resource.  And you'll see there in brackets I have the term "website." The reason for that is at that time, NXP construed

1    "website" to mean Internet resource.  They've changed that,

2    too, but the point is at the time they were saying you

3    anticipated a need for location by the intended website.

4           So they stuck with that throughout the end of

5    discovery.  But then what happened?  Well, long after

6    discovery was closed and NXP realized they couldn't prove

7    infringement apparently under that construction, lo and

8    behold, for the first time we see in their claim

9    construction brief an entirely new construction.  And here

10   it did not come closer to BlackBerry.  They dropped

11   entirely the notion of the need by the intended website, by

12   the request from the website.  Instead they come up with a

13   generic just need for a location.

14          There's no explanation for the change.  The

15   evidence hasn't changed.  This is just construction in

16   search of an infringement theory.

17          So in sum, Your Honor, we ask the Court to adopt

18   our proposal on this wherein the GPS receiver is "powered

19   up" clause.

20          And I look to the final term which is "website."

21          Now, NXP says that even though BlackBerry proposes

22   no construction, that the Court is compelled to construe

23   the claim because there's a dispute.  They point to the

24   *O₂Micro* case.  We've heard that case mentioned a number of

25   times.

1        But what the Federal Circuit has also said in

2   the -- I'll point the Court to the *ActiveVideo v. Verizon*

3   case, 694 F. 3d 1312 at 1325, and that was the Federal

4   Circuit just last year, 2012, said consistent with $O_2Micro$,

5   the Court can resolve the dispute by saying the term has a

6   plain and ordinary meaning that the jury will easily

7   understand and it need no further construction.  That's how

8   we can resolve this dispute.

9        So it's this -- you know, it's interesting because

10  NXP offers plain and ordinary meaning on a number of

11  constructions and doesn't say then therefore we must adopt

12  something even though there's -- just because there's a

13  dispute.  The dispute could be resolved in BlackBerry's

14  favor by saying it has a plain and ordinary meaning.

15       Now, why does NXP say that there's a dispute?  NXP

16  takes a shot at Dr. Michalson, BlackBerry's expert on the

17  '420 patent --

18       Mr. Reger, can I ask you to go to page 171, slide

19  171, please.

20       And this unfortunately, Your Honor, is not a slide

21  that I provided.  The -- it is accurate, as Ms. De Mory

22  pointed on the screen, that Dr. Michalson, when asked, "Is

23  www.facebook.com a website?" he said, "Well just at that

24  level detail, I can't tell."  Then they put an ellipsis in

25  the slide that NXP presented.  I'd like to go back and

1    present you with the entire testimony.

2            He went on to say unambiguously that facebook.com

3    is of course a website.  It has a website.  It's just that

4    the technical way to describe it is

5    http://www.facebook.com.  He confirms that again.

6            Ms. De Mory tried to get another sound bite and

7    said, "So you can't tell me?"

8            He said, "No, I told you.  It's the http."

9            In more modern browsers, you can just put in www,

10   the browser will figure it out and work for you, but to be

11   technically accurate, the website is http.  There's no

12   confusion about somebody can't tell you what a website is.

13   Everyone knows.  It is the web page and address in the

14   facebook.com company.

15           So going back to slide 125, please.

16           So what does the patent tell us about what

17   "website" means?  Well, it tells us very little.  The claim

18   uses just the term "website."  The specifications use the

19   term "website."  The only difference there is there was no

20   space between the two in the specification.  And the

21   prosecution history just uses "website."  They give an

22   example of www.911.com.  But there's no broader meaning.

23   It doesn't prevail intended resource, worldwide web

24   resource, any of these concepts that NXP has at various

25   times sought to import into the claim or sought to expand

1    the claim to cover.

2            In fact, beyond just "resource" and "worldwide web

3    resource" that are now in their construction, NXP's brief

4    makes it pretty clear what this is about is that they want

5    the term "website" to cover the software apps on a smart

6    phone.  That's -- but there's no evidence whatsoever in the

7    patent to support that.

8            So as a result, here right here before you on

9    slide 127, this one paragraph is the entirety, this is the

10   universe of argument and evidence that NXP put before the

11   Court on this term in its brief one paragraph.

12           The first sentence says that the parties have a

13   dispute and it was a citation to that misleading Michalson

14   testimony that I just provided the full context on.  The

15   rest of it cites to no evidence whatsoever.  And so all

16   they've said here is, "Well, Judge, NXP" -- excuse me --

17   "BlackBerry is trying to rewrite the claim," which is

18   really a remarkable statement when BlackBerry hasn't

19   offered a construction, NXP keeps changing their

20   construction, and now apparently we're rewriting the claim.

21           So they say as a result we'll be better off for a

22   construction.  What's our construction?  We're going to

23   change "website" to "app."  Why?  What evidence do we have?

24   Well, that's the BlackBerry phone we have.  So we want the

25   Judge, we'd like you to rewrite it to the plaintiffs from

1    "website" to "app."  That's the whole argument.

2            That turns claim construction on its head.  This

3    is not looking at the patent to understand how it should be

4    understood in light of the intrinsic evidence.  It's

5    looking at the accused device and coming up with a

6    construction, and not even offering a bit of intrinsic

7    evidence.

8            Now, lest any doubt remain, many courts, as

9    Ms. De Mory prefaced, that BlackBerry would say have

10   construed "website" simply under its plain and ordinary

11   meaning without broadening in the way that NXP asks.  The

12   appellate court said that lay jurors can understand what a

13   "website" means.  And that's consistent with Federal

14   Circuit case law precedent that explains when that's the

15   case, when there's a straightforward everyday object, you

16   don't have to construe it.

17           So NXP's presentation called Your Honor's

18   attention to the *Discovery Patent Holdings v. Amazon* case.

19   This was slide 130 of the presentation.  And there's this

20   really big paragraph here that the Court came up with there

21   for a construction of "website."  And I thought that's

22   interesting.  I wonder what the patent said about "website"

23   to lead to such a long construction of such a simple term.

24           Well, lo and behold, the patent there 6,029,141,

25   it's a 28-page patent all about websites, says, "Herein let

me define 'website.'"  This is what they said.  This is
precisely word for word what's in the patent.

          The Court didn't come up with this because it
didn't have an ordinary meaning.  It was because the patent
expressly said -- there's a phrase in patent law that says
patentee can be its own lexicographer, you can make up
words if you want or you can rewrite other words, you just
have to tell everyone "This is what I'm doing."

