**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| **NXP B.V.,** | ) | |
| | ) | **Case No. 6:12-cv-498-YK-TBS** |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **BLACKBERRY LIMITED and** | ) | |
| **BLACKBERRY CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT BLACKBERRY'S MOTION FOR
<u>DECLARATION OF AN EXCEPTIONAL CASE AND AWARD OF FEES</u>**

# TABLE OF CONTENTS

Page

I.      THE PURPOSE OF 35 U.S.C. § 285 .............................................................. 1

II.     LEGAL STANDARD UNDER § 285 − THE CONTROLLING TWO-STEP
        INQUIRY ...................................................................................................... 2

III.    THIS EXCEPTIONAL CASE WARRANTS AN AWARD OF FEES ........................... 5

        A.      NXP's Substantive Positions Were Objectively Baseless In Light Of The
                Disclosures In The Asserted Patents And NXP Pursued These Claims In
                Subjective Bad Faith .................................................................................. 5

        1.      The Three Asserted Patents That Were Not Tried to the Jury Illustrate
                NXP's Pattern of Pursuing Meritless Claims ......................................... 5

        2.      As Soon As the Court Issued Its Claim Construction for the Term
                "Serialized Data Blocks" it was Apparent that NXP Could Not Prove
                Literal Infringement, Infringement by the Doctrine of Equivalents, or
                Induced Infringement for the '654 Patent ............................................... 7

        3.      NXP Pursued Infringement of the '420 Patent Despite Knowing that
                BlackBerry's Accused Devices Could Not Meet the "Website" Limitation
                in Claim 3 ............................................................................................... 14

        4.      NXP Failed to Rebut Evidence that the '455 Patent Was Invalid, but
                Rather Than Concede Defeat, Resorted to Never-Before-Heard
                Conception Theories .............................................................................. 17

        5.      NXP's Infringement Theory Disregarded the IEEE Rejection of Nitsche's
                Proposal ................................................................................................. 21

        B.      NXP Engaged In Litigation Misconduct And Perpetuated Its Tactics At
                Trial ....................................................................................................... 23

        1.      NXP's Damages Case Ignored Controlling Law and the Facts of the Case ........ 23

        C.      Under The Circumstances, The Court Should Award Reasonable
                Attorney's Fees to BlackBerry ............................................................... 27

IV.     CONCLUSION ............................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*,
    501 F.3d 1307 (Fed. Cir. 2007)............................................................................13

*Biax Corp. v. Nvidia Corp.*,
    No. 09-cv-1257, 2013 WL 1324935 (D. Colo. Mar. 30, 2013)...................5, 15, 17

*Brasseler, U.S.A. I, L.P., v. Stryker Sales Corp.*,
    182 F.3d 888, 892 (Fed. Cir. 1999).....................................................................28

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
    707 F.3d 1342 (Fed. Cir. 2013)............................................................................12

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*,
    393 F.3d 1378 (Fed. Cir. 2005).............................................................................3

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)............................................................................17

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006)............................................................................13

*Eon-Net LP v. Flagstar Bancorp*,
    653 F.3d 1314 (Fed. Cir. 2011)........................................................................7, 17

*F&G Research, Inc. v. Google, Inc.*,
    No. 06-cv-60905, 2007 WL 2774031 (S.D. Fla. Sept. 21, 2007)...........................14

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
    No. 08-cv-1992, 2013 WL 410103 (S.D. Cal. Feb. 1, 2013)..................................13

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    --- U.S. ----, 131 S. Ct. 2060 (2011) ....................................................................13

*Highmark, Inc. v. Allcare Health Mgmt.*,
    687 F.3d 1300 (Fed. Cir. 2012)..........................................................................3, 4

*Honeywell Int'l Inc. v. ITT Indus. Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006)............................................................................12

*iLOR, LLC v. Google, Inc.*,
    631 F.3d 1372 (Fed. Cir. 2011)............................................................................15

*Kilopass Tech., Inc. v. Sidense Corp.*,
    738 F.3d 1302 (Fed. Cir. 2014).................................................................3, 4, 9, 13

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Lakim Indus., Inc. v. Linzier Prods. Corp.,*
No. 2:12-cv-4976, 2013 WL 1767799 (C.D. Cal. Apr. 24, 2013) .......................... 1, 16, 29, 30

*MarcTec, LLC v. Johnson & Johnson,*
664 F.3d 907 (Fed. Cir. 2012) ....................................................................... 3, 4, 5, 14, 17, 23

*Mathis v. Spears,*
857 F.2d 749 (Fed. Cir. 1988) ..................................................................................... 2, 23

*Monolithic Power Sys., Inc. v. O2 Mirco, Int'l, Ltd.,*
726 F.3d 1359 (Fed. Cir. 2013) ................................................................................. 4, 5, 10

*Raylon, LLC v. Complus Data Innovations, Inc.,*
700 F.3d 1361 (Fed. Cir. 2013) (Reyna, J., concurring) .............................................. 2, 15, 17

*ResQNet.com, Inc. v. Lansa, Inc.,*
594 F.3d 860 (Fed. Cir. 2010) ............................................................................................ 26

*Riles v. Shell Exploration & Prod. Co.,*
298 F.3d 1302 (Fed. Cir. 2002) .......................................................................................... 24

*Sulzer Textil A.G. v. Picanol N.V.,*
358 F.3d 1356 (Fed. Cir. 2004) .......................................................................................... 28

*Taurus IP, LLC v. DaimerChrysler Corp.,*
726 F.3d 1306 (Fed. Cir. 2013) .................................................................... 2, 3, 10, 14, 17

*Taurus IP, LLC v. DaimlerChrysler Corp.,*
559 F.Supp.2d 947 (W.D. Wis. 2008) ................................................................................ 20

*Therasense, Inc. v. Becton, Dickinson & Co.,*
---F.3d----, 2014 WL 943184 (Fed. Cir. Mar. 12, 2014) ................................................ 22-23

*Transclean v. Bridgewood Servs.,*
290 F.3d 1364 (Fed. Cir. 2002) .......................................................................................... 24

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,*
546 U.S. 394 (2006) ........................................................................................................... 28

*Whitserve, LLC v. Computer Packages, Inc.,*
694 F.3d 10 (Fed. Cir. 2012) .............................................................................................. 25

**STATUTES**

35 U.S.C. § 271(b) ...................................................................................................... 13, 14

35 U.S.C. § 271(g) ............................................................................................................... 6

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

35 U.S.C. § 285 ................................................................................................ passim

1946 U.S. Code ....................................................................................................2

**OTHER AUTHORITIES**

Federal Rule 50(a) .............................................................................................28

Rule 11 .................................................................................................................5

S. Rep. No. 1503, 79th Cong., 2d Sess. (1946) ..................................................2

U.S. Patent No. 5,763,955 ................................................................................5, 6

U.S. Patent Nos. 5,597,668 ..............................................................................6, 7

U.S. Patent Nos. 6,434,654, 6,501,420, and 7,330,455 ................................ passim

On April 7th, 2014, the jury found all asserted claims of U.S. Patent Nos. 6,434,654, 6,501,420, and 7,330,455 not infringed and invalid.  (Doc. No. 484).  As a result, it awarded no damages.  *Id.*  Judgment was entered against NXP B.V. ("NXP") and in favor of defendants BlackBerry Limited and BlackBerry Corporation (collectively, "BlackBerry").  (Doc. No. 491). As the prevailing party, BlackBerry hereby requests an award of its attorneys' fees incurred from the inception of this case, or, in the alternative, attorneys' fees incurred since the issuance of the Court's claim construction order on January 16, 2014.

## I.      THE PURPOSE OF 35 U.S.C. § 285

"Meritless patent litigation places a particular strain on judicial and party resources." *Lakim Indus., Inc. v. Linzier Prods. Corp.*, No. 2:12-cv-4976, 2013 WL 1767799, at *2 (C.D. Cal. Apr. 24, 2013).  For over two years BlackBerry has felt—and continues to feel—the strain associated with defending the company against its former supplier, NXP.  As the jury no doubt recognized, this case was never about patent rights; it was a thinly veiled attempt to capture BlackBerry's revenue by any available means.  Indeed, the jury heard at trial from Roberto Troiolo about his meetings with Chris Kelly of NXP.  *See* Trial Tr. 4/2/14 at 84-88.  That testimony publicly exposed that this lawsuit was about "leveraging" some "old patents that [NXP] inherited from Philips."  *Id.* at 85:25-86:6.  And, eventually, amidst an internal power struggle, NXP's leveraging efforts led to a hostile ultimatum: either BlackBerry double the business it was doing with NXP from five to ten million dollars, or face a patent infringement lawsuit.  *Id.* at 90:22-95:15.

