# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |  |
|---|---|---|
| NXP B.V., | ) | |
| | ) | Case No. 6:12-cv-498-YK-TBS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REDACTED FOR PUBLIC FILING |
| | ) | |
| BLACKBERRY LIMITED and | ) | |
| BLACKBERRY CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## NXP B.V.'S MOTION FOR A NEW TRIAL AND RENEWED JUDGMENT AS A MATTER OF LAW REGARDING THE '455 PATENT

I.    INTRODUCTION ............................................................................................ 1

II.   A NEW TRIAL SHOULD BE GRANTED ....................................................... 2

      A.    Pertinent Procedural History and Erroneous Rulings ........................... 2

      B.    BlackBerry Exploited the Court's Ruling That It Could
            "Urge the Jury to Adopt Reasonable Inferences Regarding
            Motivations for Suit or Financial Considerations" ............................... 6

      C.    Legal Standards for New Trial and Renewed JMOL ........................... 10

      D.    Evidence of a Party's Motivation for Filing Suit Is Rarely
            Discoverable or Admissible, Particularly In a Jury Trial .................... 13

      E.    The Improper Admission of Evidence and Arguments
            Relating to NXP's Motivation Substantially Prejudiced the
            Outcome .............................................................................................. 17

            1.    NXP is entitled to Judgment as a Matter of Law that
                  the '455 Patent is Infringed ...................................................... 19

            2.    NXP is Entitled to Judgment as a Matter of Law that
                  the '455 Patent is Valid ............................................................ 22

      F.    There Was No Evidence on Which the Jury Could Find the
            '455 Patent Both Invalid and Not Infringed ....................................... 29

      G.    NXP Is Entitled To a New Trial on All Patents ................................... 29

III.  CONCLUSION ............................................................................................. 30

# TABLE OF AUTHORITIES

PAGE

**CASES**

*Abington Textile Mach. Works v. Carding Specialists, Ltd.*,
    249 F. Supp. 823 (D.D.C. 1965) ........................................................................ 27

*Aetna Casualty & Surety Co. v. Gosdin*,
    803 F.2d 1153 (11th Cir. 1986) ....................................................................... 10

*Allstate Ins. Co. v. Nassiri*,
    No. 2:08-CV-369, 2013 WL 239416 (D. Nev. May 30, 2013) ......................... 15

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ......................................................................................... 13

*Andrx Pharms., Inc. v. Elan Corp.*,
    *PLC,* 421 F.3d 1227 (11th Cir. 2005) ............................................................. 16

*Burchfield v. CSX Transp., Inc.*,
    636 F.3d 1330 (11th Cir. 2011) ...................................................................... 10

*Cote v. Shinseki*,
    No. 8:07-cv-1524-T-TBM, 2009 WL 3246602 (M.D. Fla. Oct. 6,
    2009) ................................................................................................................. 11

*Couch v. Village of Dixmoor*,
    No. 05 C 963, 2006 WL 3409153 (N.D. Ill. Nov. 27, 2006) ........................... 15

*Cytologix Corp. v. Ventana Med. Sys.*,
    424 F.3d 1168 (Fed. Cir. 2005) ....................................................................... 22

*Digital Equipment Corp. v. System Industries., Inc.*,
    108 F.R.D. 742 (D. Mass. 1986) ...................................................................... 14

*Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*,
    524 F.3d 1254 (Fed. Cir. 2008) ....................................................................... 16

*Dyber v. Quality King Distributors, Inc.*,
    No. CV 06-735, ECF No. 17, 2006 U.S. Dist. LEXIS 89707
    (E.D.N.Y. Dec. 12, 2006) ................................................................................. 14

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) .................................................................................... 15, 16

*Edwards v. Sears, Roebuck & Co.*,
    512 F.2d 276 (5th Cir. 1975) ........................................................................... 11

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*,
    471 F.3d 1369 (Fed. Cir. 2006)..................................................................... 26

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008)..................................................................... 26

*Foremost Promotions, Inc. v. Pabst Brewing Co.*,
    15 F.R.D. 128 (D. Ill. 1953).......................................................................... 14

*Gen. Mills, Inc. v. Hunt-Wesson, Inc.*,
    103 F.3d 978 (Fed. Cir. 1997)....................................................................... 21

*George v. Honda Motor Co.*,
    802 F.2d 432 (Fed. Cir. 1986)....................................................................... 21

*Georgeson v. DuPage Surgical Consultants, Inc.*,
    No. 05 C 1653, 2007 WL 914207 (N.D. Ill. Mar. 22, 2007) ........................ 15

*Grammenos v. Allstate Ins. Co.*,
    No. 07-2725, ECF No. 95, 2009 U.S. Dist. LEXIS 37069 (E.D. Pa.
    Apr. 30, 2009) .............................................................................................. 14

*Haught v. U.S. Eng'r Contractors Corp.*,
    No. 07-80436-CIV, 2009 WL 36591 (S.D. Fla. Jan. 6, 2009)....................... 15

*Illinois Tool Works, Inc. v. MOC Prods. Co.*,
    946 F. Supp. 2d 1042 (S.D. Cal. 2012)......................................................... 15

*Impax Labs., Inc. v. Aventis Pharms. Inc.*,
    545 F.3d 1312 (Fed. Cir. 2008)..................................................................... 26

*In re Bayer*,
    568 F.2d 1357 (Fed. Cir. 1978)..................................................................... 24

*In re Cronyn*,
    890 F.2d 1158 (Fed. Cir. 1989)..................................................................... 24

*In re Lister*,
    583 F.3d 1307 (Fed. Cir. 2009)..................................................................... 25

*Joseph v. Publix Super Mkts.*,
    151 Fed. Appx. 760 (11th Cir. 2005)....................................................... 11, 12

*Mannatech, Inc. v. Glycoproducts Int'l, Inc.*,
    No. 3-06-CV-0471, 2008 WL 2704425 (N.D. Tex. July 9, 2008)................. 22

*Mendez v. Unitrin Direct Prop. & Cas. Ins. Co.*,
    622 F. Supp. 2d 1233 (M.D. Fla. 2007) ........................................................ 11

*Mikhon Gaming Corp. v. Acres Gaming*,
   165 F.3d 891 (Fed. Cir. 1998) ...................................................................... 16

*Morgan v. Family Dollar Stores, Inc.*,
   551 F.3d 1233 (11th Cir. 2008) ................................................................... 13

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
   545 F.3d 1359 (Fed. Cir. 2008) .................................................................... 26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) .................................................................... 21

*Peat v. Vanguard Research, Inc.*,
   378 F.3d 1154 (11th Cir. 2004) ................................................................... 10

*Pfizer Inc. v. Teva Pharms. U.S.A., Inc.*,
   882 F. Supp. 2d 643 (D. Del. 2012) .............................................................. 25

*PODS Enters., Inc. v. ABF Freight Sys., Inc.*,
   No. 8:11-cv-84, 2011 WL 4948397 (M.D. Fla. Oct. 17, 2011) ...................... 16

*Prof'l Real Estate Investors. v. Columbia Pictures Indus.*,
   508 U.S. 49 (1993)........................................................................................ 16

*Promega Corp. v. Applied Biosystems, LLC*,
   No. 13-C-233, ECF No. 274, 2013 U.S. Dist. LEXIS 154690 (N.D.
   Ill. Apr. 4, 2013) ......................................................................................... 22

*Q-Pharma, Inc. v. Andrew Jergens Corp.*,
   No. C01-1312P, ECF No. 120, 2002 U.S. Dist. LEXIS 27222 (W.D.
   Wash. Nov. 18, 2002) .................................................................................. 16

*Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*,
   No. 88-9752, 1991 WL 183842 (E.D. Pa. Sept. 16, 1991) ............................. 14

*Rolex Watch U.S.A., Inc. v. Rainbow Jewelry, Inc.*,
   No. 12-21437-CIV, 2012 WL 4138028, (S.D. Fla. Sept. 19, 2012)................. 16

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
   511 F.3d 1186 (Fed. Cir. 2008) .................................................................... 25

*Stollings v. Ryobi Techs., Inc.*,
   725 F.3d 753 (7th Cir. 2013) .............................................................. 12, 13, 18, 19

*Sulzer Textil A.G. v. Picanol NV*,
   358 F.3d 1356 (Fed. Cir. 2004) .................................................................... 22

*Toole v. McClintock*,

999 F.2d 1430 (11th Cir. 1993) ................................................................ 11

*Torjagbo v. United States*,
    285 Fed. Appx. 615 (11th Cir. 2008) ............................................... 13

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965) ............................................................... 15, 16

*United States ex rel. Singh v. Bradford Reg. Med. Ctr.*,
    249 F.R.D. 220 (W.D. Pa. 2008) ...................................................... 14

*United States Steel, LLC v. Tieco, Inc.*,
    261 F.3d 1275 (11th Cir. 2001) ....................................................... 13

*Vizio, Inc. v. ITC*,
    605 F.3d 1330 (Fed. Cir. 2010) ....................................................... 26

*W.V. Realty, Inc. v. Northern Ins. Co. of N.Y.*,
    334 F.3d 306 (3rd Cir. 2003) ......................................................... 12

*Weatherly v. Ala. State Univ.*,
    No. 2:10CV192, 2012 WL 274654 (M.D. Ala. Jan. 31, 2012) ..................... 15

*Wood v. Green*,
    323 F.3d 1309 (11th Cir. 2003) ....................................................... 13

## **STATUTES**

35 U.S.C. S 102(a) ....................................................................... 25

## **RULES**

Fed. R. Civ. P. 61 ....................................................................... 10

NXP respectfully submits this combined Motion for New Trial and Renewed Motion for Judgment as a Matter of Law pursuant to Federal Rules of Civil Procedure 59 and 50.