          That's what they did there.  That doesn't mean
that "website" doesn't have an ordinary meaning.

          And that's why in the *VirnetX* case, Judge Davis
rejected precisely the line of argument that NXP is
presenting here, that "website" should be broadened to
cover "Internet resource."  He said, "You chose 'websites.'
You could have chosen other language.  But the public is
entitled to take your word for what it was you claimed, and
that's what your invention was."

          So he came up with a very simple construction.
And NXP says it's very close to what they're offering, but
that's not true at all because this reference, Judge Davis'
construction, says one or more related web pages.  That's
missing completely from NXP's construction.  So let's not
have any confusion that this is what NXP proposed.

          So as result, Your Honor, in sum, we ask the Court
to adopt BlackBerry's proposed position that "website"

doesn't require construction.  It has a plain and ordinary

meaning that one skilled in the art would have understood

and even a lay juror can understand without construction.

THE COURT:  All right.

MS. DE MORY:  I just --

Mr. Win, we're going to move up to the next '668

will be next.

Just briefly on a couple issues, one, on "power

up."

So there was reference to -- it's on slide 102 of

defendant's presentation, we don't need to go to that, but

to the priority application and how the priority

application allegedly goes from off to dormant as power up

mode.  And I -- I want the Court to look back at that.

The dormant -- here it says that the dormant mode

is entered on power up.  And what we know about the patent

is that the getting a fix mode is entered on power up.  And

in this case and of the prior application, it doesn't say

going from off.  It says the dormant is entered on power

up.  So it doesn't speak to what BlackBerry is trying to do

here which is to say that no power is supplied to the chip

at all prior to -- prior to power up.

On anticipation, the -- the -- NXP's proposed

construction of anticipation comes directly from the -- the

evolution of that position comes directly from the

prosecution history.  BlackBerry is absolutely right, the
intrinsic evidence has not changed.  And as the common --
with the -- the patent, when you first look at the claim it
says the claim says on its face "in response to a user
selecting a website."  So you look at that.  That is all
that's required.  Nothing else is required.

And if it's that all that there was, then we would
just say it's in response to user selecting a website, and
we wouldn't be incorporating the limitation.

When we get to the point of incorporating the
limitation, we go look at where does -- where are we
getting this disclaimer from, where are we getting the
limitation from.  It comes from the file history.  And so
it's the file history that should be followed.  And that's
the perspective looking on it, it did eliminate a number of
disputes between the parties, and I think in fact
Mr. Graubert agrees that now one of the disputes is even
gone.  So -- and we hadn't argued one of those disputes
either which we agree is gone.

And with that, I will pass to Mr. Win.

THE COURT:  All right.

MR. WIN:  Good afternoon, Your Honor.  Cliff Win
on behalf of the plaintiff, NXP.

So I will be addressing the claim terms at issue
for the '668 patent and the '697 patent.  These patents

1    sort of have a little bit of synergy.  They're both

2    directed towards semiconductor manufacturing and what is

3    called dummy fill.

4          And with that I would like to go to the first

5    slide for the '668, slide number 132.

6          So the first term at issue for the '668 patent,

7    BlackBerry would like to construe the term "mask."  NXP

8    would like to sort of broaden that term as it makes more

9    sense within the context of the invention as "generating a

10   mask," as the phrase ought to be construed.

11         And then the second term is "dummy fill pattern,"

12   which is another term that appears in a number of the

13   dependent claims as well as independent claim 13.

14         If we can move to slide 33.

15         Your Honor, I'd like to give a little bit of a

16   primer on semiconductor manufacturing, if I may really

17   quickly.

18         Where we start off is you begin by drawing a

19   blueprint drawing or plans, if you will, like a building.

20   If you see on the right-hand side of the slide, there is a

21   layout plan or a blueprint of a circuit.

22         And this is sort of like a film negative, and that

23   is the blueprint of the circuit.  What they do is they take

24   this image, first you drive -- in the earlier days of

25   semiconductor manufacturing, what they did was they

actually drew it by hand and then they started using

computer tools and things like that, mouses and

point-and-click, and you can actually draw this image as

you see.

They would take this image and they would get it

on a glass plate, engraved, if you will.  So you engrave

the image that you see on right blown up, get it engraved

on a glass plate.  And then what they'd do is they would

use this glass plate and they would expose light on the

plate and through a lens onto the semiconductor wafer.

And when that exposure process was done, you

actually have your circuit printed on the wafer, similar to

like a printed circuit board.

If you -- if you notice, you know, you have the

glass plate and then you have this image.  And I just

wanted to signal the Court that this is where the main

issue lies.  The dispute is whether this invention is

really about creating or manufacturing this physical glass

plate or whether this invention is really about how to --

how to draw this picture that this is blowup of, the

patent, whether it's really about designing the blueprint,

whether you're -- whether this invention is about

manipulating or modifying the patent.  So that's really

where the issue lies.

Before we leave the slide, what I want to point

out is that if you look at this image on the right, this
sort of film -- negative film, you'll see that there's
certain areas that are open spaces, there are certain areas
that have a little bit more higher density, more densely
populated, there are certain areas that have a lot -- or
less densely populated.

And with that, I'd like to move to the next slide.

And so the slide previous was the top view of the
plan.  Now if you look at it from a cross-section
standpoint, and if you look at one layer of it, if you look
at an area that's less densely populated or an open area,
you would see that there's this sort of -- well, let me
back up.

So what you do is if you look at a physical
circuit, you have these circuit elements.  You have these
circuit elements, and in areas where there is no circuit
element, when you deposit an insulating layer on top of the
circuit element, you're naturally going to have the sag.

And so then when you start stacking floors into
the circuit wafer, it's like an apartment building with
multiple floors.  And so when you -- when you're -- let's
think of it this way.  You're making a pillar in a certain
room and so when you're making a pillar, the ceiling is
going to start to sag.  And when you're using the next
floor to -- as a base to build your next level, that sag is

1  going to continue on and then you're going to get a sag at

2  the next floor.

3          So that was the problem that the '668 patent was

4  trying to solve, at least one of the problems.