BlackBerry has always recognized that NXP was asserting patents over technology that was not new, not useful, and not practiced in BlackBerry devices.  But what makes this case "exceptional" is that NXP also knew the weakness of its case and pursued unwinnable positions. NXP's disregard for the Court's claim construction ruling and the intrinsic teachings of the

patents, its insistence on expanding the scope of triable issues, and its willingness to mislead the jury as to how much money was at stake demonstrate an "unreasonable continued pursuit of an infringement claim."  *See Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1374 (Fed. Cir. 2013) (Reyna, J., concurring).

The "strain" of meritless patent litigation in this case aligns with the "patent-specific policy rationale" of enacting 35 U.S.C. § 285.  *Id.* at 1372-73.  As set forth in the legislative history and ensuing commentary, the "purpose of the statute" is to provide "compensation to the prevailing party for its monetary outlays in the prosecution *or defense* of the suit."  *Id.* (emphasis added) (citing *Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983)); *see also* S. Rep. No. 1503, 79th Cong., 2d Sess. (1946), *reprinted in* 1946 U.S. Code Cong. Serv. 1386, 1387 (discussing an award of attorney fees to prevailing defendants "to enable the court to prevent a gross injustice to an alleged infringer").

Thus, it was "gross injustice" that informed the passage of § 285 and it is the theme of "gross injustice" that should pervade the exceptional case inquiry in this case.  NXP has inflicted "gross injustice" on BlackBerry both in the theories it advanced at trial and in the vexatious manner in which it prosecuted the case.  For the reasons outlined below, this case has been, from the beginning, in the middle, and at the end during trial, "an egregious abuse of the judicial process."  BlackBerry asks the Court to award fees to make BlackBerry "whole," consistent with Congressional intent and Federal Circuit precedent.  *Mathis v. Spears*, 857 F.2d 749, 758 (Fed. Cir. 1988) (citing *Hall v. Cole*, 412 U.S. 1, 5 (1973)).

## II.    LEGAL STANDARD UNDER § 285 − THE CONTROLLING TWO-STEP INQUIRY

When assessing whether to award attorney fees under 35 U.S.C. § 285, a district court engages in a two-step inquiry.  *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1326

(Fed. Cir. 2013).  The court must first determine whether the prevailing party has proved, by clear and convincing evidence, that the case is exceptional.  *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915 (Fed. Cir. 2012).  If the court finds the case exceptional, it must determine whether an award of attorney fees is appropriate and, if so, the amount of that award.  *Id.* at 916.

Absent litigation misconduct (discussed below), a case may be found exceptional under § 285 if (1) the litigation is brought or maintained in subjective bad faith, and (2) the litigation is objectively baseless.  *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005).  To be objectively baseless, the patentee's assertions—whether manifested in its infringement allegations or its claim construction positions—"must be such that no reasonable litigant could reasonably expect success on the merits."  *Taurus IP*, 726 F.3d at 1327 (quoting *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008)).  "[S]ubjective bad faith only requires proof that the 'lack of objective foundation for the claim 'was *either* known *or* so obvious that it should have been known' by the party asserting the claim."  *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1310 (Fed. Cir. 2014) (emphasis in original) (quoting *Highmark, Inc. v. Allcare Health Mgmt.*, 687 F.3d 1300, 1309 (Fed. Cir. 2012)).

The most recent Federal Circuit pronouncement[1] on the appropriate standard to gauge

---

[1]  Before the end of the current term in June 2014, the Supreme Court is expected to issue two decisions interpreting the application of 35 U.S.C. § 285 in pending and future cases, including this case.  In *Octane Fitness v. Icon Health & Fitness* (No. 12-1184), the Supreme Court is considering whether the two-part test articulated in *Brooks Furniture* is overly rigid and appropriates a district court's discretionary authority to award attorney fees.  In *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.* (No. 12-1163), the Supreme Court is considering what standard of review should apply to a district court's finding that a case is "objectively baseless."  Because the additional Supreme Court guidance will be considered during the course of an appeal, BlackBerry intends to seek leave, if warranted, to file a supplemental brief applying the decisions

objective baselessness and subjective bad faith clarifies that there need not be "smoking gun" evidence to show that a litigant "should know" that its infringement claim lacks a likelihood of success.  *See Kilopass*, 738 F.3d at 1311.  In considering the losing party's subjective state of mind, courts are "to take into account the totality of the circumstances."  *Id.* (internal citations omitted).  Because subjective bad faith is difficult to prove, lack of direct proof of subjective bad faith is not dispositive; an inference of bad faith from circumstantial evidence will suffice.  *Id*. at 1311 (emphasizing that "one's misguided belief, based on zealousness rather than reason, is simply not sufficient by itself to show that a case is not exceptional in light of objective evidence that a patentee has pressed meritless claims").

Quite apart from classifying a case exceptional for the pursuit of baseless claims in subjective bad faith, "an exceptional case finding can also be supported by litigation misconduct."  *Highmark*, 687 F.3d at 1315 (citing *MarcTec*, 664 F.3d at 919).  Indeed, "litigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285."  *Monolithic Power Sys., Inc. v. O2 Mirco, Int'l, Ltd.*, 726 F.3d 1359, 1366 (Fed. Cir. 2013) (quoting *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003)).  Recently, the Federal Circuit observed that "many forms of misconduct" can support a finding of an exceptional case, including a vexatious litigation strategy.  *Monolithic Power Sys.,* 726 F.3d at 1366.  In *Monolithic Power*, the patentee's "overall vexatious litigation strategy" and "pervasive" instances of unprofessional behavior drove the district court to award more than $8.4 million in attorneys' fees.  *Id*. at 1365, 1369.

---

in *Octane Fitness* and/or *Highmark* following the Supreme Court's rulings.

III.    **THIS EXCEPTIONAL CASE WARRANTS AN AWARD OF FEES**

    A.    **NXP's Substantive Positions Were Objectively Baseless In Light Of The Disclosures In The Asserted Patents And NXP Pursued These Claims In Subjective Bad Faith**

Based on the facts of this case, NXP's positions were objectively unreasonable and pursued for over two years as a result of "wrongful intent, recklessness, or gross negligence." *Biax Corp. v. Nvidia Corp.*, No. 09-cv-1257, 2013 WL 1324935, at *5 (D. Colo. Mar. 30, 2013) (quoting *Phonometrics, Inc. v. Westin Hotel Co.*, 350 F.3d 1242, 1246 (Fed. Cir. 2003)); *see also MarcTec*, 664 F.3d at 916.  The case is also exceptional based on the litigation misconduct demonstrated through NXP's vexatious tactics, especially as demonstrated on the damages side of the case.

    1.    **The Three Asserted Patents That Were Not Tried to the Jury Illustrate NXP's Pattern of Pursuing Meritless Claims**

NXP originally asserted six patents against BlackBerry.  For all six originally asserted patents, NXP did not have the requisite evidence to charge infringement.  NXP was aware of the evidentiary deficiencies during the early stages of the litigation but nonetheless refused to drop *any* allegation until it was glaringly apparent that it lacked a Rule 11 basis to continue.  The pattern of asserting patents only to later drop the allegations before trial "warrants designating the case exceptional." *Monolithic Power. Sys.*, 726 F.3d at 1367 (internal citation omitted).

NXP's first use of baseless allegations to drive up BlackBerry's attorney fees was filing suit on U.S. Patent No. 5,763,955.  The '955 patent is directed to integrated circuits and the use of metal fill to improve the uniformity in the fabrication process.  For the first year of the lawsuit, NXP asserted this patent against BlackBerry's devices in the absence of credible infringement contentions.  As a result, BlackBerry was forced to prepare non-infringement and invalidity analyses, including completing prior art searches.  Then, a year later, NXP amended

the Complaint, dropping the '955 patent. (Doc. No. 97). The logical inference is that the '955 patent was included as part of the "kitchen sink" approach without a good faith basis to support the allegations of infringement.