## I.    INTRODUCTION

> As the jury no doubt recognized, this case was never about patent rights; it was a thinly veiled attempt to capture BlackBerry's revenue by any available means.
>
> BlackBerry Motion for Attorney's Fees (Doc. 506) at 1.

This statement sounds incredible. Really? This ***patent infringement*** case was never about patent rights? How can that be possible?

Of course, from a legal standpoint, BlackBerry's statement is incorrect. BlackBerry's trial strategy notwithstanding, this case is, and always has been, about BlackBerry's infringement of NXP's patent rights. Yet BlackBerry proudly proclaims that the jury understood this case to not be about patents at all — essentially, that the jury nullified the evidence of infringement that NXP presented. Unfortunately, NXP must agree with BlackBerry that the jury perceived the case to be about NXP's allegedly improper motivation for filing suit, rather than BlackBerry's (alleged) infringement — because motivation was what BlackBerry argued to the jury and was the primary focus of BlackBerry's cross-examination of NXP's corporate witnesses. Although NXP sought to prevent BlackBerry from adducing this evidence and making these arguments, the Court's evidentiary rulings permitted BlackBerry to portray NXP as an extortionist, targeting BlackBerry for revenue using dusty, old patents after BlackBerry refused to purchase additional NXP product. These arguments unduly prejudiced the jury, and NXP is entitled to a new trial as a result.

From last October through trial, NXP requested that the Court prevent BlackBerry from hijacking the proceedings by arguing that NXP was a patent troll or referring to NXP's motives for filing suit. These requests were made because NXP's motivation for filing suit is legally irrelevant to the only issue in this case: whether BlackBerry infringed a valid claim

of the patents-in-suit.  Permitting this evidence and argument to go to the jury was clearly prejudicial to NXP.  Beyond BlackBerry's acknowledgment of the prejudicial impact of this evidence, the record shows that the verdict was impacted by the improperly admitted evidence.  Most tellingly, BlackBerry did not present ***any evidence*** from which the jury could find that the '455 patent was both invalid and not infringed; yet the jury reached that verdict.  BlackBerry incited the jury to act on its passions, and the jury did.

Moreover, judgment as a matter of law on infringement of the '455 patent should be entered because the entirety of BlackBerry's testimony concerning the '455 patent depended upon an interpretation of the claims that was inconsistent with the Court's claim construction.  No reasonable jury could conclude that each element of BlackBerry's anticipation defense was satisfied by the "Fischer" or "Cole" references, when reviewed under the applicable clear and convincing standard.  Had the jury not been prejudiced by BlackBerry's arguments regarding motivation for filing suit, it would have recognized that this case was, indeed, about patent rights, and decided the case accordingly.  Thus, NXP is entitled to a new trial and judgment as a matter of law on infringement and invalidity of the '455 patent.

## II.    A NEW TRIAL SHOULD BE GRANTED

### A.    Pertinent Procedural History and Erroneous Rulings

On August 23, 2013, BlackBerry served the Rebuttal Report of Keith Ugone.  Dr. Ugone relied on a document entitled "Licensing Proposal" (the "2010 IPValue Document"), which he opined proved the royalty amount that NXP would have accepted at the time of the hypothetical negotiation for a portfolio-wide license.[1]  Dr. Ugone did not rely on any testimony from NXP or IPValue to support his opinion, and ignored the express language of the document and related documents.[2]  Noting the lack of probative value of the 2010

---

[1] Doc. S-109 at 9-11, 15-16, 39-44, 47, 68-71, 76-79.

[2] *Id.*; *see also* 10/28/13 NXP's Motion to Strike (Doc. 204, Doc. S-108); DX 99; DX 101.

IPValue Document, NXP challenged Dr. Ugone's opinion.[3]

On October 31, 2013, NXP filed its Omnibus Motion *in Limine*.[4] NXP's MIL H sought to preclude any reference to NXP's motivation or state of mind in filing this case as prejudicial and irrelevant.[5] Similarly, in MIL J, NXP sought to preclude BlackBerry from arguing that NXP is a patent assertion entity. NXP also sought to preclude any reference to its relationship with IPValue, its licensing agent.[6]

On February 21, 2014, the parties filed their Joint Pretrial Statement.[7] NXP again objected to the admissibility of the 2010 IPValue Document as irrelevant and highly prejudicial, and noted its pending objections in MILs H and J.[8] NXP also objected that all other IPValue related documents were irrelevant and prejudicial.[9]

On March 21, 2014, the Court entered its Order on NXP's *Daubert* challenge with regard to Dr. Ugone's testimony. The Court denied NXP's Motion to preclude Dr. Ugone from relying on the 2010 IPValue Document.[10]

Trial commenced on March 24, 2014. The Court had not yet ruled on any motions *in limine*. NXP's MIL H was discussed prior to opening statements when NXP reiterated its request to preclude BlackBerry from introducing any evidence on "business discussions and the like on motivation."[11] A related issue was also discussed relating to NXP's Rule 403 objection to the 2010 IPValue Document, on which the Court had not yet ruled.[12] If the IPValue

---

[3] *Id.*
[4] 10/31/13 NXP's Omnibus Motion *in Limine* (Doc. 218).
[5] *Id*. at 23-24.
[6] *Id*. at 25.
[7] 2/22/14 Joint Pretrial Statement (Doc. 333).
[8] 2/22/14 BlackBerry's Trial Exhibit List with NXP's Objections (Doc. 333-3) at 20 (DX 99).
[9] *Id.* at 19 (DX 92), 21 (DX 101), 62 (DX 344), and 163 (DX 934).
[10] 3/21/14 Court's Sealed Memorandum ("*Daubert* Order") at 19-21 (Doc. 406 or 407).
[11] 3/24/14 Trial Tr. 90:7-14.
[12] Although the Court had ruled on the *Daubert* issue relating to DX 99, the Court had not yet made any evidentiary rulings on particular documents, including as to DX 99 or other IPValue documents.

Document were deemed admissible, concerns were raised about the permissible scope of related testimony and the scope of NXP's possible rebuttal. NXP argued that BlackBerry knew from meetings with NXP, conducted under the auspices of Rule 408 that the 2010 IPValue Document did not reflect NXP's valuation of damages, that the document so be excluded as irrelevant, or in the alternative, that NXP should not be able to rely on the Rule 408 discussions.[13]

The Court did not resolve MIL H prior to opening statements, but issued an oral order: "at least for now as to openings, that there — that the whole approach to discussing prior business dealings will be excluded for purpose of opening statements for both sides. And then we can ferret out this 408 issue."[14] The Court also instructed the parties ***not*** to reference any documents or evidence to which there were outstanding objections.[15]

In contravention of the Court's oral ruling and instructions, in its opening statement, BlackBerry referred to the 2010 IPValue Document, later admitted as DX 99, citing it as allegedly evidencing the value NXP placed on the patents in 2010:

> The evidence will show that NXP has drastically inflated their damages claims over and above what they actually believe them to be. In April 2010, NXP hired a licensing agent called IPValue to evaluate NXP's patent portfolio. A few months later, IPVALUE submitted a propos[al] to NXP.
> 
> ████████████████████████████████████████████████████[16]

This argument put the preliminary-excluded business relationship at issue because BlackBerry's argument could only be explained by NXP via reference to the business discussions.

---

[13] 3/24/14 Trial Tr. 91:3-93:22.

[14] 3/24/14 Trial Tr. 93:10-18.

[15] *Id.*

[16] 3/24/14 Trial Tr. 157:12-157:22. NXP renewed its objection at the end of BlackBerry's opening statement. *Id.* at 160:6-163:17.

On March 25, 2014, the Court entered its Order concerning the motions *in limine*.[17]
The Court reserved ruling on MIL H until a later date.[18]  The Court denied MIL J, holding
that "non-practicing entity is an accurate and neutral term, and bears on Plaintiff's damages
claim" (subject to renewal if Defendants utilized disparaging terms), and that "Plaintiff's
relationship with IPValue is relevant to Dr. Ugone's rebuttal expert report on damages."[19]

After the 2010 IPValue Document was mentioned in opening, the Court had to decide
whether it should nonetheless be excluded, or whether another course of action was
warranted.  On day three, BlackBerry objected to the alternative course of action under
consideration.[20]  NXP filed a responsive brief, reiterating its position on MIL H, and urged
the Court to preclude reliance on the 2010 IPValue Document pursuant to Rule 403 because
it would "(1) confuse the jury; (2) mislead the jury; and (3) perpetuate a fraud on the jury,
NXP, and the Court."[21]  At oral argument, NXP explained "[t]he prejudice definitely
outweighs the probative value here, because the probative value is contrary to actual fact.
There is no probative value of that document.  So we would suggest that the easiest way to
remedy this is to prevent the IPValue/NXP agreement from coming into evidence."[22]

Late at night after the third day of the trial, the Court entered an order on NXP's
MILs H and I.[23]  The Court determined that the 2010 IPValue Document was probative and
admissible, and denied MIL H finding that "to the extent relevant to damages, the parties'
prior business dealings are admissible."[24]  Most significantly, the Court ruled that "[e]ither

---

[17] Doc. 419.

[18] *Id*. at 15-16.

[19] *Id*. at 16-17.

[20] BlackBerry was served and provided a brief to the Court but it does not appear that it was filed.

[21] 3/26/14 NXP's Opposition to BlackBerry's Brief Regarding the Admissibility of the October 2011 and November 2011 Settlement Discussions (Doc. S-433 at 1).