5          If we could move to the next slide.

6          So here you have an insulating layer that's

7  covered over the circuit elements before you have dummy

8  fill.  So the first part of the patent was to introduce

9  what is called dummy fill.  They called it dummy fill

10 because if you --

11         Can -- can we go to the next portion.

12         So now this is -- you have blue elements.  Now the

13 blue elements aren't really circuit elements.  That's why

14 we call them dummy.  They look just like circuit elements,

15 they may look like a circuit transistor, but it's really

16 not.  It's there just to hold up the ceiling.  It's just

17 extra -- extra pillars that may look like actual circuit

18 elements, but they have no significance to the actual

19 circuit.  So that's why we call them dummy.  We call them

20 fill because they're starting to fill the open spaces.

21         And we go to the next slide, here's just a top

22 view of it.

23         Again, the red lines are your actual circuit

24 elements, wires and traces and transistors.  And then to

25 the right after you have dummy fill, you have all these

1    additional open spaces that are -- that are -- that are

2    filled up in blue that have no significance to the circuit.

3          So one way to do this was sort of manually go in

4    and sniff out the open spaces and manually either draw it

5    in or fill up the spaces.  But the inventors of the '668

6    patent came up with a clever way to automate this process.

7    So it's all that they did -- I mean, the first part of the

8    invention was about using dummy fill to fill up the spaces.

9    But really the heart of the invention really lies at a

10   clever way to automate filling up these spaces.

11         So with that I'd like to go to the front page of

12   the patent.  It says, "A patterned filled photo mask

13   generation for integrated circuit manufacturing."  Again,

14   we're talking about patents here, we're talking about how

15   to manipulate and modify these patents.

16         We can go to the next slide.

17         Here I have a blowup of the abstract.

18         "The active circuitry lines are combined with fill

19   pattern to produce a final pattern for the mask."  And

20   toward the end of the abstract, "The union of the original

21   active circuitry lines and the final fill pattern forms a

22   composite pattern for the mask."

23         The whole point of the invention is to come up

24   with a pattern.  The pattern that you saw in the very first

25   slide of the invention when we saw the negative film

looking image.  It's about -- it's about coming up with a
pattern, manipulating a pattern, modifying a pattern.

There's some further support on the next slide, at
slide 139, you can take a look at later on.  I don't have
cites for it, but their call-outs are pretty descriptive.
It's at column 3 and column 4.  And we'll get to this a
little later on.

And again, at slide 140, summary of the invention.
The end product is a pattern.  We're trying to produce a
pattern.

And if we can go to slide 141.

I'd like to bring this back up again, you know,
you have the before and after.  So the invention sort of
focuses on a process that gets you to the end result.

There's a number of steps that are described.  And
this is just one example that the patent talks about.  One
example to achieve an automated way to add dummy fill into
your existing original circuit pattern that previously had
a bunch of open spaces and to do it in an automated way.
I'll walk you through a number of these steps, starting
with slide number 142.

So what you do here is you start off with your
original circuit pattern and you're going to sort of
oversize it a little bit.  And now these are sort of going
to be the areas where you oversize it and then you invert

it.  And now you have this orange area.

So the orange areas are going to be the bounded areas where you're going to put in the dummy fill.  Now you oversized it before you converted it because you wanted a little bit of keep-out space because you didn't want dummy fill slamming up against the original circuitry lines.  So that's what you're doing in this step where you get this orange -- these orange areas.

Now if you go to the next slide, you take this orange -- the result from the previous slide with the orange areas, and you take the intersection of that with a dummy fill pattern and now you get another result.  And this result, what you have is a bunch of dummy fill blocks which are highlighted in blue in certain areas.  These areas were the open areas where there was no original -- or there were no active elements or circuit elements.

And then you go to the next step.  And again, this is an example.  This is not exactly what the claim -- the claim isn't limited to this, but what you'll do next is you'll cut out or excise shapes that are smaller than a certain minimum dimension or threshold.  If you look at the slide, you'll see certain portions that are colored in purple in contrast to the elements that are colored in blue, so you cut out the stuff in purple.  And then now the end result of this step is you have nicely shaped dummy

1    fill elements.

2           And then finally what you're going to do, slide

3    145, is then take the union of that and your original

4    circuitry and voilà, you have this -- the end result which

5    is the original circuitry plus the open spaces filled in

6    with the blue dummy fill features.  So that's an example of

7    how -- how -- you know, how this invention works.

8           Again, at every step of the way, the result was a

9    pattern.

10          So now if we can get to the claims at issue here.

11          With what I just said as a backdrop, BlackBerry

12   would like to construe the term "mask" as an opaque plate

13   with holes or transparencies that allow light to shine

14   through in a defined pattern.

15          And NXP's position is that the invention is really

16   about, as you saw at every step of the way, this is really

17   a pattern about how to design an image or how to modify a

18   pattern.  And so really generating a mask should be

19   construed as generating a pattern to be used for

20   manufacturing an integrated circuit.

21          Now if we can go to slide 147.

22          Here's sort of a flow chart illustrating the steps

23   that I've just gone through.

24          And as I explained it, every step taught the

25   manipulation and generation of a mask.  None of the steps

1    involve a physical mask plate.

2          If we can go to the claim at 148.

3          I challenge BlackBerry to show me any step, aside

4    from the actual step at issue in step A, that talks about

5    creating a physical plate or creating a glass.  It doesn't

6    even talk about engraving the pattern onto this plate.  If

7    you look at step A.1, A.2, A.3, they're all talking about

8    modifying or manipulating a pattern.  The whole end result

9    of claim -- independent claim 1 is a pattern.

10          I think the only step that BlackBerry can point to

11   that even remotely comes close to, you know, a physical

12   plate might be, A, generating a mask, but that's a circular

13   argument.  Other than that, which is the very element at

14   issue, every other step I'm sure BlackBerry has got to

15   agree it's about generating a pattern.

16          We can go to slide 149.

17          BlackBerry only relies on extrinsic evidence and

18   sound bites taken out of context.  In fact, I wanted to

19   point out one thing where their expert cites to a glossary

20   definition, in fact, supports NXP's construction.  They

21   say, "An opaque image on a translucent plate."  That's

22   right.  It's the opaque -- it's the image, it's the image,

23   not -- it's exactly, the opaque image.  It's the image that

24   we talk about in the very first slide that looked like a

25   negative film.  It's not the plate itself.

1          Your Honor, if you don't have any other questions,

2    I can move on to the next --

3          THE COURT:  Yes.

4          MR. WIN:  -- claim element.

5          The next claim element is dummy fill pattern.

6    That appears in a number of the dependent claims.  I think

7    the parties are able to agree -- if I -- if I may parse

8    this claim construction out, if you look at both parties'

9    constructions, the last portion, "without regard to the

10   presence of active circuitry lines," the parties totally

11   agree to that.