This abusive pattern continued with U.S. Patent Nos. 5,597,668 and 5,639,697. The '668 and '697 patents cover methods for fabricating chips and the resulting chips. It has been undisputed from the beginning of this case that BlackBerry does not fabricate chips. It purchases chips from third-party suppliers. Moreover, as memorialized in BlackBerry's motion for summary judgment, even before a claim construction ruling, BlackBerry could not infringe under 35 U.S.C. § 271(g) for three distinct reasons: (1) it was undisputed that one type of accused chip is made in the U.S., thereby falling outside the reach of § 271(g); (2) NXP lacked sufficient evidence—especially expert opinions—to prove the elements of § 271(g) for the other types of accused chips; and (3) with respect to the '668 patent, BlackBerry indisputably does not import, sell, or use a product made by the patented method. *See* (Doc. No. 205 at 2-10) (discussing in detail the lack of a viable path for NXP to prove that the TriQuint, Qualcomm, SanDisk, and Hynix third-party components infringed the '668 and '697 patents). Despite the absence of direct infringement or a credible § 271(g) theory, NXP continued to assert the '668 and '697 patents for two years of litigation, requiring BlackBerry to devote hundreds of hours of attorney time to its defense, as well as substantial costs in the form of depositions, third party discovery, prior art searches, and the engagement of an expert witness specific to those two patents. Before the Court even ruled on claim construction, NXP thought so little of its infringement allegations under the '668 and '697 patents that it chose not to even depose BlackBerry's expert for these patents.[2] This exploitation of the high cost of defending complex litigation must be admonished.

---

[2] While the entirety of NXP's positions on these two patents lacked intrinsic support, the

*See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1328 (Fed. Cir. 2011) (affirming the district court's determination that it was bad faith to exploit the high cost imposed on an accused infringer to defend against baseless claims).

Eventually NXP had no choice but to concede the meritless nature of its allegations. After the Court construed three claim terms for the '668 patent and three claim terms for the '697 patents (Doc. No. 307 at 20-27), BlackBerry's counsel asked NXP to state a Rule 11 basis for maintaining its allegations.  NXP finally conceded.  *See* Exhibit A (Correspondence dated January 20, 2014 from BlackBerry to NXP pointing out the lack of a good faith basis for NXP to proceed on the '668 and '697 patents).

> **2.  As Soon As the Court Issued Its Claim Construction for the Term "Serialized Data Blocks" it was Apparent that NXP Could Not Prove Literal Infringement, Infringement by the Doctrine of Equivalents, or Induced Infringement for the '654 Patent**

In its Order issued on January 16, 2014, the Court construed the claim term "serialized data blocks" in the '654 patent as "variable-sized blocks for transmitting commands, addresses, and data."  (Doc. No. 307 at 13).  As NXP surely realized, the accused products did not operate along these parameters because BlackBerry devices transmit commands and addresses using

---

arguments surrounding NXP's treatment of the claim limitation "mask" or "generating a mask" in the '668 patent were uniquely untenable.  While the '668 patent is directed to "masks"—a technical tool to create a semiconductor wafer—it was undisputed even before the Court adopted BlackBerry's claim construction that BlackBerry did not generate, import, sell, offer to sell, or use "masks."  NXP's infringement expert, Dr. Smith, *could not identify any BlackBerry component that qualified as a "mask"* either in his expert report or during his deposition.

BlackBerry incorporates by reference the entirety of the discussion in the summary judgment briefing pointing out Dr. Smith's failure to demonstrate even an inference of infringement.  (Doc. No. 205 at 5, 9-10 and footnotes 10-15 and 24-27) (Exhibit C).  BlackBerry further invites the Court to revisit the cited passages from Dr. Smith's deposition transcript.  *See* Exhibit D (Smith Depo. Tr. 10/4/13 at 29-39, 64-65); *see also* Smith Opening Report ¶¶ 66, 102.  A review of the record, in context, illustrates the objective baselessness of these allegations and that, following expert discovery, NXP knew or should have known even before the issuance of the Court's claim construction order that it lacked a good faith basis to proceed on the '668 patent.

fixed-width transfers over a separate, fixed-width bus.

In conducting the standard two-step infringement analysis,[3] it was known or should have been known from the moment NXP received the Court's claim construction order that *none* of the three accused interfaces in BlackBerry's devices—eMMC, microSD cards, and SDIO—could infringe literally or under the doctrine of equivalents. Moreover, in the absence of direct infringement, there could be no induced infringement. Because NXP ignored or circumvented the otherwise clear outcome dictated by the Court's claim construction order, the Court should find that no reasonable litigant would believe this baseless position could succeed.

### a.   Bad Faith Before Trial: Dropping, and then Seeking to Grab Back, Literal Infringement for the '654 Patent

Since as early as NXP's opposition to BlackBerry's summary judgment motion, NXP conceded that if the Court adopted BlackBerry's construction of "serialized data blocks," it would drop literal infringement and proceed only on the doctrine of equivalents. (Doc. No. 229 at 15). After the Court denied NXP's motion to reconsider the claim construction order (Doc. No. 324), NXP again reiterated that under the Court's construction, its literal infringement allegations were moot. (Doc. No. 320 at 2, 4). In addition, during a telephonic meet and confer, BlackBerry's counsel inquired about the literal infringement allegations, and on February 20, 2014, NXP's counsel confirmed that it would proceed only on the doctrine of equivalents. Thereafter, NXP represented to the Court in the Pre-Trial Statement that the trial presentation for the '654 patent would only include allegations under the doctrine of equivalents. (Doc. No.

---

[3] NXP knew that the jury would be instructed that whether an accused product infringes is a two-step inquiry: "the court first determines the meaning of disputed claim terms and then compares the accused device to the claims as construed." *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009). The accused device must contain each and every claim limitation to infringe. *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1379 (Fed. Cir. 2008) (quoting *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005)). Thus, if any single element of an asserted patent claim is missing, an accused product cannot infringe that claim or any claim dependent on that claim.

333).

Six days later, on the eve of trial, NXP filed a Motion for "Miscellaneous Relief"
arguing, in essence, that it had changed its mind and now wanted the trial to include allegations
of literal infringement of the '654 patent. (Doc. No. 342). Eventually, the Court denied NXP's
request, thereby holding Plaintiff to its strategic choices, but the incident is emblematic of the
type of burdens NXP needlessly inflicted on BlackBerry in having to oppose its ever-shifting
theories. Consequently, at a time when the parties should have been singularly focused on
preparing for trial on a narrower set of facts, NXP was attempting to grab back a claim that never
had a chance of succeeding in light of the Court's claim construction. Setting aside the burden
inflicted on BlackBerry and the Court in dealing with the Motion to add back literal
infringement, NXP's willingness to *enlarge* a case already lacking in evidentiary support is
*direct evidence* of bad faith. Before filing the Pre-Trial Statement, NXP *knew* it had no chance
of prevailing on a theory of literal infringement and therefore told both the Court and BlackBerry
that it would proceed only on the doctrine of equivalents. Later, however, for reasons that
remain unknown, NXP had a change of heart and sought relief for an "erroneous omission."
(Doc. No. 342 at 1).

NXP's inconsistent pre-trial statements and its refusal to withdraw its literal infringement
claims, even after it had agreed to do so, epitomize the type of "misguided belief" that the
Federal Circuit classifies as subjective bad faith. *Kilopass*, 738 F.3d at 1311 (citing *Eltech Sys.
Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990)) (finding bad faith when the
patentee is "manifestly unreasonable in assessing infringement, while continuing to assert
infringement in court").

    **b. The Lack of Evidence Presented on the Dependent Claims Further Signals
Knowledge of a Baseless Infringement Position**

The circumstances surrounding the infringement allegations for the '654 patent are further exposed by NXP's failure to present proof on dependent claims 2-5 of the '654 patent.  In spite of NXP's stated position that it would present evidence at trial on claims 1-5 of the '654 patent, NXP did not do so.  Before trial there was no suggestion that NXP was dropping the dependent claims, but NXP's case-in-chief addressed only claim 1.  It was only after NXP rested and only after BlackBerry's attorneys and experts prepared to defend against the assertion of the dependent claims that NXP finally agreed to drop claims 2-5.[4]

### c.   NXP Knew or Should have Known the Equivalents Allegations At Trial were Objectively Baseless

Claim 1 of the '654 patent was notable for the contrived positions Dr. Alpert had to take in his effort to demonstrate equivalents.  Because NXP's infringement theory was divorced from the patent's intrinsic disclosures and the extrinsic evidence also refuted NXP's positions, NXP was forced to contort Dr. Alpert's testimony well beyond the scope of his expert report.  Underlying the need for NXP's linguistic acrobatics, however, is the basic reality that a finding of infringement was inconsistent with a straightforward reading of the court's claim construction order.