[22] 3/26/14 Trial Tr. 225:8-225:13.  NXP further argued:  "It's a 403 exclusionary issue.  It should be excluded, because, just like a big number can inflame the jury, a little number can really cool them off."  *Id*. at  233:2-2:33:4.

[23] 3/26/14 Order (Doc. 435).

[24] *Id*. at 2.

party may urge the jury to adopt reasonable inferences *regarding motivations for suit or financial considerations*."[25]  As to MIL I the Court held "evidence of financial status at the time relevant to any expert's evaluation of the relative strength of the parties' positions under Georgia-Pacific is relevant and admissible."[26]

**B.**     **BlackBerry Exploited the Court's Ruling That It Could "Urge the Jury to Adopt Reasonable Inferences Regarding Motivations for Suit or Financial Considerations"**

BlackBerry exploited the Court's rulings at every turn in a substantially prejudicial manner.   During trial, BlackBerry advanced an alleged extortion scheme, whereby NXP purportedly formed an "attack team" to extort money, purportedly to cover accounting losses of $4 billion incurred in preceding years.[27]  Allegedly directed by NXP management, the "attack team," comprised of NXP sales people, NXP's IP attorneys, and IPValue, "targeted" BlackBerry, demanding that BlackBerry double its purchases from ███████████ or NXP would retaliate.  Via its extortion scheme arguments, BlackBerry encouraged the jury to ignore the merits of the patent dispute and instead render a verdict for BlackBerry because NXP was a bad actor with improper motives.

BlackBerry's closing epitomizes BlackBerry's version of the alleged scheme and the "evidence" in support thereof.  BlackBerry began by characterizing NXP as a company in financial distress with "combined losses of more than $5 billion."[28]  During trial, BlackBerry asked NXP's witnesses, Drue Freeman, Aaron Waxler, and Roy Weinstein, to review NXP's

---

[25] *Id*. at 2 (emphasis added).

[26] *Id*.

[27] In addition to being highly prejudicial, the extortion scheme argument was fictional, woven from a series of unrelated documents disparate in time and with no evidence that the authors of various documents were coordinated, much less acting in concert. The theory that BlackBerry was "targeted" came from a 2010 internal sales presentation for one business unit that referenced "hyper growth").  (DX 1093).  In that document, many potential customers were identified as possible sales "targets."   Likewise, the oblique reference to an "attack team" in one email was simply sales-jargon for putting together a team to pursue a sales opportunity. (DX 1021).  No document tied this lawsuit against BlackBerry to any effort to recover from $4 billion in losses.

[28] 4/4/14 PM Trial Tr. 57:1-57:5.

securities filings to confirm NXP's purported net losses.[29] BlackBerry's Senior Director of Commodity Management, Roberto Troiolo, also testified that he was told that NXP "was having a bad quarter" and "needed to do something about [its] revenue and profits."[30]

Next, BlackBerry argued to the jury that NXP management formed a "RIM attack team."[31] BlackBerry presented a story in which NXP targeted BlackBerry because it desired to "increase its revenue by selling more of these commodity parts [and] also trying to sell other products as well."[32] The focal point of this story was a presentation from one NXP product sales team entitled, "Targeting Hyper Growth."[33] BlackBerry aggressively questioned Mr. Waxler, who had no prior involvement with the document,[34] at length about the presentation:

> Q:  And you see a photo of a man with a bow and arrow on the first page
>      of the presentation.  Do you see that.
> A:  Yes, I do.
> Q:  He appears to be intently aiming at something according to that picture
>      in front of you; is that right?
> A:  Yes.
>      . . .
> Q:  And then there's RIM out there off the coast of the Americas, RIM.  It
>      has a target symbol behind it.  Do you see that?
> A:  Yes, I do.
> Q:  Again, that's BlackBerry, of course.
> A:  I believe so.[35]

---

[29] 3/27/14 Trial Tr. 23:3-24:1; 3/28/14 Trial Tr. 163:14-167:5 (A. Waxler); 3/31/14 Trial Tr. 54:4-57:6 (R. Weinstein); DX 37 at 3; PX 2075.

[30] 4/2/14 Trial Tr. 85:2-86:11(R. Troiolo); *see also Id.* at 89:4-89:16 (R. Troiolo).

[31] 4/4/14 PM Trial Tr. 57:6-57:10.

[32] 3/28/14 Trial Tr. 109:4-109:12 (A. Waxler).

[33] *See* DX 1093.

[34] 3/28/14 Trial Tr. 127:22-128:22 (A. Waxler) ("This is the first time I'm seeing this presentation.").

[35] 3/28/14 Trial Tr. 127:16-130:12 (A. Waxler); *see also* 3/28/14 Trial Tr. 130:13-130:21 (A. Waxler); *id.* at 131:3-131:6 (Q:  And, by the way, BlackBerry was -- your understanding, at least by 2010, that it was going to be one of the revenue targets of NXP's, right?  A:  For sales, yes.); *id.* at 133:24-135:5 (Q.  So the purpose, again, of this presentation in its entirety was to get the sales people fired up to try to target companies in order to generate revenue, right?  A:  Yes.  Q:  That's why we see arrows and targets and the dollar signs all over this presentation, right?  A:  Yes.).

With regard to the "RIM attack team," BlackBerry's attorneys pieced together the concept from email snippets between NXP employees and suggested that this "attack team" was created to "counteract [NXP's] revenue problem" because "NXP was nowhere near meeting its $1 billion hypergrowth target."[36] BlackBerry routinely referred to the purported "attack team" and an "attack plan" throughout the trial.[37]

BlackBerry argued that "NXP decided to dust off their old patents" and "use them to shake down their customers for more business."[38] In BlackBerry's words "NXP hired IPVALUE to develop a plan to target BlackBerry using these old, dusted-off patents."[39] BlackBerry focused on NXP's relationship with IPValue, despite its irrelevance to the merits of this lawsuit. BlackBerry characterized IPValue's business as "threatening and funding litigation;" referred to NXP's notice letter as a "threat letter" explained that IPValue █████, and twice called out an IPValue representative by name who was observing the trial from the gallery.[40]

BlackBerry argued that following a "directive" from an NXP executive, who allegedly set a four week deadline to show results, NXP delivered a "doomed message" in the form of the August 2011 demand letter to BlackBerry.[41] According to BlackBerry, NXP's account executive for BlackBerry, Chris Kelly, met with BlackBerry's head of

---

[36] *See* DX 1021; 3/28/14 Trial Tr. 163:14-167:5 (A. Waxler).

[37] *See, e.g.*, 3/28/14 Trial Tr. 171:12-171:14 (A. Waxler) (Q: If NXP's attack plan for more sales, trade that for licensing revenue failed, NXP would only lose a small amount of business as compared to another customer. Right?); *id.* 176:14-176:16 (Q: So as we're getting close to this June meeting, the attack is becoming even more of a deeper dive? Is that right?); *id.* 177:2-177:4 (Q: And, again, the goal of this RIM attack team is to generate as much sales as it can during this time period with BlackBerry; is that right?); *id.* 177:6-177:7 (Q: And the attack plan is getting more geared towards this June, July, August 2011 time period; is that right?).

[38] 4/4/14 PM Trial Tr. 57:6-57:17.

[39] *Id.*

[40] PX 1641; 3/28/14 Trial Tr. 150:10-150:22, 151:25-152:6, 153:19-154:14 (A. Waxler); *see also id.* at 156:25-157:10, 135:15-135:17); 4/4/14 PM Trial Tr. (Closing) 102:1-24 ("Their representative has been here throughout the trial. He's here today, on day ten.").

[41] 4/4/14 PM Trial Tr. 57:25-58:4.

purchasing, Mr. Troiolo,[42] to deliver the demand letter along with a message that the demand letter "wouldn't be followed up on" if Mr. Troiolo "double[d] BlackBerry's spend on NXP products from ██████████████████████ [.]"[43]

Permitted to do so by the Court's ruling on "motivations for filing suit and financial considerations," BlackBerry called Mr. Troiolo to the stand for the sole purpose of characterizing NXP as the bad actor and the meetings as a "shake down." Indeed, Mr. Troiolo speculated at trial that "NXP thought [it] could leverage [a bunch of old patents] by seeing if some of [its] customers were buying components from their competitors that would infringe those patents" and that what NXP "[was] actually looking for was not a royalty payment, but [] an increase in revenue."[44] Mr. Troiolo also testified that he knew NXP "approach[ed] BlackBerry [] instead of the component suppliers that actually were designing and manufacturing the component they were infringing" because "the royalty that they could get from a phone manufacturer would be much higher . . . ."[45]

Then, to put a white hat on BlackBerry, BlackBerry argued that it tried to put the relationship "back on a professional footing, where business would be awarded based on performance and merit, not threats."[46] BlackBerry claimed to have informed NXP that their relationship could continue "only if NXP first removed the gun that it had put against BlackBerry's and Mr. Troiolo's head."[47] In a blatant effort to play to the jury's emotions,

---

[42] Though entirely irrelevant to the issues in this case, BlackBerry even went so far as to point out that Mr. Troiolo pursued his theology degree at night while working for BlackBerry. *See* 4/4/14 PM Trial Tr. 58:8-58:13. BlackBerry's reliance on Mr. Troiolo's theology degree is just one more example of BlackBerry's efforts to appeal to the jury's emotions rather than present evidence relevant to the core issues in this case – infringement, invalidity and damages.

[43] 4/4/14 PM Trial Tr. 58:14-58:20.

[44] 4/2/14 Trial Tr. 85:2-86:11, 90:21-91:2, 92:22-94:9 (R. Troiolo).