12         So the disagreement really is about, you know,

13   whether it's a pattern containing one or more features

14   versus the Black -- versus BlackBerry's construction that

15   it has to be an array of dummy features.  So they want it

16   to be like you can't have one feature, it has to be more

17   than one feature.  But there's nothing in the specification

18   or the prosecution history or anywhere else that limits it

19   in a way that BlackBerry would like it to be limited to.

20         There's certainly examples and embodiments where

21   you have a herringbone pattern, and obviously you're going

22   to have a multiplicity of features, but there's nothing at

23   all that says it has to be, you know, more than one feature

24   or that it has to have -- be an array.

25         In fact, if we can go to slide 151, and if we look

at claim 2 in the greater context with claim 3 and claim 4,

you know, under the principles of claim differentiation,

this is where that principle would -- would apply the

strongest.  You have claim 3 which depends on claim 2 which

also includes dummy fill pattern, and there it clearly

requires a multiple number of lines.  It says it's

comprised of "rectangular lines," in plural.

But in claim 2 there's no such restriction.  It

just says "pattern."  And so claim 3, which depends on

claim 2, that's the claim that imposes the restriction that

BlackBerry would want.  But other than that, there's

nothing at all in the intrinsic evidence that would limit

the way that BlackBerry wants it to.

And otherwise, I think the position that NXP is

taking is that the dummy fill pattern is clear on its face,

there doesn't need to be a construction.

With that I could move on to the '697 pattern.

THE COURT:  Let me hear BlackBerry's response

first.

MR. WIN:  Okay.

MR. GRAUBART:  Your Honor, two sentences first on

the '420 patent to respond to Ms. De Mory.

NXP's second construction requires anticipation of

an equal location by the intended Internet resource.  That

intended Internet resource, that's what's missing from the

1    third construction, the one they're asking for now.

2           So moving on to the '668 patent.  I think we can

3    be brief on the '668 patent.  Mr. Win did a nice job of

4    giving the Court enough background of what the general

5    technology is.

6           This patent relates to making semiconductors.  And

7    as opposed to the '697 patent we're about to talk about,

8    it's about this predecessor step, making this mask that's

9    used in the process.

10          And what is that mask that's the parties' dispute?

11   Sometimes you'll see in the patent and elsewhere people

12   call it a photo mask.  "Mask" is short for "photo mask."

13   So the title of the patent in fact is "Pattern Filled Photo

14   Mask."  But everything relates to generating a mask.

15          So you'll see that throughout claim 1 and all the

16   claims "mask" appears frequently.  This is a term we need

17   to construe.  The parties' proposed constructions are here.

18   And NXP, as Mr. Win said, wants to construe "generating a

19   mask."  But once we look and see, they propose "generating

20   a mask" to mean generating a pattern.  So we all agree that

21   generating means generating.  The issue is what's a mask.

22          And then as Mr. Win described, I have an even more

23   simplified version of the photolithography process here in

24   a little schematic.  Here's the dispute.  That blue

25   rectangle with -- that has a design on it, that's the mask.

That is the plate on which the design is embedded so that when you shine light through it, it will then transmit that image onto the semiconductor wafer below.

NXP's construction is much more broad. It could be just the pattern, the idea in someone's head. It could be, as their expert said, the electronic data file where BlackBerry's suppliers, once they design a form for the pattern, that all meets up with the mask.

And then, in fact, in BlackBerry's -- in NXP's briefing, we now see with the real end game of this is, is to say that that little red or brown image that's on the substrate after it's been transmitted, that could be pattern, too.

And so as result, you take the wafer, what happens is after they've made all these circuits on it, they dice them up into chips. And the chips go off and get put in components and into phones and end up in the United States including in BlackBerry devices.

And in response to BlackBerry's summary judgment motion where we made abundantly obvious we don't import patterns, I don't care if it's the mask itself or just the pattern on the plate or the design file, we don't sell those. That saves us the supplier wherever they are.

So NXP came up with a new idea that, well, "pattern" is broad enough that it could mean the brown

thing on the wafer.  But you're going to see, Your Honor,
that's just absolutely not possible.  This is the dispute.

So right off the bat, the specification for the
patent versus in its title where it says it's a "pattern
filled photo mask," says there's "pattern" and there's
"mask," they're not the same thing.

The summary even mentions, makes it very clear,
that there is a mask generated for patterning, and as part
of that you make a filled pattern for the mask.  "Pattern,"
"mask," different things.

And the claim is exactly why.  As Mr. Win said, he
challenged BlackBerry to point to any step other than the
actual step at issue that involves a physical plate.  Well,
the actual step at issue, that's the one that's generating
a mask.  Mr. Win seems to admit it's a physical plate.
That's the only step in the claim.  So go generate a mask,
the physical plate.

Then to do that, part of -- some of the steps are
make a pattern for the mask.  Again, "pattern," "mask,"
very different.  The inventors knew what they were doing
when they said one versus the other.  And we ask that the
Court hold the inventors to their -- to their word.

Any doubt remains, the prosecution history
hammered this home.  They said it can't be the pattern on
the chip once it's already been transmitted through the

plate.  Because their invention, to distinguish the chain

and the Wolf prior art references that had rejected it,

that based on that, the patent office rejected it.  They

said our invention, the present invention, occurs before

the layer is placed on the wafer when the mask for the

frosting layer is generated.

So they're saying it is the thing on the wafer,

that actual material that's been etched in a way after you

shine light through the plate, over here, here's our

invention making the plate.

Cannot read as broadly as NXP contends.

The extrinsic evidence confirms this at least four

times.  Earlier this week again Mr. Reger took the 30(b)(6)

deposition of NXP's own semiconductor fabrication engineer,

done it for 10 years, said "Sure, of course, the mask is

separate from the semiconductor."  Obviously.

The inventor, Dr. Bothra, said the same thing, the

mask is this physical plate.  NXP's own expert, Dr. Smith,

who at the time apparently wasn't -- you know, didn't have

wind of NXP's new infringement theory that they were going

to say the pattern's down on the substrate, he said it's

just this electronic pattern in a file.  Because he said of

course the mask is separate from the semiconductor.  It's

also what NXP's first 30(b)(6) witness said, Dr. --

Mr. Waxler.