The claim language "serialized data blocks" refers to what is transmitted over a bus, a physical connection of metal lines between components.  *See* '654 patent at Col. 1:12-15.  Consistent with the discussion in the Court's claim construction order (Doc. No. 307 at 12), the jury heard about the claimed invention, including the manner in which different types of data were sent in parallel over *different types* of buses."  Trial Tr. 4/2/14 at 177:24-184:24

---

[4]  Again, NXP persists in a vexatious pattern of refusing to streamline the issues for trial until well after BlackBerry had endured the economic strain of litigating that which should never have been brought.  *See, e.g., Monolithic Power Sys.*, 726 F.3d 1367; *Taurus IP*, 726 F.3d at 1329 (explaining that while a party is required to abandon infringement claims that have no basis in fact or law, the eventual abandonment does not permit the patentee to maintain other infringement claims that fail to meet or exceed a reasonable threshold).

(BlackBerry's expert's presentation to the jury regarding different widths of buses and background discussion regarding variable width data buses as described in the '654 patent); Trial Tr. 4/3/14 (AM) at 3:7-6:16 (same). The jury also heard that the claims required "serialized data blocks" as carrying commands, addresses, and data over a *single* data bus. Trial Tr. 4/3/14 (AM) at 6:23-10:4; *see also* Trial Tr. 4/3/14 at 12:18-32:10 (Mr. Berg's non-infringement testimony comparing claim 1 to the BlackBerry devices under the doctrine of equivalents). In particular, Dr. Alpert's cross examination pinpoints why the accused devices cannot be equivalent to the claim, because, *inter alia*, the BlackBerry devices use a separate command line distinct from the data bus:

> Q: And in fact, we'll probably go into it in a little more detail in your cross-examination. In each and every one of the schematics you've have shown us under the standards, your BlackBerry's product and in the source code, there's a separate command line shown, correct?
>
> A: Yes, that's correct.
>
> Q: So for each and every one of the standards, a JEDEC, the SDIO and the SD card standard, you went through in some detail with NXP's counsel -- each and every diagram you showed us showed a separate command line in addition to the data bus. Correct?
>
> A: Yes.

Trial Tr. 3/26/14 (PM) at 153:15-154:1.

No matter how hard NXP and Dr. Alpert tried to spin an infringement theory that sending three types of information over a single data bus (as required by claim 1 of the '654 patent) sounded "the same" as sending two types of information (commands and addresses) over a single command line and a third type of information (data) over a separate data bus (as performed in the BlackBerry devices), these opposites are not the same or even substantially the same.[5] *See*

_____

[5] The analysis in BlackBerry's Motion for Judgment as a Matter of Law on Non-infringement and Damages (Doc. No. 456), as well as in BlackBerry's Motion for Summary Judgment (Doc. No. 205 at 18-20), chronicles the technical and legal underpinnings of BlackBerry's non-

*Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013).

NXP offered no evidence of equivalents that aligned with the intrinsic teachings of the '654 patent. Dr. Alpert opined at trial that the accused eMMC, microSD, and SDIO bus technologies performed substantially the same function, in the same way, with the same result as claim 1 in the '654 patent, but NXP ignored that this opinion results in fatal claim vitiation. NXP's infringement position collapses a variable bus to be "the same" as a fixed width bus. This position cannot be reconciled with the written description and claim 1, which clearly distinguish between a variable width and a fixed width bus. Dr. Alpert's opinion at trial attempted to impermissibly bend the meaning of "serialized data blocks" in a way that would violate the all-elements-rule and nullify the function, way, result test. *See Honeywell Int'l Inc. v. ITT Indus. Inc.*, 452 F.3d 1312, 1321 (Fed. Cir. 2006) (explaining that where two devices are substantially different, no reasonable trier of fact could find that the structures are equivalent under the function-way-result test).

NXP either knew or should have known that it was baseless to allege that the fixed width data bus in the accused devices was equivalent to the variable width data bus disclosed in claim 1. *See* Exhibit B (Correspondence dated January 27, 2014, requesting NXP's Rule 11 basis for proceeding on the '654 patent following the Court's claim construction ruling). Further, given the care with which the written description distinguishes a variable width data bus from ones with fixed, "non-matching widths," NXP knew or should have known that its infringement theory ran afoul of Federal Circuit precedent. *See Brilliant Instruments*, 707 F.3d at 1347 (recognizing that there "cannot be equivalents for infringement purposes" where "two alternatives exist that are very different from each other"). The positions advanced to the jury

_____

infringement defense.

were objectively unreasonable and were pursued in subjective bad faith.

### d.   NXP Knew or Should Have Known the Induced Infringement Allegations were Objectively Baseless

NXP's induced infringement allegations are legally baseless for the same reasons as the direct infringement allegations.  There is no dispute that a claim of induced infringement requires proof of direct infringement.  *See* 35 U.S.C. § 271(b); *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) (requiring that a patentee "must prove specific instances of direct infringement or that the accused device necessarily infringes the patent in suit, in order to sustain the jury verdict of induced infringement").  Over and above its failure to prove direct infringement, NXP never adduced evidence that (1) BlackBerry knew of the '654 patent at the time of infringement,[6] or (2) that BlackBerry had the specific intent to induce others to infringe the '654 patent.

NXP's bad faith in unreasonably pursuing induced infringement is readily inferred. Under § 271(b), NXP needed to demonstrate BlackBerry's "knowledge that the induced acts constitute patent infringement."  *Global-Tech Appliances, Inc. v. SEB S.A.,* --- U.S. ----, 131 S. Ct. 2060, 2068 (2011); *see also DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) ("[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.").  Based on the statute, Federal Circuit, and Supreme Court precedent, NXP was well aware that it lacked even a scintilla of evidence to persuade a reasonable juror that BlackBerry was culpable of specifically encouraging another to infringe.  But that did not stop NXP from straining BlackBerry's resources, wasting the jury's time, and driving up the cost of this litigation.  *See Kilopass*, 738 F.3d at 1311; *see also Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08-cv-1992, 2013 WL 410103, at *5 (S.D. Cal.

---

[6] To the contrary, the trial record is undisputed that BlackBerry did not have pre-suit knowledge of the '654 patent.  Trial Tr. 3/26/14 (PM) at 124:9-12.

Feb. 1, 2013) (citing *MarcTec*, 664 F.3d at 919) ("advancing unfounded arguments that unnecessarily extended [the] litigation and caused [prevailing defendant] to incur needless litigation expenses" qualified as vexatious conduct).

Moreover, all along NXP premised its induced infringement theory only on microSD cards. These are cards that can be inserted and removed from the smartphone device. Yet, at trial, NXP introduced no evidence specific to the microSD card and its experts acknowledged that NXP had done no research to determine whether microSD cards were used. *See, e.g.,* Trial Tr. 3/26/14 (PM) at 191:9-192:15 (Dr. Alpert acknowledging that he does not have information on usage of microSD cards). NXP's disregard for proving the elements of § 271(b) is notable. Such casual treatment of the evidence necessary to prove knowledge and specific intent in alleging induced infringement persuaded a neighboring court to award attorneys' fees based on similar facts. *F&G Research, Inc. v. Google, Inc.*, No. 06-cv-60905, 2007 WL 2774031, at *15 (S.D. Fla. Sept. 21, 2007).

### 3. NXP Pursued Infringement of the '420 Patent Despite Knowing that BlackBerry's Accused Devices Could Not Meet the "Website" Limitation in Claim 3

At trial, NXP asserted claim 3 of the '420 patent. That claim requires a "user selecting a particular website." NXP's assertion and maintenance of this claim is a classic case of a patentee latching onto an "unreasonably broad" view of the claim instead of heeding the intrinsic record. *See Taurus IP*, 726 F.3d at 1327. All along, NXP has fashioned its understanding of "website" so that it could maintain that software applications ("apps") such as the Facebook App and the BlackBerry Maps App infringed. But NXP well understood that this argument was like shoving a square peg into a round hole. Based on the disclosures in the patent, there was never a credible way to transform the term "website" into "app." Indeed, NXP's expert, Dr. Alpert, has consistently opined that an app is not a website. Instead of acknowledging that its position did

not conform to the standards of claim construction, NXP went to trial based on an understanding of the claim that "no reasonable litigant could have believed [ ] would succeed." *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011); *Raylon*, 700 F.3d at 1368 (distinguishing between losing claim construction positions and a threshold below which a proposed claim construction is altogether unreasonable).