[45] 4/2/14 Trial Tr. 94:23-95:15 (R. Troiolo); *see also* 4/2/14 Trial Tr. 149:9-150:2 (R. Mishler).

[46] 4/4/14 PM Trial Tr. 58:21-58:24.

[47] *Id.* at 59:3-59:6.

BlackBerry's counsel, on several occasions, placed his fingers against the side of his head to symbolize a gun. To cast a final doubt on NXP's character, Mr. Troiolo testified, that in the end BlackBerry no longer bought parts from NXP because it "couldn't trust [NXP]."[48]

### C. Legal Standards for New Trial and Renewed JMOL

A party can obtain a new trial pursuant to Rule 59 by showing that the erroneous admission of evidence had a "substantial prejudicial effect."[49] "[T]he inquiry is always directed at the same central question - how much of an effect did the improperly admitted or excluded evidence have on the verdict?"[50] The Eleventh Circuit looks to a number of factors in analyzing and answering that question, "including the number of errors, the closeness of the factual disputes (i.e., the strength of the evidence on the issues affected by the error), and the prejudicial effect of the evidence at issue."[51] The Eleventh Circuit also considers "whether counsel intentionally elicited the evidence, whether counsel focused on the evidence during the trial, and whether any cautionary or limiting instructions were given."[52] If analysis of these factors suggests that improperly admitted evidence substantially influenced the jury's verdict, a new trial should be granted.[53]

A prejudicial effect on the jury's verdict requiring a new trial can be shown by erroneous admission of evidence irrelevant to a party's claim. In *Toole v. McClintock*, for example, the Eleventh Circuit reversed a decision denying appellant's motion for a new trial

---

[48] 4/2/14 Trial Tr. 97:6-97:16 (R. Troiolo).

[49] *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1333 (11th Cir. 2011) (citation omitted); *see also* Fed. R. Civ. P. 61.

[50] *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004).

[51] *Id.* , 378 F.3d at 1162.

[52] *Id.* (citations omitted).

[53] *Id.* at 1162-65 (admission of evidence constituted reversible error); *see also Burchfield*, 636 F.3d at 1334-38 (granting new trial because video was improperly admitted and prejudicial because it was "calculated to cause the jury to accept [Defendant's] theory over [Plaintiff's] evidence."); *Aetna Cas. & Surety Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir. 1986) ("Because we cannot say that this unduly prejudicial evidence did not affect the jury's ultimate decision, we must vacate the judgment below and remand this case for a new trial.").

in a breast implant products liability case.[54]  The Court held that the district court abused its

discretion by admitting into evidence a document setting forth Food and Drug Administration

proposed findings concerning risks posed by breast implants, finding that this evidence was

irrelevant to the issues in the case.[55]  Because the FDA report "contained highly and unfairly

prejudicial assertions" and counsel "was permitted to argue to the jury that the FDA evidence

showed both [Defendant's] liability and the [Plaintiffs'] damages," the Eleventh Circuit

found the evidence improperly influenced the jury and rendered "a new trial [was]

mandatory."[56]

The Eleventh Circuit applied similar logic in *Joseph v. Publix Super Mkts., Inc.*,[57]

where the appellant Publix asserted that it was entitled to a new trial because the court

erroneously allowed the appellee's testimony that a retired former store manager made racial

slurs in an employment discrimination case.[58]  Because the alleged statements were made

years before the alleged discrimination began, and bore no relationship to the adverse

employment action, the testimony was considered "not relevant to prove any element" of the

claim-in-suit.[59] The Eleventh Circuit decided that the testimony should not have been

admitted and that the error caused sufficient "prejudicial impact" to set aside the judgment.[60]

---

[54] 999 F.2d 1430, 1431 (11th Cir. 1993).

[55] *Id.* at 1433-34.

[56] *Id.* at 1435, *citing Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 283 (5th Cir. 1975) (granting a new trial due to "clear and prejudicial error" that "unduly influenced the jury's sympathies"); *see also Mendez v. Unitrin Direct Prop. & Cas. Ins. Co.*, 622 F. Supp. 2d 1233, 1239-40 (M.D. Fla. 2007) (granting new trial where "the jury's verdict was unfairly swayed by the irrelevant evidence regarding execution of the judgment," which evidence was subject of a motion *in limine* the Court had previously denied).

[57] 151 Fed. Appx. 760 (11th Cir. 2005).  NXP notes that while this decision is designated "Not for Publication", at least two courts in this district have cited it, which indicates that even if *Joseph* is not considered precedential, it still may considered for its persuasive value.  *See Cote v. Shinseki*, No. 8:07-cv-1524-T-TBM, 2009 WL 3246602, at *5 (M.D. Fla. Oct. 6, 2009).

[58] *Publix,* 151 Fed. Appx. at 763, 769.

[59] *Id.* at 769.

[60] *Id.*

The Seventh Circuit's decision in *Stollings v. Ryobi Techs., Inc.* is particularly instructive here.[61]  In *Stollings*, the Court found that an irrelevant and prejudicial trial theme relating to the motive for filing suit merited a new trial.  In *Stollings*, the plaintiff was injured in a table saw accident and sued Ryobi, the saw manufacturer, contending certain safety features would have prevented the accident.[62]  After the jury returned a verdict in favor of Ryobi, Stollings appealed and argued that the district court erred by "failing to stop Ryobi's counsel from arguing to the jury that Stolling's counsel brought the case as part of a joint venture with the inventor of the" safety features that allegedly would have prevented the accident.[63]

The Seventh Circuit found that from start to finish during trial, "Ryobi framed the case for the jury" as what the district court referred to as a "conspiracy" focusing on the "motives of Stolling's counsel."[64]  Although the trial judge "realized that Ryobi's arguments had gone too far," his mitigation attempts (allowing Stollings to try to rebut the accusations, and trying to properly instruct the jury) were insufficient to correct the prejudicial error.[65]  The Court of Appeals chastised Ryobi's conspiracy argument as "not relevant to any issue in dispute" and noted that it "worked by directing the jury's focus away from elements of the case to an extraneous and inflammatory consideration."[66]  Applying factors similar to those applied by the Eleventh Circuit in *Joseph*,[67] the Court concluded that that "[t]he improper statements were prejudicial because they constituted a substantial part of the case, they were

---

[61] 725 F.3d 753 (7th Cir. 2013).

[62] *Id.* at 756.

[63] *Id.*

[64] *Id.* at 758; *see also id.* at 762 ("This sustained focus on the motives of plaintiff's counsel in all phases of the trial was substantial."); *W.V. Realty, Inc. v. Northern Ins. Co. of N.Y.*, 334 F.3d 306, 317 (3rd Cir. 2003) (noting that the "way in which [] evidence was presented to the jury" sufficiently "enhanced" its prejudicial effect necessitating a new trial).

[65] *Stollings,* 725 F.3d at 760.

[66] *Id.* at 761.

[67] *Id.* at 760.

not invited by Stollings, they could not be rebutted effectively, an effective curative instruction was not given, and the weight of the evidence was not overwhelmingly in Ryobi's favor."[68]  The court further noted that once Ryobi's argument was raised:

> Stollings had to choose between two bad alternatives.  He could spend time addressing the argument and risk suggesting to the jury that it was important, or he could do his best to ignore the argument and hope the jury focused on the elements of the case.  The fact that Stollings faced this dilemma does not mean that he had an adequate opportunity to rebut the argument.[69]

With regard to judgment as a matter of law pursuant to Rule 50, the question for the court is "whether the evidence is 'legally sufficient to find for the party on that issue.'"[70] "[A] party is entitled to judgment as a matter of law 'if during a trial by jury the opposing party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the opposing party on that issue."[71]  The standard for a motion under Rule 50 is the same as for summary judgment under Rule 56.[72]  Admissions by a witness may be sufficient to support entry of judgment as a matter of law.

### D. Evidence of a Party's Motivation for Filing Suit Is Rarely Discoverable or Admissible, Particularly In a Jury Trial

A party's motivation for filing a lawsuit or claim is rarely relevant to a claim or defense as the *Stollings* court recognized.  Because of the very limited circumstances in which motivation for filing suit may be relevant, it is a rare circumstance in which even *discovery* of the plaintiff's motivation for filing suit is allowed.  In a seminal case on the issue,  in *Foremost Promotions, Inc. v. Pabst Brewing Co.*, the court considered whether Rule 26 allowed for discovery concerning plaintiff's motivation for filing a complaint for

---

[68] *Id.* at 762.

[69] *Id.* at 763.

[70] *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1247 n.8 (11th Cir. 2008).

[71] *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003) (quoting *United States Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1288 (11th Cir. 2001)).

[72] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Torjagbo v. United States*, 285 Fed. Appx. 615, 619 (11th Cir. 2008) (citing *Anderson*).

suppression of competition pursuant to the Sherman Act and state law.[73]  The court held that

such discovery was "not in any way relevant to the trial of the particular issue" and stated

that "[i]t is difficult to see how an inquiry into the circumstances surrounding the instigation

of the action could affect the substance of the claim."[74]  Similarly, as a Pennsylvania federal

court stated in a decision denying a motion to compel "motivation" evidence:

> The Lease is either a violation of the law, or it is not.  The Defendants either
> intended to illegally benefit from the lease or they did not.  Answering these
> questions does not depend on the Relators' credibility or their motivations in
> filing suit.  Even if Relators filed suit to further their own interests, that does
> not affect whether the Defendants violated the law.[75]

Similar reasoning applies to a wide variety of claims,[76] including patent claims.  In

*Digital Equipment Corp. v. System Industries., Inc.*, relying on the *Foremost* reasoning (and

numerous cases citing it), the court granted a protective order prohibiting defendants from

seeking testimony concerning plaintiff's motive for instituting a patent infringement lawsuit,

even where the defendant asserted that the plaintiff knew the patents were obtained

fraudulently and was knowingly asserting invalid patents.[77]

Because the subjective intent of the plaintiff is rarely relevant, there is little case law

discussing the admissibility of such evidence.  However, where discovery reveals some

evidence of the plaintiff's motivation for filing suit and admissibility is litigated, the evidence

---

[73] 15 F.R.D. 128, 128-29 (D. Ill. 1953).