So their construction can't possibly be right.
Unless any doubt remains about that, let's try and plug it
in.  Let's try using the claim for what the term -- the way
the jury's going to be asked to.  Well, it would result in
a final pattern for the pattern.  That doesn't make any
sense.  And NXP's own expert agreed it didn't make any
sense.  So we ask the Court to adopt BlackBerry's proposed
construction for the mask.

I'm going to leave dummy fill with one sentence.
A pattern is not a single feature of the -- NXP's
construction is that you could just have a square.  It's a
pattern, requires repeated -- repeated features.  That's
the ordinary meaning of the term.

So Mr. Win says we're trying to limit it to the
rectangles that are in one example.  No.  It could be any
sort of pattern as long as it's this regular repeated
pattern, not just some engineer cherrypicks, let's put a
circle here and maybe one or a square right here.  That's
not a pattern.

And, Your Honor, before I sit down, with respect
to '668 patent, I want to note for the Court that a general
note that we're frankly surprised that this patent and the
one after, the '697 patent, are still at issue in this
case.

And the reason for that is that the cases already,

and NXP's alleged, that BlackBerry's supplier has chips
from five different suppliers that infringe.  Over time
they dropped three of those.  There's now two.  And
Magistrate Judge Smith struck their expert's opinions with
respect to some of them.  And as a result we're just in a
situation where the damages demand they're making on these
claims are a tiny fraction of what's left with the rest.

        And so while they're still in the case, we're
going to continue to argue about them, we think there may
be better uses of the Court's resources than doing the
patents that may ultimately be dropped before trial, and
forcing the parties to deal with them.  For the time being,
NXP says we'll continue to talk about the '668, '697
patent, Your Honor.

        THE COURT:  All right.  Mr. Win?

        MR. WIN:  Your Honor, Ms. De Mory would like to
make one final --

        MS. DE MORY:  So I just briefly wanted to talk
about Mr. Graubart's comment on the '420 patent.

        Claim construction is a question of law.  NXP has
set forth different claim constructions over time -- there
was a claim construction negotiation process with
BlackBerry, too, where they took various positions.

        The bottom line is that that claim construction
for anticipation comes directly from the file history which

is where that limitation comes from.  And if we went just
with the plain claim language as in NXP's original
construction, it would be just in response to selecting a
website.  We wouldn't even be talking about what it was in
response to.

Our expert report has not changed.  So this is
truly a question of law based on the intrinsic evidence.
Our expert report and theory hasn't changed.  And all this
summary judgment that BlackBerry filed, none of them
address noninfringement of the '420 patent for anticipating
under our claim construction or their claim construction.
And so that's it briefly on that.

MR. WIN:  Your Honor, I'd like to briefly address
key points on rebuttal for the '668 before I move on to
'697.  And I have a slide that you won't find in your copy,
but this is in rebuttal to Mr. Graubart's bringing up the
prosecution history.

And I took up a -- I took a larger screen shot of
the prosecution history here, and the point that I wanted
to make was that, you know, BlackBerry's own cite to this
passage, and I think it actually supports NXP's position
that it's a pattern, not a plate.  The inventors -- the
language might be a little inartful in this prosecution
history, or office action response, but what they're really
trying to say is that you're modifying -- modifying the

pattern.  You can't modify something like a -- you can't
modify the pattern once it's engraved on the glass.
You're -- you're -- that's what this whole invention is
about.  It's about modifying the pattern.

Once it's in -- in -- in fact, like Mr. Graubart
just cited, that BlackBerry's own expert -- or NXP's own
expert talked about how he saw a mask to be a digital
pattern, right, a pattern that you store it on a computer
and that's where you modify it.  You don't modify it once
the image has been engraved on a glass plate already.

And my final comment is, you know, in claim
construction, you don't take words in isolation and
substitute them here and there.  It's really about the
invention.  And I think it's quite clear the invention is
about modifying and manipulating the patterns.  That's what
the end result is.  You just look at claim 1.  It's about
what do you get at the end of claim 1, you get the end
result is a modified pattern.

With that I'd like to move on to the '697.

You can go to the first slide of '697.

Your Honor, we have three claims at issue here.
The first claim term, "standard uniform pattern density"; a
second term is "a planar surface on a wafer"; and the third
term is "standardized polishing of the wafer."  And all of
these terms are contained in claim 1 of the '697 patent.

1          I want to note that originally there was another

2    term or fourth term, "electrically coupled," which was --

3    which BlackBerry was offering construction for, but they

4    appeared to have dropped it.

5          So if you recall in -- in fact, let me -- if I

6    could turn the Court's attention to slide number 135 really

7    quick.

8          So here in the '668 patent you added those two

9    blue blocks, extra pillars, if you will, in the room, to

10   eliminate the sag.  You may have eliminated the sag and it

11   certainly is a bit flatter, but you still got some curves,

12   you've got some bumps.  So it's not -- you know, you can

13   argue that the plane area has increased, it's certainly

14   flatter, but there's still room for improvement to get this

15   flatter.

16         I mean, you can imagine at semiconductor level

17   even these little bumps are going to cause the next floor

18   which is going to be built off this base to have these type

19   of bumps and now you're going to have bumpy floors on the

20   next level.

21         So the '697 patent kind of picks up where the '668

22   patent leaves off.  How are we going to get these bumps?

23         With that, let's go to slide number 156.

24         So you have circuit dummy fill -- if you go to the

25   next slide -- now I've sort of exaggerated the bumps here.

1          And if you go to the next slide.

2          So this is -- this is how they get the bumps out.

3     One way is a process called chemical mechanical polishing.

4     And if you notice -- if you contrast the second verse with

5     the third, now you've got a really, really flat surface or

6     a substantially planar surface.

7          If we go to the next slide, I have a couple

8     pictures here for you that explains this process.  Here's a

9     couple pictures of the machine.  And what -- what you're

10    doing here is you have -- you take the wafer and you hold

11    it upside down, and then you have a table, and the table

12    has a polishing pad, and you're buffing the circuit away,

13    or the wafer, rather.  You don't actually -- actually you

14    don't want to buff the circuit, you want to buff the

15    insulating layer.

16         Think of this is like when you're waxing your car,

17    you have a circular polisher.  And it's very important,

18    sometimes you get a really good wax job and that's because

19    the person who's actually operating the buffer knows just

20    the right amount of pressure to apply, the right speed.

21    And sometimes if you hold it too gingerly you're not going

22    to get -- you know, you're barely buffing it, but if you,

23    you know, press it too hard, you're -- you're going to be

24    taking off too much and you're going to cause abrasion on

25    the -- on the surface.