NXP should never have proceeded to trial on the '420 patent.  During claim construction, NXP specifically asked the Court to fashion the construction of "website" to include apps.  (Doc. No. 207 at 11).  NXP urged in claim construction that the term "website" means a "resource accessible through the world wide web."  *Id*.  The Court disagreed, concluding that "NXP cites no evidence whatsoever for its construction of 'website.'"  (Doc. No. 307 at 20).  The claim construction order expressly rejected NXP's construction of website.  *Id*.  At this juncture, NXP should have ceased litigating the '420 patent altogether.  In fact, by January 2014, when the claim construction order issued, NXP had already conceded during the course of summary judgment briefing that if BlackBerry's construction was adopted, it could not establish literal infringement.  (Doc. No. 211 at 30, n.120).  But NXP never stopped to reevaluate.  *See Biax Corp.*, 2013 WL 1324935, at *6 (awarding fees where a party "lacking a viable theory of infringement after the Court construed the claims" failed to "reevaluate its infringement claims, as it was required to do").

By the time of trial, it was evident based on Dr. Alpert's deposition admission that an app is not a website and that even NXP's expert could not support its contrived literal infringement theory.  *See* Alpert Depo. Tr. 9/11/13 at 345:9-18.  Indeed, on cross-examination at trial, Dr. Alpert again conceded that "applications are not the website" and agreed that the Facebook and

Maps Apps are not the website. Trial Tr. 3/26/14 (PM) at 197:21-198:3. The claim required a *website* and even Dr. Alpert admitted than the apps in the accused devices were *not websites*.

Instead of faithfully applying the Court's construction, however, NXP and Dr. Alpert reverted back to the rejected pre-claim construction position. A week after Dr. Alpert first testified (and after Dr. Michalson no longer had an opportunity to respond), NXP changed course. In rebuttal at trial, Dr. Alpert testified that the "user selecting a particular website" in claim 3 is met by "going out and acquiring the information that they seek from the worldwide web." Trial Tr. 4/3/14 (PM) at 132:11-18. Not only is this conclusion not in keeping with the intrinsic record or the Court's claim construction order, but this testimony is *exactly* the NXP position that was earlier rejected. Thus, instead of defining the claim term as being met through "a resource accessible through the worldwide web," (Doc. No. 207 at 11), NXP switched its theory in rebuttal to contend that a user selects a "website" by "going out and acquiring the information they seek from the worldwide web."[7] Trial Tr. 4/3/14 (PM) at 132:11-18.

As a whole, the infringement record demonstrates a stark disconnect between the claim language and the accused products.[8] *See Lakim*, 2013 WL 1767799, at *6. Dr. Alpert's contrived statements at trial only underscore NXP's willingness to circumvent the inevitable finding of non-infringement by resurrecting an infringement theory based on a claim

---

[7] Dr. Alpert further reverts to the rejected "website" construction—"a resource accessible through the world wide web"—in equating the Facebook server as the "Facebook website." In describing the type of information that is received by the Facebook app, Dr. Alpert falls short of saying a "webpage" is returned or displayed. Instead, he contends that a "list of recently checked-in friends" is requested and received from the Facebook server. *See* Trial Tr. 3/26/14 (AM) at 46:20-24, 47:9-14, 50:11-14.

[8] The allegation of direct infringement under the doctrine of equivalents fares no better. In its motion for judgment as a matter of law, BlackBerry addressed in detail NXP's lack of particularized testimony establishing equivalents in its case-in-chief. (Doc. No. 456 at 18-20) (citing Trial Tr. 3/26/14 (AM) at 57:20-58:10, 59:2-16). Therein, BlackBerry also explained that because Dr. Alpert did not identify equivalent structure and function, the broad infringement read would vitiate the claim elements. (Doc. No. 456 at 20).

construction that was previously rejected by the Court.  Time and again, courts award a prevailing party fees for having to continue litigating baseless claims well past the point it was apparent those claims would not succeed.  *Taurus IP*, 726 F.3d at 1327-29; *Raylon*, 700 F.3d at 1368-69; *MarcTec*, 664 F.3d at 917-18; *Eon-Net*, 653 F.3d at 1326; *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008) (citations omitted); *Biax Corp.*, 2013 WL 1324935, at *5.  Where, as here, there is an inference that the infringement testimony was calculated to evade substantive shortcomings, then the bad faith element of § 285 is also met. *MarcTec*, 664 F.3d at 907 (noting that the patentee "knew its allegations were baseless but pursued them anyway") (citing *Forest Labs, Inc. v. Abbott Labs*, 339 F.3d 1324, 1327 (Fed. Cir. 2003)).

### 4.  NXP Failed to Rebut Evidence that the '455 Patent Was Invalid, but Rather Than Concede Defeat, Resorted to Never-Before-Heard Conception Theories

Although courts typically rely on a knowingly weak infringement case to find a case exceptional, this case presents powerful circumstances of a knowingly weak validity case. Throughout the case, NXP alleged that BlackBerry infringed the asserted claims of the '455 patent if the accused devices "perform[ed] the functions necessary to comply with the 802.11g standard in a device that supports more than 8 data rates."  (Doc. No. 469 at 3).  For reasons explained below, although this infringement theory had its own set of problems, NXP's reliance on the 802.11g standard reinforced BlackBerry's contention that the asserted claims (13-17) were invalid in view of earlier contributions from the IEEE 802.11 working group.

### a.  BlackBerry's Powerful Trial Evidence of Invalidity

At trial, BlackBerry put on expert testimony that each and every element of claims 13-17 of the '455 patent was anticipated by the November 2000 proposal Dr. Michael Fischer submitted to the IEEE 802.11 working group in Tampa, Florida, as well as obvious in view of

comments compiled by Terry Cole in late 2002 in connection with his work as a member of the

IEEE 802.11g Task Group and the established 802.11 standards.  BlackBerry's expert, Dr.

Heegard, considered the Fischer Proposal (DX -229 & DX-231), as well as the Cole Presentation

(DX -230) and compared the prior art to the claims.  Trial Tr. 4/1/14 at 105:22-106:1.

For the Fischer Proposal, Dr. Heegard confirmed that the reference was prior art (Trial

Tr. at 4/1/14 at 72:13), compared the prior art to the claims, and concluded that all the

requirements of claims 13-17 were met.  Trial Tr. 4/1/14 at 105:7-106:1; 107:1-113:12

(discussing each claim element for claim 13 and explaining why it was disclosed in the Fischer

prior art reference); Trial Tr. 4/1/14 at 114:3-116:25 (same for claims 14-17).  He particularly

pointed out that the Fischer proposal describes a first and second data transmission rule.  Trial

Tr. at 4/1/14 at 71:19-25.  The expert opinion on anticipation was supplemented by the live

testimony of Dr. Fischer, who detailed his involvement as an active member in the 802.11

working group, including the contributions he made to portions of the original 802.11 original

standard and subsequent amendments thereto.  *See generally* Trial Tr. 3/31/14 at 162-170.  Dr.

Fischer's proposal was admitted into evidence after he explained that:

- His proposal addressed a known problem in the MAC protocol in the original version of 802.11 by aiming to add quality of service (QOS) facilities so that items like voice and video could move effectively along with data over the network.  Trial Tr. 3/31/14 at 164:7-165:15.

- The details of the "open issue" comment relating to how high a data rate could be encoded in the supported rates element and how many rates could be encoded.  Trial Tr. 3/31/14 at 166:20-167:6.

- The "open issue" comment was adopted within the section of the 802.11 standard called 7.3.2.2 supported rates element.  Trial Tr. 3/31/14 at 167:9-13.  With a few amendments the Fischer proposal became "the baseline of the 802.11 QOS draft."  Trial Tr. 3/31/14 at 168:22-169:24.