[74] *Id.* at 130.

[75] *United States ex rel. Singh v. Bradford Reg. Med. Ctr.*, 249 F.R.D. 220, 224 (W.D. Pa. 2008); *see also Grammenos v. Allstate Ins. Co.*, No. 07-2725, ECF No. 95, 2009 U.S. Dist. LEXIS 37069, at *5 (E.D. Pa. Apr. 30, 2009) (granting MIL, stating "[t]o the extent Aclaim seeks to introduce this evidence to show Allstate's motivation in filing its fraud complaint against Aclaim, such evidence is irrelevant.").

[76] *Dyber v. Quality King Distributors, Inc.*, No. CV 06-735, ECF No. 17, 2006 U.S. Dist. LEXIS 89707, at *6 (E.D.N.Y. Dec. 12, 2006) (denying discovery concerning plaintiff's motivation for filing lawsuit, and stating "courts have held that a plaintiff's motive in bringing an action, even at the discovery phase, is irrelevant") (citations omitted); *see also Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, No. 88-9752, 1991 WL 183842, at *2, 4 (E.D. Pa. Sept. 16, 1991) (denying motion to compel documents allegedly relevant for showing motivation for bringing fraud claims).

[77] 108 F.R.D. 742, 743 (D. Mass. 1986).

is routinely excluded as evidenced by the following cases excluding both testimony and documents that reveal or relate to plaintiff's motivation for filing suit: *Allstate Ins. Co. v. Nassiri*;[78] *Weatherly v. Ala. State Univ.*;[79] *Haught v. U.S. Eng'r Contractors Corp.*;[80] *Georgeson v. DuPage Surgical Consultants, Inc.*;[81] and *Couch v. Village of Dixmoor.*[82] Excluding such evidence in a patent case, one court noted the extreme prejudice that may result if a jury is exposed to irrelevant "motivation" evidence:

> [M]uch of MOC's evidence deliberately highlights ITW's alleged misconduct, which could needlessly confuse the jury and tempt them to decide the patent infringement claims on the basis of equitable factors…**Presenting the jury with such evidence may contaminate their factual findings on legal issues, which must be made strictly on the basis of the evidence and the law, _without reference to considerations of fairness or equity._** [83]

In the limited circumstances where "motivation" or "intent" might be found to be relevant, an extremely high threshold showing must be made before such evidence is considered. Even then, the evidence is only to be considered by the Court – not a jury. The *Noerr-Pennington* doctrine protects the First Amendment right to petition courts by granting parties immunity from suit based on litigation conduct, even if that conduct has or may have an anticompetitive effect.[84] Immunity, however, does not extend to so-called "sham"

---

[78] No. 2:08-CV-369, 2013 WL 239416, at *5-16 (D. Nev. May 30, 2013) (granting MIL "to preclude any reference to the intent of plaintiffs in bringing this action").

[79] No. 2:10CV192, 2012 WL 274654, at *3 (M.D. Ala. Jan. 31, 2012) (excluding exhibits that "would be used to question the Plaintiff's motives for filing this lawsuit.").

[80] No. 07-80436-CIV, 2009 WL 36591, at *3 (S.D. Fla. Jan. 6, 2009) (granting MIL, stating "the nature of Plaintiffs' motivation in filing this action, … is irrelevant to whether Defendants violated the FLSA.").

[81] No. 05 C 1653, 2007 WL 914207, at *2 (N.D. Ill. Mar. 22, 2007) (granting MIL, finding "[e]vidence of [plaintiff's] motivation for filing this suit will shed no light on either his rights or the defendants' alleged violations of those rights, and therefore his alleged motivation is irrelevant.").

[82] No. 05 C 963, 2006 WL 3409153, at *3 (N.D. Ill. Nov. 27, 2006) (granting MIL to exclude evidence of "plaintiff's motives for filing suit").

[83] *Illinois Tool Works, Inc. v. MOC Prods. Co.*, 946 F. Supp. 2d 1042, 1046 (S.D. Cal. 2012) (emphasis added).

[84] *See United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).

litigation,[85] but the Supreme Court has been careful not to allow parties to call a lawsuit a "sham" merely because of an allegedly improper motivation. The Court has held that a plaintiff's subjective intent — its motivation — is irrelevant unless and until the party asserting that litigation is a sham proves that the underlying litigation is objectively baseless.[86] "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."[87] Pursuant to this test, the Supreme Court in *PRE* found that the "Court of Appeals properly refused PRE's request for further discovery on the economic circumstances of the underlying copyright litigation" because Columbia's "economic motivations in bringing suit…were rendered irrelevant by the objective reasonableness of the litigation."[88] It is rare, ***even where sham litigation is asserted***, that "motivation" can become relevant, and even then, it is only relevant for the court – not the jury – after a court has determined that the litigation was objectively baseless.[89]

This high bar further demonstrates that motivation evidence and argument should not have been introduced in this case. BlackBerry did not assert sham litigation here, nor could it do so. To have argued sham litigation, BlackBerry would have had to meet the "objectively

---

[85] *Noerr*, 365 U.S. at 144.

[86] *Prof'l Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 57 (1993).

[87] *Id.* at 60.

[88] *Id.* at 65-66.

[89] *See, e.g., Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1233-35 (11th Cir. 2005) (the district court decision "properly found that Elan was immunized from antitrust liability for filing infringement proceedings against Andrx"); *see also Rolex Watch U.S.A., Inc. v. Rainbow Jewelry, Inc.*, No. 12-21437-CIV, 2012 WL 4138028, at *2-3 (S.D. Fla. Sept. 19, 2012) (finding trademark infringement claim not subject to the sham litigation exception to the *Noerr-Pennington* doctrine); *PODS Enters., Inc. v. ABF Freight Sys., Inc.*, No. 8:11-cv-84, 2011 WL 4948397, at *3-6 (M.D. Fla. Oct. 17, 2011) (same); *Q-Pharma, Inc. v. Andrew Jergens Corp.*, No. C01-1312P, ECF No. 120, 2002 U.S. Dist. LEXIS 27222, at *26 (W.D. Wash. Nov. 18, 2002) (granting summary judgment of "sham" litigation counterclaim where suit not objectively baseless and denying additional discovery because "[a]ny discovery would only lead to evidence of [plaintiff's] subjective actions and intent in its decision to file its lawsuit"). The two-pronged objective/subjective approach set forth in *PRE* is also applied in patent cases to determine whether the doctrine of patent law preemption applies to state law tortious interference or unfair competition claims. *Mikhon Gaming Corp. v. Acres Gaming*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1258 (Fed. Cir. 2008).

baseless" standard of *PRE*, which it cannot do. Even still, the evidence regarding intent would not have gone to the jury, as it did here. BlackBerry effectively received the benefit of making a sham litigation claim without having to meet the standards for asserting such a claim set out by the Constitution and the Supreme Court.

### E. The Improper Admission of Evidence and Arguments Relating to NXP's Motivation Substantially Prejudiced the Outcome

NXP's motivation (or subjective intent) was never relevant to any issue in this case — a standard patent infringement case. NXP asserted that BlackBerry infringed three patents and was entitled to reasonable royalty damages.[90] BlackBerry contended that the patents were not infringed and were invalid, and disputed NXP's entitlement to damages.[91] As evidenced by the jury instructions ultimately given in this case, NXP's ***subjective intent was not an element of or otherwise relevant to any claim or defense in this case***.[92] Evidence and argument relating to NXP's "motivations for suit and financial considerations" should have been excluded as irrelevant.

Admission of BlackBerry's prejudicial extortion scheme arguments deprived NXP of a fair trial. By its own proud admissions, during trial, BlackBerry framed the case for the jury as an extortion scheme, focusing on the alleged motives of NXP and its management, legal team, and sales team, in concert with IPValue. To find that admission of the extortion scheme argument was prejudicial and directly impacted the outcome, the Court need look no further than BlackBerry's own description of the outcome in this case: "As the jury no doubt recognized, this case was never about patent rights; it was a thinly veiled attempt to capture BlackBerry's revenue by any available means."[93]

---

[90] Pretrial Statement at 2-4.
[91] *Id.* at 4-5.
[92] 4/17/14 Final Jury Instructions (Doc. 483).
[93] Doc. 506 at 1.