1    So, you know, CMP might be a good idea if you have
2    to control it.  You need good results.  So the '697 patent
3    is directed towards how -- how can we improve that process.
4        So if we go to the next slide.
5        The title of the patent is "Dummy Underlayers for
6    Improvement and Removal Rate Consistency During Chemical
7    Mechanical Polishing."  And I have a blowup of the next
8    slide of the abstract.
9        If we could go to slide 160.
10        The point here is that you have wide variation in
11    pattern densities which causes undesirable variations in
12    the amount of polish material on uneven surfaces.  So if
13    you look -- if you have the high-density region on the left
14    and you start buffing it away, because the region is so
15    dense, you have to a lot of pillars to hold up the
16    insulating material, and so you're not going to buff away
17    as much as where if you have the lower density region,
18    you're going to start eating away a lot because there's not
19    enough structure to hold up the material.
20        And now here's an extreme case.  At the very
21    bottom of the page that I'd like to illustrate is where if
22    you have, you know, height -- you have high density and you
23    have a polished surface, you buff away just enough so that
24    you actually leave a little bit of insulating surface which
25    is what you want to build your base off of for the next

1    level.

2           Now, in the right -- in the case on the right,

3    this sort of an extreme exaggerated case, very undesirable

4    case, where you have a very low-density region and you're

5    buffing away so much that it may be -- it may look very

6    flat and substantially planar, but you actually have

7    started to eat away even parts of the transistor.

8           So you want to be able to control the amount of

9    material that you're actually buffing away.  Well, how do

10   you do that?  That's where the '697 patent comes into play.

11          If we can go to the next slide at 161.

12          The '697 patent uses dummy fill to control the

13   density.  It manufactures the density that you want to

14   achieve acceptable, reliable, consistent CMP results.

15          And with that I'd like to go to the next slide,

16   162, which is the first term at issue here "standardized

17   "uniform pattern density."

18          NXP's proposed construction is "a predetermined

19   pattern density or range of pattern densities between

20   multiple layers of a wafer or among different wafers."

21          And BlackBerry's proposed construction is "a

22   concentration of raised areas that is substantially the

23   same for all layers of distinct types of products."

24          Now, what I'd like to do is sort of parse out the

25   many discrete issues built into those two opposing

1     constructions.

2            We can go to the slide at 163.

3            The first point of this agreement is whether a

4     standard uniform pattern density is a density or a range of

5     densities versus what BlackBerry would propose which is one

6     specific density.

7            So if you sort of turn to 164, 165, 166, I have a

8     number of slides including the summary of the invention

9     that really talk about how this invention is about a

10    standardized density, and it could be a range.

11           BlackBerry's argument is that -- they're trying to

12    take a literal read of the language and say, "No, no, the

13    density is -- it's a density within a range, it can't be

14    the range."

15           But I think as BlackBerry's counsel earlier had

16    mentioned, you know, they're trying to construe terms to

17    avoid infringement, and here they're trying to read in

18    something that would be technically absurd.  In a

19    manufacturing environment, you can't have a standardized

20    density that's so precise that it's 56 percent.  And so

21    what if it's 58 percent?  Does that mean that it's

22    nonstandard?

23           I think there has to -- in manufacturing, it's all

24    about tolerances.  And that's what we -- what the patent

25    talks about.  The time and time again they talk about 40 to

80 percent which is just an example.  It could be 30 to
70 percent or 50 to 90 percent.  But it has to be a range
in a manufacturing environment.  I think the patent makes
that quite clear.  You just can't have one -- one specific
density.

   And lastly there's nothing in the intrinsic record
that would limit the way that BlackBerry would suggest.
There's nothing that said that it has to be a specific
density, that it can't be a range of densities.

   If we go to 165.

   I think it's worth pausing right here just to kind
of give you the spirit of what the invention is about.  It
says the percentage can clearly be raised and lowered
without departing from the spirit or scope of the
invention.  The goal is to commonize the plurality of
layers for the plurality of products by creating
substantially the same pattern density or topography on the
plurality of layers.  As such, the actual percentage of
pattern density and topography is less important than a
consistent pattern density.

   So at the end of day, you just want a consistent
pattern density, whatever that guarantees.

   We can go back to slide 163 to address the
remaining issues within this claim -- this particular claim
term at issue.

1          Another point of this disagreement here is whether

2    the term applied, you know, the "standard uniform pattern

3    density" applies across multiple layers of a wafer or among

4    different wafers versus across all layers and distinct

5    types of products.  If I parsed out even further, the issue

6    is whether there has to be similar across all layers and

7    whether it must have be similar across dis -- distinct

8    types of products.

9          So if you notice, BlackBerry really hangs on to

10   the end here, that it has to be all layers and distinct

11   types of products.  But there's enough evidence in here

12   including some evidence that BlackBerry cites to, they use

13   the word "or."

14         Go to 166.

15         "In particular, dummy underlayers may be

16   implemented for use with any polishing process which would

17   benefit from a consistent material removal rate from layer

18   to layer or from product to product."

19         BlackBerry has acknowledged this particular

20   phrase -- sentence.  So this is just one example of where

21   it can be "or," it doesn't have to be "and," and there's

22   nothing that says that it has to be "and."  There's both

23   examples.

24         There's probably -- in fact there is another

25   example in the patent where, you know, you -- you have a

common density from layer to layer and from product to
product.  But there's nothing that says it has to be one or
the other.  These are all examples and any one could apply
without departing from the scope or the spirit of the
invention.  And so there's no need to improperly -- to
unnecessarily limit the claim term to take one example and
limit it to that example and ignore the other example.

Now if we to go to 169.

BlackBerry would like to impose a requirement that
"standard uniform pattern density" applies to all layers,
not a bunch of layers, not some layers, not one layer, but
all layers.  And again, I think NXP's position is that
we're not trying to exclude that possibility, it could be
all, but it certainly could be some, it could be one, or it
could be a bunch of them.

Here you have some -- here you have some evidence
that BlackBerry has cited to in which they're arguing that
there was some sort of disclaimer or prosecution history
estoppel because the applicant might have inartfully said
that, you know, let's see --

Could we go to 169, the first -- the first snippet
here "as agreed" -- okay.

The second highlight on the first snippet, it
says, "In addition, maintaining substantially the same
standardized pattern density on all layers of the plurality

of the same types of integrated circuits enable the CMP process."  I think this is just an example.  If you take it in the larger context, this passage starts with a reference to an in-person interview.