For the Cole Presentation, Dr. Heegard again confirmed that the reference was prior art,

compared the prior art to the claims, and concluded that all the requirements of claims 13-17

were obvious in light of the Cole Presentation combined with earlier, 1999 versions of the

802.11 standard.  *See generally* Trial Tr. 4/1/14 at 72-73, 120-128.  The expert opinion on

obviousness was supplemented by the live testimony of Dr. Matthew Shoemake, who was

chairperson of the 802.11g Task Group at the time Terry Cole compiled the Task Group's

comments in late 2002.  Trial Tr. 4/1/14 at 15:18-18:22.

The testimony of Drs. Heegard, Fischer, and Shoemake—whether considered alone or in

the aggregate—demonstrated "compelling evidence that the patent is not original and so it's an

invalid patent."  Trial Tr. 4/1/14 at 66:17-21.  This testimony, considered alongside the

references themselves, left little room for doubt that claims 13-17 of the '455 patent were

invalid.[9]

### b.  NXP Did Not Put On A Validity Expert In Rebuttal, Thereby Leaving BlackBerry's Clear and Convincing Evidence Unrebutted

NXP knew, and had known since much earlier in the case, that it was asserting invalid

claims.  For the '420 and the '654 patents, NXP relied on the same expert to opine on

infringement and validity.  Yet, for the '455 patent, NXP could not count on the same individual.

Mr. Williams, the infringement expert, must have been unwilling to take on the validity side of

the case, because he told the jury that he recommended another expert, Dr. Alon Konchitsky, for

this role.  Trial Tr. 3/28/14 (AM) at 35:14-25.  But Dr. Konchitsky never testified.

Rebutting the evidence of invalidity for the '455 patent in light of known prior art such as

the Fischer Proposal and the Cole Presentation was an objectively unreasonable proposition.

When NXP finally did find an expert who would opine on validity, Dr. Konchitsky submitted a

report that was, as the Court recognized, "admittedly concise," with only a single paragraph

---

[9] Ironically, BlackBerry called Drs. Fischer and Shoemake because NXP persisted in its argument that the Fischer and Cole references were not prior art.  The trial testimony made crystal clear not only that they are prior art, but also that they invalidate the '455 patent.

stating his "opinion."  (Mar. 21, 2014 Sealed Memorandum Opinion and Order at 18).  NXP never called Dr. Konchitsky in rebuttal and BlackBerry's invalidity evidence went to the jury unrebutted.

The lack of rebuttal expert testimony on the '455 patent is direct evidence that NXP actually knew its claims were baseless.  In patent cases, it is highly unusual—essentially unheard of—for a patent holder not to present a rebuttal expert after the accused infringer has come forward with evidence to invalidate the patent.  Dr. Konchitsky was on the witness list as "will call."  Dr. Konchitsky was *seated in the courtroom* for several days of the trial, and Mr. Williams indicated that Dr. Konchitsky was identified to NXP as an expert regarding the purported validity of the '455 patent.  BlackBerry's attorneys prepared to cross-examine Dr. Konchitsky through the night before the close of evidence.  But, by opting not to call Dr. Konchitsky to testify, NXP essentially conceded to the jury and to this Court that the asserted claims were, in fact, anticipated and obvious.

### c.   NXP Contrived Unreasonable Theories About the Prior Art Rather Than Withdraw the Infringement Allegations for the '455 Patent

By the time of Closing Statements, BlackBerry's evidence of invalidity was unrebutted and the only reasonable conclusion was that BlackBerry had carried its burden.  Nonetheless, rather than take the only reasonable path available and withdraw the '455 patent allegations, NXP continued to take the position that the Fischer Proposal and the Cole Presentation were not publicly available, notwithstanding the unrebutted testimony from three active IEEE participants—Drs. Heegard, Fischer, and Shoemake—to the contrary.  This is the type of "long shot" theory that has resulted in finding a case exceptional.  *See Taurus IP, LLC v. DaimlerChrysler Corp.*, 559 F.Supp.2d 947, 968 (W.D. Wis. 2008) (characterizing the plaintiff's misguided argument a "long shot" and awarding fees because the patent holder should have

"thrown in the towel").

Indeed, in Closing Statement, counsel for NXP suggested to the jury that the Fischer Proposal and the Cole Presentation could not be prior art because these submissions discussed at IEEE 802.11 meeting were not sufficiently accessible to the public. Trial Tr. 4/4/14 (PM) at 35:4-37:13, 38:16-41:13. And, even more unsettling, NXP's counsel interjected the wildly speculative notion that Gunnar Nitsche, the inventor listed on the '455 patent, somehow authored the contents of the Cole Presentation. Trial Tr. 4/4/14 (PM) at 41:3-13. There was no evidence at trial to support these attorney suggestions. Moreover, these positions were never offered in response to BlackBerry's interrogatory on the bases for NXP's contention that the '455 patent was not invalid, and were never mentioned in Dr. Konchitsky's expert report.

The manufactured dispute regarding whether BlackBerry's invalidating references qualified as publicly available prior art should not have been before the jury. A reasonable litigant would have yielded when it could not find an expert to defend the validity of its patent, but NXP responded by inventing new explanations. As a result of NXP's denial, BlackBerry had no choice but to bring Dr. Fischer and Dr. Shoemake to Florida to debunk NXP's characterization of the prior art's availability. Not only did the additional witnesses increase the cost of the litigation, but the two non-party witnesses were inconvenienced by travelling hundreds of miles to testify. Because these arguments, contrary to all evidence in the record, were a blatant attempt to ignore reality after it was objectively discernible that NXP would not succeed, neither BlackBerry nor the witnesses should have assumed these burdens.

### 5. NXP's Infringement Theory Disregarded the IEEE Rejection of Nitsche's Proposal

NXP's infringement allegations were tied to the notion that if BlackBerry's devices practice relevant portions of the 802.11g standard, then practicing the standard was proof of

infringement.  Mr. Williams opined that the 802.11g incorporates the claims, concluding that the

Standard also includes a first data transmission rule and a second data transmission rule which

expands the permissible value range of the element identification party.  *See* Williams Op.

Report ¶ 82; *see also* Trial Tr. 3/28/14 (AM) at 27:7-22, 36:13-17.  NXP's motion for judgment

as a matter of law on the issue of infringement traces the trial evidence that supposedly equated

infringement with practicing the 802.11g standard:

- Mr. Williams's testimony "describing how the 802.11g standard added a new element ID with the value of 50" (citing Trial Tr. 3/27/14 at 147:9-148:22).

- BlackBerry advertisements indicating compliance with 802.11g (citing PX721-740, PX744, PX746-748).

- BlackBerry's certification with Wi-Fi Alliance as being compliant with 802.11g (citing PX741-743, PX762, PX770-772, PX776-783, PX787, PX791, PX793-800, PX945, PX947, PX949-951).

(Doc. No. 469 at 4, n.12).  Thus, as demonstrated by the evidence NXP highlighted to the Court,

its infringement allegations turn on the conclusion that the 802.11g standard *actually*

*incorporates the limitations of the asserted claims.*

NXP's assumption that the Standard incorporates claim 13 is demonstrably false.  From

the outset of this case, NXP has avoided the reality that the IEEE ***rejected*** the inventor's

proposal.  The 802.11g Task Group considered Mr. Nitsche's proposal in a straw poll and

rejected it with eighteen members of the group voting "No" and only nine voting "Yes."  Trial

Tr. 4/1/14 at 21:4-23:6.  It is therefore objectively unreasonably for NXP to use the functions

necessary to comply with the 802.11g standard as a proxy for infringement when the standards

body decided that the proposal covering two separate data transmission rules would *not* become

part of 802.11g.

NXP pursued infringement of claims 13-17 of the '455 patent by willfully ignoring the

IEEE's dispositive treatment of Mr. Nitsche's proposal.  *See Therasense, Inc. v. Becton,*

*Dickinson & Co.*, ---F.3d----, 2014 WL 943184, at *3 (Fed. Cir. Mar. 12, 2014) (recognizing a case as exceptional when the patentee ignores reality and demonstrates a "persistent penchant for wasting judicial resources") (quoting *Mathis*, 857 F.2d at 752).   Throughout this case NXP has *known* that the IEEE never adopted a first and second data transmission rule.   It therefore knew that an accurate representation of what 802.11g incorporated would compel a conclusion of non-infringement.   NXP's assertion of the '455 patent in complete disregard of the adoption of the 802.11g standard evidences an infringement theory that is objectively baseless and brought in subjective bad faith.  *See MarcTec*, 664 F.3d at 916.