Beyond BlackBerry's admission, the record confirms the prejudicial impact. Here, as in *Stollings*, the Court's ruling on the third day of trial created a highly prejudicial dilemma. NXP had to choose either to ignore the merits of its claims and focus on rebutting the extortion scheme arguments, or focus on the extortion scheme and highlight it even further for the jury. The dilemma was further exacerbated here by the timing of the Court's ruling. NXP had no preview of BlackBerry's extortion scheme theory, concocted by BlackBerry's new counsel in the two months before trial at great expense. It was not until well into Plaintiff's case — right before NXP's next-to-last witness, Aaron Waxler, took the stand — that this issue was resolved. NXP then had to offer Mr. Waxler for cross examination without any sense of the approach BlackBerry would take. Further, as in *Stollings*, the number of items admitted and argued under the erroneous ruling regarding "motivations for suit and financial considerations" weighs in favor of new trial. The irrelevant evidence includes the "target"/"hypergrowth" presentation, the emails between the sales people and between sales and legal, the so-called "attack team" email, the evidence of NXP's losses, the majority of Mr. Troiolo's testimony, the 2010 IPValue Document and related IP Value documents, and all arguments relating to any of these items.[94]

Finally, on the merits, the jury should have found for NXP. Aside from BlackBerry's own admission about the impact of the extortion scheme theory on the jury, the most compelling proof that the jury was unduly prejudiced is the jury's verdict that '455 patent was both not infringed and invalid. BlackBerry did not present any evidence from which the jury could have found that the '455 patent was ***both*** not infringed ***and*** invalid. The fact that the jury accepted both arguments even though they were logical alternates strongly suggests that the jury was unduly influenced by BlackBerry's extortion scheme argument to simply

---

[94] DX 1093; DX 1021; DX 101; DX 934; DX 37; 4/2/13 Trial Tr. 75:13-19-17 (R. Troiolo)

rule against NXP across the board. That influence extended to the jury's verdict on the '654 and '420 patents as well. Similar to the *Stollings* case, the jury was unduly influenced by BlackBerry's extortion scheme presentation at trial; thus a new trial is warranted.

### 1.     NXP is entitled to Judgment as a Matter of Law that the '455 Patent is Infringed

NXP demonstrated that the accused BlackBerry devices infringed claims 13-17 of the '455 patent because they practiced each limitation of the asserted claims read in light of the proper claim construction.[95] JMOL and a new trial are warranted because Dr. Heegard's non-infringement theory relied on the wrong claim construction, and because no reasonable jury could have found for BlackBerry unless it ignored the merits of NXP's claims and decided the matter based on BlackBerry's extortion scheme argument.

At trial, NXP presented the documentary evidence and the expert testimony of Joel Williams regarding the infringement of the '455 patent. As set forth in Appendix A to the jury charge, [96] the Court defined the "second data transmission rule" as follows:

> In other words, the Court understands Claim 13 to disclose a device for which a **second data transmission rule expands the range of element IDs** so that a **new element ID** can flag the device as one capable of communicating at a greater number of data transmission rates.[97]

Applying the Court's construction, Mr. Williams explained that the "first data transmission rule" of claim 13 of the '455 patent was the rule in the 802.11b standard that allowed for a maximum of eight data rates.[98] With respect to the "second data transmission rule," Mr.

---

[95] *See* 4/3/14 NXP's Motion for Judgment as a Matter of Law (Doc. 469) at 3-5, incorporated by reference.

[96] 4/4/14 AM Trial Tr. 49:2-52:4. Upon review, Appendix A was not filed on the Court's Docket as having been included in the Instructions Provided to the Jury (Doc. 483). If Appendix A was not provided, then the jury was never properly instructed on the Court's claim construction, necessitating a new trial since the jury should not have been left to determine the meaning of the claims on its own. The instructions indicated that the construction would be attached as Appendix A and provided to the jury.

[97] *Id.* at 1-2 (emphasis added).

[98] 3/27/14 Trial. Tr. 137:12-16, 140:7-17 (J. Williams).

Williams explained that the 802.11g standard and the accused devices implemented a second rule to expand the number of data rates beyond eight, while maintaining backward compatibility via a second information element defined by a second standardized ID value of 50.[99] Mr. Williams showed, consistent with the Court's claim construction, that this second data transmission rule expanded the value range of element IDs to permit an additional element ID, and that the second element ID flagged the device as one capable of communicating at a greater number of data rates.[100] Mr. Williams introduced his testing, which showed that the accused BlackBerry devices included the first and second data transmission rules.[101]

BlackBerry relied on the testimony of Dr. Heegard to challenge infringement. Dr. Heegard's opinions were premised on his theory that there was no infringement because the 802.11g standard and BlackBerry devices did not have a "second data transmission rule."[102] According to Dr. Heegard, the second data transmission rule needed to do more than "expand[] the range of element IDs so that a new element ID can flag the device as one capable of communicating at a greater number of data transmission rates" as set forth in the Court's claim construction. Instead, his nonfinfringement theory testimony added a self-imposed claim requirement that the second rule must work **differently** from the first data transmission rule, for example by restricting which rates could go in which rate element.[103]

---

[99] *Id*. at 137:17-138:15, 146:20-147:13, 148:4-19, 152:7-11.
[100] *Id*. at 148:23-149:2 ("Q. Now, does the second data transmission rule of the '455 patent expand the range of element IDs? A. Yes, it does. Again, it started initially – there was – the range was one, and it expanded it to two. You had two data rates and two information elements, two IDs."), 150:9-152:21 ("And so when the receiver receives this new element ID, it knows that there's more information — more data rates available than before.").
[101] *Id*. at 164:14-192:11; PX 2071.
[102] 4/1/14 Trial Tr. 71:4-10 (C. Heegard) ("[I]t's my opinion that the 802.11g devices or the standard itself, actually, or devices that implement the standard do not infringe the patent because there is no second data transmission rule that's defined in the 802.11g."); *see also* 4/4/14 PM Trial Tr. 64:17-67:12 (closing argument).
[103] 4/1/14 Trial Tr. 90:9-91:8, 95:22-96:17 (C. Heegard). This was a new theory for non-infringement, not previously disclosed in BlackBerry's expert reports or motion for summary judgment. NXP repeatedly raised

Dr. Heegard repeatedly testified that the "extended supported rates element" in the 802.11g standard (ID 50) was not a second data transmission rule because it operated the same way as first data transmission rule, *i.e.*, the "supported rates element."[104]

But this "requirement" was not found in the language of the claims or the Court's construction. BlackBerry prompted the jury to adopt this new meaning, even though it contradicted the Court's construction. On cross-examination, Dr. Heegard admitted that there was nothing in the Court's construction to support his new construction:

> Q. Can you answer the question as to whether there's anything in the March 4th order [Clarifying Order] that suggests that the first and the second [data transmission rules] must be different other than that the second must signify the device is capable of communicating at more than 8 rates?
> A. I don't think its addressing that question.
> Q. So the answer is no?
> A. The answer is no.[105]

The entirety of Dr. Heegard's testimony on direct examination ignored the Court's claim construction. But this is not a dispute of fact; a dispute concerning ***claim interpretation*** is a legal issue decided by the Court.[106] BlackBerry's arguments to the jury in contradiction of a claim construction constituted legal error.[107] Because this is the only "evidence" BlackBerry

---

objections to BlackBerry's theory including when BlackBerry attempted to advance such theory during Mr. William's cross examination. 3/27/2014 Trial Tr. 207:19-211:21, 213:13-214:11, 223:19-224:19 (J. Williams); 3/28/2014 Trial Tr. 2:2-12:6 (J. Williams); 4/1/14 Trial Tr. 67:22-70:14, 94:5-95:16 (C. Heegard).

[104] 4/1/14 Trial Tr. 88:4-8; 88:24-89:3; 92:2-9 (C. Heegard).

[105] *Id.* at 138:4-11.

[106] *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008), 521 F.3d at 1360; *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997) ("Where the parties do not dispute any relevant facts regarding the accused product . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment."); *see also George v. Honda Motor Co.*, 802 F.2d 432, 434 (Fed. Cir. 1986) ("The determination of scope of the claims is a question of law, and a dispute respecting that legal issue does not preclude summary judgment").

[107] *O2 Micro*, at 1361-62 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute. . . . By failing to construe this term, the district court left the jury free to consider these arguments.").

presented to the jury relating to non-infringement, judgment as a matter of law should be granted to NXP.[108]

The facts of this case are very similar to *Mannatech, Inc. v. Glycoproducts Int'l, Inc.*, in which the Court granted a renewed motion for judgment as a matter of law of infringement.[109] The court determined that the jury, in reaching a verdict of non-infringement, must have relied on an argument that was contrary to the court's claim construction.[110] The court noted that the jury "may not consider its own meanings for disputed claim terms" and "must apply the court's construction of those terms in its deliberations."[111] In light of the evidence adduced at trial, no reasonable jury could have determined that BlackBerry does not infringe the '455 patent.

### 2. NXP is Entitled to Judgment as a Matter of Law that the '455 Patent is Valid

BlackBerry did not demonstrate by clear and convincing that either of its two asserted references qualified as prior art — the "Fischer" reference was not publicly available or accessible, and BlackBerry did not establish that the relevant passages in the "Cole" reference were the work of someone other than a named inventor. BlackBerry did not apply the proper legal standard for anticipation: whether a person of *ordinary* skill in the art would understand a purported prior art reference to disclose each and every limitation of the claimed invention. In fact, the evidence established the opposite: when faced with the issue addressed in the '455 patent, not one of the hundreds of extraordinarily skilled participants in

---

[108] *Cytologix Corp. v. Ventana Med. Sys.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (high risk of confusion when experts opine on meaning of claims before the jury); *Callpod, Inc. v. GN Netcom, Inc.*, 703 F. Supp. 2d 815, 822 (N.D. Ill. 2010) ("Expert opinions that conflict with a court's established claim construction tend only to create confusion and are thus unhelpful to the jury."); *Promega Corp. v. Applied Biosystems, LLC*, No. 13-C-233, ECF No. 274, 2013 U.S. Dist. LEXIS 154690, at *18 (N.D. Ill. Apr. 4, 2013) (Posner, J.) (expert opinions contrary to claim construction order do not create a factual dispute).