So I've taken snapshots from the prosecution history of the in-person interview, and it doesn't say anything about all layers.  And if you look at the reason for allowance from the patent office, it says this is a reason why it was allowed.  "The prior art of record does not teach or suggest the type of determining a standard uniform pattern density using the overall surface topology of the wafer."  That's the reason why the patent office granted it.

The patent office didn't allow this patent because of the sentence that says "all layers."  And if the statement was not required to -- for the purpose of overcoming prior art, there's no -- there's no disclaimer, there's no prosecution history estoppel.  I think it's pretty well-settled law.

Finally the last point of contention for this one claim term at slide number 170 is whether we're talking about different types of wafers, different types of product.  BlackBerry again is imposing a requirement that it has to be distinct types of products.

Again, sure, there -- there's some portions of

patent that talk about distinct types of products, they
talk about different wafers. And when we say different --
and when the patent says different wafer, it's unclear, are
we talking about the same type of product but different
wafers of that same product? Are we talking about
multiplicity of products?

BlackBerry cited to a particular passage from the
prosecution history that does not support its construction.
It says, "on all layers of a plurality of distinct types of
integrated circuits." Not "distinct types of products."
"Integrated circuits." You can have distinct types of
integrated circuits even within one product. You could
have a MOS transistor or a bi-pole transistor.

But that's not the point. The point is that it
says "distinct types of integrated circuits," not "distinct
types of products."

THE COURT: Mr. Win, you've got five minutes left.

MR. WIN: Okay.

THE COURT: For whatever else you want --

MR. WIN: I'll move quickly to the final two claim
terms, planar surface on the wafer, this is slide number
171.

Surface -- if we can go to 172 -- we don't dispute
the -- NXP does not dispute the term "planar surface on the
wafer" that it applies to the entire wafer. We agree with

BlackBerry it does apply to the entire wafer.

However, BlackBerry's proposal, "a circuit at a consistent height" is confusing, it doesn't really do anything to help the jury. A height relative to what? Height relative to the first layer or the second layer? I think the -- NXP's proposal is correct in the context of the claim.

The purpose of polishing a wafer is to planarize or flatten the surface, that's what we've been talking about for the last 20 or 30 minutes is about planarizing, these are all -- these patents are about planarizing or flattening surfaces, and therefore the problem is polishing the surface of the insulating layer to provide a substantially flat surface. That's what the claim reads.

Why are you polishing the surface? To provide a planar surface. I think one of ordinary skill in the art as well as, you know, a jury member could understand under this plain ordinary meaning of the term that "planar" means flat.

And the last term, "standardized polishing of wafer," NXP thinks it's clear on its face. If the Court finds that construction is necessary, we think that BlackBerry's proposal is a bit imprecise to just this CMP parameters.

A question that would come to my mind is, well,

which parameters?  What are they?  Are they all the
parameters inclusive with every single CMP parameter there
is?  Or is it some of the parameters?

I think the point I want to leave here is that if
you read the patent, patent time and time again talks about
two specific CMP parameters.  The time -- the polishing
time and the polishing downforce.  And so if we're -- to
the extent that we're going to say CMP parameters, we
should be clear and we should call it out in the
construction.

That's all, Your Honor.

THE COURT:  All right.  Thank you.

MS. DE MORY:  Your Honor, I need to step out for a
second with Mr. Win on this one.  So I want to step out
real quick.

THE COURT:  Okay.

MR. GRAUBART:  Your Honor, I'll try to be as brief
as possible so we can all get on out of here.

THE COURT:  Well, he took 15 on this patent, so
I've saved you 15.

MR. GRAUBART:  Thank you, Your Honor.

So the '697 patent before -- Mr. Reger, before you
take the slide 149 to start that, I'd like to briefly go to
slide 162.  162.

You see in the upper left the slide 162.  This is

NXP's technical expert describing the supposed benefit of the '697 patent. This is the paragraph on which NXP bases its damages demand. So it just helps us understand what they're all saying is the purpose here, what -- what it's intended to do. It alleviates the need to reconfigure the CMP process on a layer-by-layer basis.

So now if we go to slide 149. 149.

You can see that -- so what does this patent -- how does it get there? How do we alleviate the need for having to reconfigure the CMP process? Well, as Mr. Win said, the patentee said, "I've got this idea. I'm going to come up with this standard uniform pattern density so when one wafer or one layer has a low density, only a couple little items on there, another one might be very dense. I'm going to add a little dummy fill to one or the other so that they come up to the same level of density."

And as a result when you then go to the polishing step at the end of the claim, you can improve standardized polishing of the wafer. That was whole purpose. And as they said, as Mr. -- Dr. Smith said, that's what it means is I don't have to change my polishing process, CMP, chemical mechanical polishing. I don't have to change that. I've alleviated the need to do that because I've got standardized polishing, and how did I get there? I had standard uniform pattern density.

1          Now, as Mr. Win said, there are basically two

2     disputes here on standard uniform pattern density, 153 is

3     the slide I'm on.

4          The -- one is the question of can it be a range of

5     density or does it have to be a standard uniform density

6     like the patent claims?

7          The second question is whether that uniformity,

8     must it be among all the layers of one wafer, or does it

9     also have to be across different wafers that have different

10    types of integrated circuit products?

11         So I want to start with the second question.

12         If you look at slide 169 of NXP's presentation,

13    the very sentence that Mr. Win pointed us to in the

14    prosecution history which is also here is that to

15    distinguish -- they say, it should having determining the

16    standardized --

17         So the patent office to distinguish the Ichikawa

18    reference, they told the patent office that Ichikawa

19    doesn't have their kind of determining standardized uniform

20    pattern density.

21         In addition, by maintaining substantially the same

22    standardized pattern on all layers of plurality of a

23    distinct types of integrated circuits enabled the CMP

24    process -- at the patent office, they disclaimed anything

25    but a method that makes the pattern density uniform

1   substantially the same across all layers and all to get

2   their patterns.

3           That's what the patent says at least six times is

4   that -- and if you could look at page 23 of document

5   number 262 are what we claim in the construction brief,

6   note 68, you'll see all six times where it says it must be

7   layer to layer and product to product.

8           The patent gives an example of how you do this.

9   For example, one wafer might have only one active feature,

10  the other has two.  So you're going to have to add more

11  dummy fill to the one that only has one so you get them

12  back to equal.