**B.     NXP Engaged In Litigation Misconduct And Perpetuated Its Tactics At Trial**

After ten trial days, the jury ultimately rendered a verdict in BlackBerry's favor upon three and a half hours of deliberation.   While the finders of fact saw through efforts to escalate the damages demand at every conceivable turn, the end result does not justify the tactics NXP employed to seek tens of millions of dollars it knew or should have known to be wholly unjustified.

Both before and during trial, NXP unilaterally ensured that the litigation landscape was always in flux.   When it came to the damages case, the "business story" between NXP and BlackBerry, NXP insincerely cried foul, forcing BlackBerry to litigate issues that never should have necessitated Court-resolution had NXP played by the rules.   Each issue, discussed in turn below, drained BlackBerry's resources and diverted attention away from NXP's baseless infringement/validity theories.   Neither the evidence nor expectations of professional conduct deterred NXP from its goal of shifting the focus away from its burden of proof and onto a variety of prejudicial sideshows.

**1.   NXP's Damages Case Ignored Controlling Law and the Facts of the Case**

NXP had "the burden of proving the amount of reasonable royalty damages it is entitled

to recover." *Transclean v. Bridgewood Servs.*, 290 F.3d 1364, 1376 (Fed. Cir. 2002).  A

patentee must employ "sound economic and factual predicates" in proving a reasonable royalty.

*Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).  In an attempt to

obtain significant damages at any price, NXP, however, blatantly ignored Federal Circuit

precedent and the facts of the case.  By repeatedly advancing damages theories that lacked legal

and factual bases, NXP's misconduct made this case exceptional.

### a. NXP's "Power Savings" Theory in Connection with the '420 Patent was Contradicted by NXP's Own Expert Witness

NXP's damages methodologies for all three patents were, at best, unsupported by the

evidence.  The litigation strategies employed by NXP in connection with the '420 patent,

however, rose to the level of litigation misconduct.  Indeed, it was grossly unjust for BlackBerry

to have to devote substantial resources defending against a damages theory premised on alleged

battery "power savings" when the deposition testimony of NXP's witnesses confirmed that no

such benefit was associated with the '420 patent.  For this reason alone, BlackBerry is entitled to

an award of attorney fees.

NXP's '420 patent damages were rooted in Mr. Weinstein's untenable connection

between the approximate cost of a smartphone battery and the alleged "power savings"

associated with the '420 patent.  According to NXP, applying a purported "16 percent power

savings to a battery price of $5 results in a cost savings of $0.80 per battery."[10]  Weinstein

---

[10] Just before trial, the Court precluded Mr. Weinstein from testifying regarding his rule of
thumb calculation that had resulted in a 40¢ per unit royalty rate.  (Mar. 21, 2014 Sealed
Memorandum Opinion and Order).  Specifically, the Court found "Mr. Weinstein's proposed
50/50 split of the [80¢] cost savings appears to be the exact sort of analysis proscribed by the
Federal Circuit in *Uniloc*: untethered to the facts of the case." *Id*. at 12.  Nevertheless, NXP
proceeded with its "power savings" theory despite the fact that it was contradicted by its experts,
*and* despite the fact that there was no royalty rate being proffered at trial by its own damages
expert based upon the alleged cost savings resulting from the use of the '420 patent.

Opening Report ¶ 198 (footnote 352 omitted).  Thus, as a result of the Court performing its role as gatekeeper, and rejecting the inflated 40¢ per unit royalty rate, NXP decided to forego advancing a royalty rate altogether, opting for a potentially more lucrative, but also more speculative, option.[11]  This alleged cost savings, however, was not only inconsistent with the alleged purpose of the patent—powering up when a need was anticipated as opposed to when necessary—but was plainly contradicted throughout discovery and at trial by NXP's own technical expert.

By proffering an economist with no technical expertise to opine on the alleged "power savings" benefits of the '420 patent, and in contradiction of the evidence and its own technical expert, NXP clearly ran afoul of settled precedent precluding speculative and unsupportable damages contentions.  *See Whitserve, LLC v. Computer Packages, Inc*., 694 F.3d 10, 31 (Fed. Cir. 2012) (finding that the expert "encouraged the jury to reach a purely speculative judgment" when he made only conclusory remarks regarding the *Georgia Pacific* methodology).   Although Mr. Weinstein admitted that he has no technical expertise in "power savings" or "longer battery life," Mr. Weinstein went on to offer opinions regarding the perceived benefits of a smartphone battery.[12]  *See, e.g.,* Trial Tr. 3/31/14 at 22:12-19, 32:8-33:1, 71:10-21.  Yet, at no point in time did NXP *ever offer any evidence* that the alleged battery savings *was tied to the asserted claim*. The record is devoid of any factual or expert testimony that the '420 patent saved power.  Dr. Alpert instead testified that the claims were not directed to power savings, and Mr. Weinstein

_____

[11]  In Mr. Weinstein's expert reports, he never claimed that the cost savings of 80¢ per battery was a royalty rate.

[12]  NXP also refused to concede the number of units actually in dispute for the '420 patent.  It was established through the testimony of Mr. Ball, Dr. Michalson, Dr. Alpert, Mr. Weinstein, and Dr. Ugone that the accused functionality in Facebook Places was not available to users until November 2010 (release date for Facebook version 1.9).  Thus, while it necessarily follows that damages should not be available until the date of the first alleged infringement in November 2010, NXP insisted on claiming damages for Facebook Places going back to 2007.

admitted that his opinions contradict NXP's technical expert. Trial Tr. 3/31/14 at 70:21-71:4. Without a link between power savings/battery life and the claimed technology, the entirety of the damages case for the '420 patent amounted to no more than rampant speculation. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010) (vacating damages award where "the district court's award relied on speculative and unreliable evidence divorced from proof of economic harm linked to the claim invention."). Persisting in a damages theory rooted in alleged "power savings" exemplified the unreasonableness of NXP's litigation strategies on the '420 patent, and BlackBerry is therefore entitled the fees expended thereon.

> **b. Contrary to Established Caselaw Requiring Support for a Claimed Royalty Rate, NXP Offered an Altogether New, Speculative and Unsupported Royalty Rate in Closing Argument**

Just before trial, the Court precluded Mr. Weinstein from testifying regarding his 50/50 rule of thumb theory on the 80¢ costs savings calculation. Thus, any testimony that the proper royalty rate for the '420 patent was 40¢ per unit was appropriately excluded by the Court. (Mar. 21, 2014 Sealed Memorandum Opinion and Order at 12.) Rather than dismiss its claims on the '420 patent, however, NXP persisted in presenting a theory of damages loosely tied to the alleged 80¢ per unit costs savings calculations. This culminated in NXP's improper attempt to, in its Closing Statement, suggest a new and unsupportable royalty rate for the '420 patent of 10¢ or 25¢.

After Mr. Weinstein testified at trial that "[w]hat I offered is 80 cents per unit cost savings, *not a royalty rate*," Trial Tr. 3/31/14 at 90:12-20 (emphasis added) and agreed that he had "not proposed a specific royalty rate for the jury," Trial Tr. 3/31/14 at 90:18-20, NXP opted to create its own attorney-proffered royalty rate during its Closing Statement. Specifically, counsel for NXP stated the following to the jury:

```
20          Now, you're going to have to decide what a reasonable
21     royalty is for the '420 patent.  You have this evidence of
22     battery savings.  And so NXP proposes a royalty range from
23     ten to 25 cents.
```

Trial Tr. 4/4/14 (PM) at 46:20-23.  This "range" had never been part of the case until NXP

interjected it at the last possible second.  The 10-25¢ "range" was not in Mr. Weinstein's expert

report.  The 10-25¢ "range" was not part of discovery.  The 10-25¢ "range" was not part of Mr.

Weinstein's direct or cross examination.  The 10-25¢ "range" was not part of Dr. Ugone's direct

or cross examination.  The 10-25¢ "range" was not identified in a single exhibit admitted into

evidence.

To make up a new royalty rate out of thin air just as the case was going to the jury is the

essence of prejudicial conduct.  Here, the jury saw through NXP's acts of desperation, but

BlackBerry's exoneration does not save it from the substantial fees and costs it incurred

defending itself against a damages theory that was unsupportable from the start of the case.