[109] No. 3-06-CV-0471, 2008 WL 2704425 at *2-3 (N.D. Tex. July 9, 2008).

[110] *Id.*

[111] *Id.* at *2 (citing *Sulzer Textil A.G. v. Picanol NV*, 358 F.3d 1356, 1366-67 (Fed. Cir. 2004)).

the 802.11 working group (including BlackBerry's own expert, Dr. Heegard) turned to the "Fischer" teachings or even referenced them. Instead, led by Dr. Heegard, the 802.11g task group declined to add an additional data transmission rule or second data rate element, giving rise to the very problem that the '455 claims solved. BlackBerry bore the burden of proving invalidity by clear and convincing evidence. BlackBerry did not meet this burden and judgment should be entered for NXP on validity. Given the weight of the evidence, the jury must have been unduly prejudiced by BlackBerry's improper extortion scheme evidence and arguments.[112]

### a. BlackBerry Did Not Establish that "Fisher" or "Cole" Qualify as Prior Art

In order to rely on the "Fischer" references for anticipation, BlackBerry first had to prove that the references were "publicly known" or a printed publication that was "reasonably accessible."[113] BlackBerry failed to establish either. BlackBerry alleged that the "Fischer" reference was publicly distributed in advance of the November 2000 meeting of the IEEE 802.11 working group — but that version ("r0") did not include any discussion of the "open issue" identified as anticipatory by BlackBerry.[114] Although Mr. Fischer initially testified that he authored and presented subsequent versions of the document, he later admitted that he was *not* the author of any of them, but the editor.[115] When pressed, he admitted not only that he was not the sole editor, but that he may not have even been present when the later versions were purportedly created and presented because he had to leave the

---

[112] At a minimum, there is sufficient evidence to support a verdict in NXP's favor.

[113] 35 U.S.C. § 102.

[114] *See* DX 232 at 49-50; 3/31/14 Trial Tr. (M. Fischer) 175:9-18 ("When I reached Tampa, I had the original version. This [DX 231] is R-1 . . . ."), 180:11-19 ("It was a different proposal that I brought, that was presented, I think on Monday.")

[115] 3/31/14 Trial Tr. (M. Fischer) 172:18-175:8.

meeting early.[116]  Mr. Fischer deferred to the meeting minutes, which establish that he **actually was not  present** for the alleged discussion and presentation of document 360r1.[117] And even if reference may have been made to document 360 in an 802.11 session, the detailed meeting minutes do not mention the purportedly relevant section, the "open issue," any "enhanced rate element," or the "supported rate element."[118]  Simply put, BlackBerry offered no clear and convincing evidence that the allegedly anticipatory portions of the "Fischer" references were ever publicly presented, and the minutes and Mr. Fischer's testimony demonstrate the opposite.[119]

BlackBerry also did not show that the "Fischer" references were reasonably accessible to the public:  Dr. Shoemake admitted that IEEE documents were accessible only by title or document number (searching subject matter was not available).[120]  BlackBerry offered no evidence that the title of the "Fischer" reference, "QoS Baseline Proposal," or the references to "360r1" in the meeting minutes would have led a person of ordinary skill in the art to believe that it addressed the subject matter of the '455 patent, and the reference was not publicly accessible.[121]  Despite suggestions of web-based availability, the only documentary

---

[116] 3/31/14 Trial Tr. (M. Fischer) 177:9-178:5 ("no specific recollection" of the actual editors of document and "have not researched that, because I have not been asked that question before"); *id.* 178:13-179:5 ("Whether I am the person who typed [the open issue], I cannot say for sure."); *id.* at 187:16-188:9, 188:17-189:11.

[117] DX 120 at TGe Minutes p. 3 (PDF page 31) ("1.8.7.2 Substitute Editor for Wednesday and Thursday (when Michael has to leave)."), p.32 (adoption of r1 on Wednesday afternoon).  Although the meeting minutes report that Mr. Fischer attained 100% attendance, Dr. Shoemake testified that  under IEEE policy, "100-percent attendance doesn't necessarily mean that [an attendee] was at all of the meetings." 4/1/14 Trial Tr. 41:23-43:1 (M. Shoemake).

[118] 3/31/14 Trial Tr. 184:22-186:17 (M. Fischer) (unsurprising that it was not mentioned in minutes "because the primary concern of the Group did not concern that section" and "rates and possible enhanced rates was a minor side item, and therefore, not what was on most people's mind").

[119] *Id.*

[120] 4/1/14 Trial Tr. 53:6-54:11. (M. Shoemake).

[121] 4/1/14 Trial Tr. 53:3-54:1 (M. Shoemake).  The IEEE website also provided a document index, which included only the document number, author, and title.  *Id.* 54:2-15, 55:8-56:1, 57:3-18. *See In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989) (thesis not publicly accessible where no relationship between student's name and thesis subject for searching); *In re Bayer*, 568 F.2d 1357, 1358, 1361 (Fed. Cir. 1978) (thesis not publicly accessible where one would need to be informed of its existence and identify it by author or title or detailed

evidence showed that links to the "Fischer" references were omitted from the IEEE website during the relevant time period — proving a ***lack*** of accessibility.[122]  Because the "Cole" reference was also a similar working group presentation, BlackBerry likewise failed to prove its public accessibility.

BlackBerry failed to prove that the "Cole" reference is prior art for another reason — it failed to prove the alleged anticipatory disclosure was not from the inventor.  The "Cole" reference was dated less than one year before the filing date of the patent.[123]  Thus, if the inventor of the patent was the source of the information in the disclosure, it does not qualify as prior art under 35 U.S.C. § 102(a) because it is not a disclosure "by another."[124] BlackBerry failed to prove by clear and convincing evidence that the disclosure in "Cole" was from someone other than the inventor.

The "Cole" reference is a PowerPoint deck entitled "Slides to Assist with non-19 Comments."[125]  BlackBerry witness testimony confirmed that the deck actually contained the contributions of various members of the 802.11g task group that met in a sub-group to resolve the "non-clause 19" comments from Letter Ballot 33.[126]  The testimony also confirmed that the subject matter of the two allegedly anticipatory slides in the deck, slides 6 and 7, pertained specifically to comments raised by Dr. Gunnar Nitsche, a named inventor of

subject matter to locate it); *see also SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1196-97 (Fed. Cir. 2008) (requiring meaningful cataloging or indexing).

[122] PX 2299; 4/1/14 Trial Tr. 55:16-57:2 (M. Shoemake) ("But, I mean, certainly it's true that whatever we're looking at here, the range 351 to 400 for the year 2000, it doesn't appear to be listed.").  *See In re Lister*, 583 F.3d 1307, 1316-17 (Fed. Cir. 2009) (manuscript not publicly accessible in absence of any evidence of when it was posted to on-line databases).

[123] PX 230

[124] 35 U.S.C. § 102"the invention was known or used *by others* . . . before the intention thereof y the applicant . . ."  *See Pfizer Inc. v. Teva Pharms. U.S.A., Inc.*, 882 F. Supp. 2d 643, 702 n.58 (D. Del. 2012) (rejecting as prior art works authored by named inventors less than one year before the priority date of the asserted patent).

[125] DX 230; 4/1/14 Trial Tr. 16:13-18:9 (M. Shoemake); 4/1/14 Trial Tr. 123:11-124:16 (C. Heegard).

[126] DX 856 (native file, 11-02-209 Comment Resolution Excel Sheet); 4/1/14 Trial Tr. 32:24-33:5 (M. Shoemake).  The discussions extended across several IEEE meetings.  *Id.;* PX 2303.

the '455 patent in Letter Ballot 33,[127] and that Dr. Nitsche was present at the IEEE meetings in which his Letter Ballot 33 comments were discussed and the slide deck was created as the summary of those meetings.[128] BlackBerry's own witnesses conceded that there was no basis to suggest that the relevant comments came from someone other than Dr. Nitsche.[129] The evidence confirmed that Dr. Nitsche pointed out that the majority of the task group members erred in rejecting his comments.[130]

> ## b. BlackBerry Failed to Prove That Fischer Anticipates the Asserted Claims

Anticipation requires proof that each and every element, as set forth in the claim, is found in a single prior art reference, either explicitly or inherently.[131] The reference must disclose all of the limitations arranged in the same way as the challenged claim.[132] Anticipation must be assessed from the viewpoint of a person of ordinary skill in the art; the reference must enable such person to make the invention without undue experimentation.[133] BlackBerry did not demonstrate that an ordinarily skilled artisan would understand Fischer to

---

[127] 4/1/14 Trial Tr. 37:1-3 (M. Shoemake) ("Q. And we agree that comment 10 that's referenced on slide 6 is Mr. Nitsche's comment, correct? A. It is, that's correct."); *see also* DX 856; DX 230.

[128] PX 2303 (May 2002 Meeting Minutes) at Attendance List (PDF page 65), p. 13-17 (continued resolving LB #33 comments and expected to continue at July 2002 meeting); 4/1/14 Trial Tr. 35:2-36:25 (M. Shoemake) (Mr. Cole prepared slides during sub-group meeting based on group discussions), 40:13-42:4 (Dr. Nitsche in attendance at May 2002 meeting).

[129] 4/1/14 Trial Tr. 131:15-132:2 (C. Heegard) (did not know one way or another whether or not the content of slides 6 or 7 came from Gunnar Nitsche); 4/1/14 Trial Tr. 33:16-34:13 (M. Shoemake) (same).

[130] PX 989 (Letter Ballot 50) at 13-14 (row 72); DX 128.

[131] *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006).

[132] *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) ("We thus hold that unless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102."); *Vizio, Inc. v. ITC*, 605 F.3d 1330, 1342 (Fed. Cir. 2010).