13          So the second issue, though, is this range

14  question.  NXP's construction would allow for range.  They

15  don't tell you what the bounds of the range are, Your

16  Honor.  A range can be one percent to 99 percent.  I asked

17  Dr. Smith, their expert, to tell me what values could be

18  outside of this range, and he couldn't tell me.

19          This completely eviscerates the entire claim by

20  saying "a range."  See, it says "standard uniform pattern

21  density," not a whole range with no bounds.  And NXP's

22  construction just can't be correct, can't be squared with

23  the uniformity that the claim requires.

24          And that's why over and over and over, even in the

25  passages that Mr. Win cited, the patent says the whole

1    purpose here is to commonize, make them uniform,

2    substantially the same, so that both in the spec and the

3    prosecution history so that you have a consistent pattern

4    density.  So we ask the Court to adopt our construction of

5    that term.

6          We're going to rest on the brief -- excuse me --

7    rest on the papers with respect to planar surface of the

8    wafer.

9          And then very briefly, the last term that is

10   "standardized polishing of the wafer," as we said, that was

11   the whole purpose here.  Commonize the pattern density so

12   that we don't have to change the CMP process, the polishing

13   process at the end.  That's what their own expert said was

14   in this invention.

15         So what does that mean to not have to change the

16   process?  Well, first NXP says that no construction is

17   necessary.  But their offer of what the plain and ordinary

18   meaning is, it conflicts with what their own expert says.

19   So now we know we've got to have some construction because

20   NXP can't quite decide what the ordinary meaning is.

21         So we look at the specification and you see that

22   what does it mean to commonize a pattern so you have a

23   standardized polishing of the wafer?  Well, first, you're

24   going to allow you to not have to change the polish time;

25   second, you're not going have to change the downforce.  And

1    then it says in addition you create a fixed set of CMP

2    process.

3              Okay.  What's a fixed set?

4              I asked Dr. Smith.  So here's what he said.  The

5    whole benefit is to not have to change the processes.

6              I go, "What are -- what are the parameters?  What

7    is it you would have to change if you didn't practice this

8    patent?"

9              He said, "Well, there's a whole host of

10   parameters.  There's polishing pad types, vary rotation

11   speed, pad type, substrate force, et cetera."  Anything

12   less than fixing all of those, you're going to have to

13   reconfigure your -- pattern doesn't help the same.  So to

14   create a standardized polishing of the wafer, you must fix

15   all these parameters.  That's what Dr. Smith said, their

16   expert.

17             And again, the prosecution history disclaimed

18   everything but that, Your Honor.  It said that to avoid the

19   Ichikawa reference, we must maintain substantially the same

20   pattern density on all layers for plurality of distinct

21   types of integrated circuits to enable the CMP process used

22   to planarize all integrated circuits to remain fixed.

23             As result, we ask Your Honor to adopt BlackBerry's

24   proposed construction of standardized polishing of the

25   wafer.

```
1              Do you have any questions?
2              THE COURT:  No.  I'll get an order out as soon as
3    I can.
4              MR. GRAUBART:  Thank you very much, Your Honor.
5              THE COURT:  Just a few issues about trial.
6              Judge Kane from the Western District of
7    Pennsylvania -- Middle District of Pennsylvania may end up
8    trying this case.  She can give you a date certain.  She's
9    going to be here the first three weeks of March.
10   Alternatively you could ask for Judge Smith.  I can't give
11   you a date certain because of my criminal trial
12   requirement, at least not until March.  So this case is
13   still to take two to three weeks, right?
14             MR. GRAUBART:  Your Honor, as we notice, the
15   McDermott firm has entered appearances in this case as
16   they'll be trying the matter.  So I'll let my colleague,
17   Ms. Columbia, to address any trial-related issues.
18             THE COURT:  Okay.
19             MS. COLUMBIA:  Good afternoon, Your Honor.  You
20   want me to --
21             THE COURT:  Well, that -- I mean, I just had that
22   one question.  I just wanted to --
23             MS. COLUMBIA:  Yes.
24             THE COURT:  -- confirm that.
25             MS. COLUMBIA:  Yeah.  I think more like two than
```

1    three --

2         THE COURT:  Okay.

3         MS. COLUMBIA:  -- but it looks like it's certainly

4    going to go into a second week.

5         THE COURT:  Okay.

6         MS. COLUMBIA:  Your Honor, just while we're on

7    that, I talked with Ms. De Mory before the break.  Looking

8    at the upcoming schedule under Your Honor's pretrial order

9    which puts a lot of work right smack in the middle of the

10   holidays, we were contemplating a joint request to bump

11   those dates a little bit.  Is that something the Court

12   would entertain?

13        THE COURT:  Well, I have to look at it.  The

14   problem is you're going to bump it into the summary

15   judgment.  I mean, I've got to have time to decide the

16   summary judgment.  Is that what you're trying to --

17        MS. COLUMBIA:  No.  I was really focused on the

18   pretrial, you know, the exhibit list for trial, the

19   deposition designations for trial, the things that --

20        THE COURT:  When is that due now?  I don't have

21   that in front of me.

22        MS. COLUMBIA:  That's January 20.  Which --

23        THE COURT:  How much more time do you want for

24   that?

25        MS. COLUMBIA:  We're just -- I mean, Ms. De Mory

1  can speak for herself.  We were thinking 10 days, so

2  pushing it to January 30 which just pushes the meet and

3  confer leading --

4          THE COURT:  Okay.

5          MS. COLUMBIA:  -- up to it after the holidays.

6          THE COURT:  All right.  Well, I can -- I'll give

7  you to February 3rd.

8          MS. COLUMBIA:  That's very helpful.  Thank you,

9  Your Honor.

10          THE COURT:  Okay.

11          MS. DE MORY:  Thank you.

12          MS. COLUMBIA:  Your Honor, when would we expect to

13  hear about Judge Kane?

14          THE COURT:  Within the next couple of weeks.

15          MS. COLUMBIA:  Thank you very much, Your Honor.

16          MR. GRAUBART:  I'm sorry, Your Honor.  One quick

17  question.  If that moves to February 3rd, does the last day

18  of the person to finalize it move the same amount of days?

19          THE COURT:  I don't care when you meet as long as

20  you get everything in by February 3rd.

21          MS. COLUMBIA:  Thank you very much, Your Honor.

22                    (End of proceedings.)

23

24

25

1    C E R T I F I C A T E

2

3         I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7    s\Sandra K. Tremel          January 3, 2014

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25