NXP's desperate efforts in Closing Statements to convince the jury to accept a new, wholly

unsupported royalty rate demonstrates the type of win-at-all costs strategy that is contrary to

established professional standards and relevant legal authority.  It also highlights the fact that it

should not have persisted in its claims on the '420 patent.

### C.   Under The Circumstances, The Court Should Award Reasonable Attorney's Fees to BlackBerry

The factual and legal circumstances overwhelmingly support an award of BlackBerry's

attorneys' fees to avoid the "gross injustice" that § 285 was designed to remedy.  Although the

Court did not grant a directed verdict on the issues submitted to the jury, and NXP is likely to

rely on this decision as a basis to deny an award of fees, this argument is misplaced.  Even when

evidence is legally insufficient and the district court recognizes such deficiencies, it is not required to grant judgment as a matter of law. *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006). Rather, district courts "are encouraged to submit the case to the jury" in lieu of granting a motion for judgment as a matter of law under Federal Rule 50(a) because final determination of the case is greatly expedited. *Id.* at 406 (quoting 9A Charles Allan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2533 at 319). Thus, given the desirability of a verdict for expediency and for purposes of appellate review, *id.* at 405-06, this Court's decision to submit the case to the jury does not in any way limit its discretion to later agree with the verdict and find the case exceptional with an award of fees to the prevailing party.

Likewise, NXP has already conveyed that it intends to argue that BlackBerry has waived its claim to attorney fees by not including the § 285 demand in the Pretrial Order. If NXP chooses to make such an argument, it will be misplaced. BlackBerry included the request for declaration of an exceptional case in its Answers to the Original and Amended Complaints. Any effort to suggest BlackBerry was required to also include a request for attorney's fees in the Pre-Trial Order is merely another attempt to evade confronting the meritless nature of this case. The Federal Circuit has described this precise effort as "untenable." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1369 (Fed. Cir. 2004). Specifically, in *Sulzer Textil A.G. v. Picanol N.V.*, the Federal Circuit rejected the contention that by not including a request for attorneys' fees in the Final Pretrial Order, it was waived. *Id*. The Court explained that a district court should entertain a prevailing party's request for fees at the close of a case because "[a]t the pretrial stage, there is no prevailing party, and thus, any claim for attorneys' fees would be premature." *Id.* at 1369-70 (citing *Brasseler, U.S.A. I, L.P., v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed.

Cir. 1999)) (rejecting an argument that a claim for attorney fees was waived by failing to raise such a claim in a successful summary judgment motion, holding that "until the prevailing party is known, a party that has pled a claim for attorneys' fees under Section 285 cannot be expected to request such fees").  Any waiver theory NXP relies on in opposition to this Motion has already been squarely discredited.

BlackBerry seeks to recover at least a portion of the millions of dollars it expended fighting back against NXP's meritless shakedown.  Specifically, BlackBerry requests that the Court enter an order requiring NXP to reimburse BlackBerry for its attorneys' fees in the amount of $11,015,620.87 for all fees incurred since the inception of this case or, in the alternative $4,984,036.29 for all fees incurred since the issuance of the claim construction order.  *See* Declaration of Jon Dean ¶ 4; Declaration of Noah C. Graubert ¶ 7; Declaration of Richard E. Mitchell ¶ 5.  The attorneys' fees for which BlackBerry seeks reimbursement were necessarily and reasonably incurred during the course of more than two years of court proceedings.  *See generally id*.  BlackBerry should receive these fees because the case never should have been brought and NXP's unfounded, and ever-shifting allegations substantially expanded the case, costing BlackBerry additional time and resources.  An award of fees in this case would address these inequities and serve as a deterrent to misconduct in the future.

As reflected in the submission of attorney Declarations for the three firms involved in defending BlackBerry in this case, the billing rates of BlackBerry's attorneys at McDermott Will & Emery LLP, Fish & Richardson P.C., and GrayRobinson, PA are within a reasonable range for complex patent-infringement actions, especially where courts recognize patent law as "a specialized field warranting higher rates."  *Lakim Indus.*, 2013 WL 1767799, at *8 (citing *In re Mgndichiani*, 312 F.Supp.2d 1250, 1263 (C.D. Cal. 2003)).  As explained in the accompanying

Declarations, McDermott Will & Emery LLP and Fish & Richardson P.C.'s billing rates reflect a national intellectual property practice, with billing rates for individual attorneys turning on the respective levels of expertise for each attorney and the work performed in this case.[13]  *See Lakim Indus.*, 2013 WL 1767799, at *8.

## IV.    **CONCLUSION**

For the reasons stated, BlackBerry respectfully requests that the Court declare this case exceptional and to award $11,015,620.87 which amounts to BlackBerry's attorney fees incurred in defense of this litigation.[14]  Alternatively, BlackBerry requests that the Court award $4,984,036.29 in fees because this amount represents attorney fees that began to accrue after the issuance of the Court's claim construction order when NXP knew or should have known that its infringement positions could not succeed.

---

[13]  Should the Court be interested in additional briefing and/or data regarding reasonable billing rates for patent infringement cases, BlackBerry proposes submitting supplemental briefing.  For the sake of brevity, the instant Motion primarily focuses on the circumstances underlying the request for an award of attorneys' fees under 35 U.S.C. § 285.

[14]  While BlackBerry maintains that an award of fees is most appropriate under the patent-specific statute, BlackBerry alternatively submits that, based on the record in this case, the Court could award attorneys' fees according to its "inherent powers" as a sanction for NXP's bad faith conduct.  *Chambers v. MASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *L.E.A. Dynatech, Inc. v. Allina*, 49 F.3d 1527, 1530 (Fed. Cir. 1995) (acknowledging a court's "inherent power to assess attorney fees as a sanction when a party acts in bad faith, vexatiously, wantonly, or for oppressive reasons").

April 24, 2014

*/s/ Sarah Chapin Columbia*

RICHARD E. MITCHELL, ESQ.
Florida Bar No.: 0168092
rick.mitchell@gray-robinson.com
GRAYROBINSON, P.A.
301 E. Pine Street, Suite 1400
Post Office Box 3068
Orlando, Florida 32802-3068
(407) 843-8880  Telephone
(407) 244-5690  Facsimile

*Local Counsel for Defendants*
*BLACKBERRY LIMITED and BLACKBERRY CORPORATION*

SARAH CHAPIN COLUMBIA, ESQ.
*Admitted Pro Hac Vice*
Massachusetts Bar No.: 550155
scolumbia@mwe.com
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775
Telephone: 617-535-4000
Facsimile 617-535-3800
                    -and-
RUSSELL HAYMAN, ESQ.
*Admitted Pro Hac Vice*
California Bar No. 110643
rhayman@mwe.com
JON DEAN, ESQ.
*Admitted Pro Hac Vice*
California Bar No. 184972
jdean@mwe.com
MCDERMOTT WILL & EMERY LLP
2049 Century Park East, Suite 3800
Los Angeles, CA  90067-3218
Telephone: 310-277-4110
Facsimile: 310-277-4730
                    -and-
JEFFREY GARGANO, ESQ.
*Admitted Pro Hac Vice*
Illinois Bar No. 6210852
jgargano@mwe.com
MCDERMOTT WILL & EMERY LLP

227 West Monroe Street
Chicago , IL 60606-5096
Telephone: 312-372-2000
Facsimile: 312-984-7700
-and-
MARCOS DANIEL JIMÉNEZ, ESQ.
Florida Bar No. 441503
mjimenez@mwe.com
McDermott Will & Emery LLP
333 Avenue of the Americas,
Suite 4500
Miami, FL  33131-2184
Telephone: 305-358-3500
Facsimile: 305-347-6500

*Lead Trial Counsel for Defendants*
*BLACKBERRY LIMITED and BLACKBERRY CORPORATION*

NOAH C. GRAUBART, ESQ.
(Admitted Pro Hac Vice) GA Bar No.: 141862
graubart@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree Street NE, 21st Floor
Atlanta, Georgia 30309
(404) 892-5005  Telephone
(404) 892-5002  Facsimile

*Co-Counsel for Defendants*
*BLACKBERRY LIMITED and BLACKBERRY CORPORATION*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing document was electronically filed with the

Clerk of the Courts by using the ECF system.

Dated:  April 24, 2014


                                              /s/  Sarah Chapin Columbia
                                              Sarah Chapin Columbia


DM_US 51346271-3.092211.0016