[133] *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008); *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008).

teach each element of the claimed invention, nor enable one to make the inventions claimed in the '455 patent.[134]  In fact, the evidence demonstrated otherwise.

According to BlackBerry, the level of skill in the art was quite low: "someone with a bachelor's degree in electrical engineering and computer science or something related to that and some academic or work experience."[135]  The "Fischer" reference, however, merely commented on an "open issue" concerning a *different problem* (the maximum speed that could be encoded), and did not disclose the elements of the claim on its face.[136]  In particular, it did not disclose claim element (c), the principal limitation of the claim.   The "open issue" notation does not recite adding a "second data transmission rule" as interpreted by the Court; the "Fischer" reference makes *no mention* of the **number** of data rates — only the fastest rate that could be **encoded** under the then-existing scheme.[137]  BlackBerry did not present evidence to show that an artisan of ordinary skill (i.e., the skill level it advocated) would have understood a rate coding "open issue" to disclose the inventions claimed in the'455 patent, much less to have enabled such an artisan to make them.  Instead, BlackBerry offered testimony from extraordinarily skilled artisans — emphasizing their superior skill — to conclude with the blessing of hindsight that the mention of an "open issue" would have enabled them to solve the problems faced by the members of Task Group G, two years later, in the same way as the '455 inventors did.[138]  Because BlackBerry did not show that this was

---

[134] *Abington Textile Mach. Works v. Carding Specialists, Ltd.*, 249 F. Supp. 823, 829 (D.D.C. 1965) ("It should be emphasized that the legal standard of reference must be the person having 'ordinary' skill in the art.").
[135] 4/1/14 Trial Tr. 72:16-73:1 (C. Heegard).
[136] DX 229 at 50; DX 231 at 49-50 ("The *maximum rate* that can be represented in the supported rates element is 64 Mb/s, whereas any rate faster than 54 MB/s that is worth implementing is probably above 64 MB/s"); 4/1/14 Trial Tr. 111:25-112:14, 139:1-19 (C. Heegard) ("[Mr. Fischer] was trying to solve a different problem."); 3/31/14 Trial Tr. 166:17-167:1, 167:14-168:3  (M. Fischer) ("The problem concerned the supported rates element because it concerned *how you encoded rates*.").
[137] *Id.*
[138] Mr. Fischer testified about his decade of participation in IEEE working groups, and credited himself with authoring much of the original 802.11 standard.  3/31/14 Trial Tr. 162:24-163:16 (M. Fischer). Dr. Heegard relied on Mr. Fischer, boasting: "I doubt that anyone understands the Mac more than he does. And he cares for

true of someone with the proper level of skill in the art, no reasonable jury could have properly determined that the "Fischer" reference was anticipatory.

In any event, the "Fischer" reference did not provide a disclosure sufficient to enable a person of ordinary skill in the art to make '455 Claim 13. Apart from a single sentence concerning the maximum possible data rate that could be encoded in 802.11b, the "Fischer" reference did not set forth a particular solution, nor address the *number* of supported rates. Though "Fischer" made a passing reference to an "enhanced rate element," it did not recite a format or structure for such hypothetical element (and in fact, went on to suggest that other, different approaches would be preferred).[139] That the "Fischer" reference did not disclose the '455 inventions or enable a skilled artisan to make those inventions is confirmed by the contemporaneous record. Just two years after the supposed the of "Fischer" reference, when faced with the problem actually addressed by the '455 inventions in May 2002, not even the extraordinarily skilled members of the 802.11g task group turned to the "Fischer" reference; rather, the group consensus (led by Dr. Heegard and agreed to by Dr. Shoemake, the task group chair) was to *reject* the addition of an extended data rate element.[140] No reasonable jury could conclude that the '455 patent is anticipated by the "Fischer" reference as understood by a person of ordinary skill in the art.

Based on the evidence presented at trial, making all appropriate inferences and applying the clear and convincing standard, no reasonable jury could have concluded that the "Cole" reference was anticipatory prior art. And because the same is true for the "Fischer" references, judgment of validity of the '455 patent is warranted.

---

it, I mean, he thinks about it a lot." 4/1/14 Trial Tr. (C. Heegard) 104:3-18; *id.* 111:15-112:14 ("Michael Fischer lives — lived and breathed the Mac . . ."); *see also* 3/31/14 Trial Tr. (M. Fischer) 167:2-3 ("It was clear to those of us who had been working on wireless LANs *for a long time* that it needed to be fixed.").
[139] DX 229 at 50; DX 231 at 49-50.
[140] PX 2303 at TGg Minutes p. 11 (PDF page 107); 4/1/14 Trial Tr. (M. Shoemake) 39:17-40:9, 44:18-46:1.

### F. There Was No Evidence on Which the Jury Could Find the '455 Patent Both Invalid and Not Infringed

The clearest evidence that the jury was unduly prejudiced by BlackBerry's improper extortion arguments can be found in the verdicts on the '455 patent. In advocating non-infringement, Dr. Heegard told the jury that the claims required two *different* rules — that something must make each unique (e.g., restriction on placement of data rates, etc.).[141] Dr. Heegard, however, presented ***no evidence that either the "Fisher" or "Cole" references had these two different rules***. With regard to the "Cole" reference, Dr. Heegard explicitly stated that BlackBerry's invalidity theory applied only if the jury first accepted NXP's infringement theory.[142] With regard to the "Fischer" reference, Dr. Heegard relied solely on his claim that implementing the reference's suggestion, although not stated, would allow for more than 8 rates.[143] Dr. Heegard never attempted to show that either the "Cole" or "Fischer" reference disclosed "different" rules. Thus, absent the jury nullification that BlackBerry incited, there was no way that the jury could have found that BlackBerry's devices lacked the "different" rules allegedly required for infringement, but that its purported prior art references disclosed these "different" rules. This inconsistency alone demonstrates that the prejudice from BlackBerry's extortion argument and mandates a new trial.

### G. NXP Is Entitled To a New Trial on All Patents

Because NXP filed a pre-verdict JMOL on the '455 patent, this brief focuses on prejudice and evidence relating to that patent. NXP, however, is entitled to a new trial on all three patents. The irrelevant and highly prejudicial evidence and arguments were presented as applying to the case generally, not any specific patent. Further, NXP presented sufficient

---

[141] *E.g.*, 4/1/14 Trial Tr. (C. Heegard) 84:3-92:20 ("So there's no second rule associated with that. There's no requirement. It doesn't even tell you where to put which rates. You're allowed to mix them anyway you want. Just like groceries, you can move them anywhere you want, there's no requirement.").

[142] 4/1/14 Trial Tr. (C. Heegard) 72:4-15.

[143] *Id.* at 112:21-25.

evidence on which the jury could have found infringement of the '654 and '420 patents, and further demonstration that BlackBerry did not shoulder its high burden to invalidate those patents. For example, NXP showed that BlackBerry handsets with the Facebook application met each limitation of the '420 patent.[144] BlackBerry's retort relied on a "third branch" in which location data was "always used," but was forced to admit that no such code had been introduced into evidence, and claimed that its documentation describing communications with the Facebook "website" as "an error."[145] NXP presented ample evidence — including by reference to BlackBerry's source code and product testing — that all claim limitations of the '654 patent were met under the doctrine of equivalents.[146] BlackBerry's theories of invalidity on these patents was by no means unrebutted. A reasonable jury weighing the facts and not swayed by emotion could well have found that BlackBerry did not demonstrate invalidity of the '654 or '420 patents by clear and convincing evidence. Thus, NXP is entitled to a new trial on all patents.

## III.   CONCLUSION

For the foregoing reasons, NXP respectfully requests that the Court grant a new trial and enter judgment as a matter of law on infringement and validity of the '455 patent.

---

[144] 3/26/14 Trial Tr. 14:25-33:20, 39:16-40:9, 43:10-53:11 (D. Alpert); PX 255; PX 1928; PX 1931.

[145] 4/1/14 Trial Tr. 191:19-192:17, 193:1-12 (J. Ball).

[146] NXP preserves its objections and position regarding claim construction issues on all patents for appeal.

Dated: May 8, 2014

Respectfully Submitted,

*/s/ Denise M. De Mory*

Denise M. De Mory

Thomas a. Zehnder, Esq.
Florida Bar No.: 0063274
Taylor F. Ford, Esq.
Florida Bar No. 0041008
KING, BLACKWELL, ZEHNDER & WERMUTH P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
Email: tzehnder@kbzwlaw.com
Email: tford@kbzwlaw.com

Denise M. De Mory (Admitted *pro hac vice*)
Matthew F. Greinert (Admitted *pro hac vice*)
Aaron R. Hand (Admitted *pro hac vice*)
Cliff Win (Admitted *pro hac vice*)
BUNSOW, DE MORY, SMITH & ALLISON LLP
600 Allerton Street, Suite 101
Redwood City, CA 94063
Telephone: (650) 351-7248
Facsimile: (650) 351-7253
E-Mail: ddemory@bdiplaw.com
E-Mail: mgreinert@bdiplaw.com
E-Mail: ahand@bdiplaw.com
E-Mail: cwin@bdiplaw.com

**Counsel for Plaintiff NXP B.V.**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing document was electronically filed with the Clerk of the Courts by using the ECF system, which will send a notice of electronic filing to all counsel of record who have registered to receive notices from the Court under the CM/ECF system.  An unredacted copy of this brief will be served on opposing counsel by electronic mail.

Dated:  May 8, 2014

*/s/ Denise M. De Mory*

Denise M. De Mory
